## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SABRINA FELLOWS, EDMUND LYNN III, DONNA PATTON, WESLEY HALL, and NINA BUSTAMANTE-VICARIO, individually and as representatives of a class of participants and beneficiaries on behalf of the ALLIED UNIVERSAL HEALTH AND WELFARE BENEFIT PLAN,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNIVERSAL SERVICES OF AMERICA, LP d/b/a ALLIED UNIVERSAL, ALLIED UNIVERAL EMPLOYEE BENEFITS COMMITTEE, MERCER HEALTH AND BENEFITS ADMINISTRATION, LLC, LOCKTON COMPANIES, LLC, and JOHN DOES 1–20,<br><br>*Defendants*. | Civil Action No.    25-cv-10659<br><br>**CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED |

## COMPLAINT

1.    Plaintiffs Sabrina Fellows, Edmund Lynn III, Donna Patton, Wesley Hall, and Nina Bustamante-Vicario ("Plaintiffs"), individually and as representatives of a class of similarly situated participants and beneficiaries of the Allied Universal Health and Welfare Benefit Plan (the "Core Plan"), bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3) against Defendants Universal Servies of America, LP d/b/a Allied Universal; Allied Universal Employee Benefits Committee (collectively, "Allied Universal"); Mercer Health and Benefits Administration, LLC ("Mercer"); Lockton Companies, LLC ("Lockton"); and John Does 1–20 (collectively,

"Defendants") for breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      Plaintiffs allege that Defendants, as fiduciaries, violated their duties with respect to the management and administration of accident, critical illness, and hospital indemnity insurance programs ("Voluntary Benefits Insurance") offered as a plan governed by ERISA (the "Plan").

3.      Plaintiffs allege that as a result of Allied Universal's failure to exercise reasonable diligence in the administration of the Plan, including by failing to monitor, negotiate, and ensure prudent and reasonable carrier selection, broker commissions, and loss ratios for the Voluntary Benefits Insurance, Plaintiffs as participants of the Plan paid excessive and unreasonable premiums.

4.      Plaintiffs further allege that Allied Universal, Mercer, and Lockton, all fiduciaries of the Plan, engaged in self-dealing regarding the Plan, and that each was a knowing participant in the self-dealing of the others.

5.      Plaintiffs further allege that Mercer and Lockton are liable for disgorgement and other equitable relief as a party-in-interest, knowing participant in, and beneficiary of Allied Universal's fiduciary breaches.

6.      ERISA imposes strict fiduciary standards on employer-sponsored healthcare plans. Plan fiduciary duties are "the highest known to the law." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (citation omitted). Fiduciaries are to act with both prudence and loyalty, and "solely in the interest of the [ERISA plan] participants and beneficiaries[.]" *Id.* (quoting 29 U.S.C. § 1104(a)(1)).

7.     The marketplace for insurance services is established and competitive. Health plans that cover thousands of lives, like the Plan, have tremendous bargaining power to obtain high quality, low-cost voluntary insurance options. Instead of using the Plan's bargaining power to benefit participants, Defendants allowed unreasonable expenses to be charged to participants for their Voluntary Benefits Insurance, including by retaining brokers with unreasonable commission fee structures that similarly situated prudent fiduciaries would have removed.

8.     To remedy these breaches of duty, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore profits made through Defendants' use of Plan assets to the Plan. In addition, Plaintiffs seek equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.     **Subject-matter jurisdiction**. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2), and (a)(3).

10.    **Venue**. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is a district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one Defendant resides.

11.    **Standing**. Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. An action under § 1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v.*

*DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). "[T]he plan [i]s the victim of any fiduciary breach and the recipient of any relief." *Id.* at 254 (quotation marks omitted). Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plan.

12.    To the extent Plaintiffs must also show individual injuries, Plaintiffs have suffered such injuries from being subjected to the fiduciary breaches alleged herein, including by overpaying for Voluntary Benefits Insurance. This overpayment would not have been incurred but for Defendants' misconduct and self-dealing, thereby reducing the value of Plaintiffs' voluntary benefits. Further, a class action is the best vehicle to remedy Plaintiffs' injuries. *Cedeno v. Sasson*, 100 F.4th 386, 396 (2d Cir. 2024) ("ERISA contemplates plan-wide remedies, and only plan-wide remedies, to address certain breaches of fiduciary duties by plan fiduciaries.").

## PARTIES

### I.    Plaintiffs

13.    Sabrina Fellows resides in Chatworths, California, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Fellows began her employment with Allied Universal in 2016.[1] Ms. Fellows worked as a security guard, and as a participant of the Plan was enrolled in accident, critical illness, and hospital indemnity insurance. Ms. Fellows paid approximately $89.96 per year for accident insurance, $304.72 per year for critical illness

---

[1] When Ms. Fellows started Allied Universal was operating under the name Securitas.

insurance, and $124.28 per year for hospital indemnity insurance. Ms. Fellows ended her employment with Allied in May 2025. As described in more detail below, Ms. Fellows overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor the accident, critical illness, and hospital indemnity insurance.

14.     Edmund Lynn III resides in Salisbury, Pennsylvania, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Lynn began his employment with Allied Universal in 2021, and is currently employed by Allied Universal. Mr. Lynn works as a field supervisor, and as a participant of the Plan is enrolled in accident, critical illness, and hospital indemnity insurance. Mr. Lynn pays approximately $191.36 per year for accident insurance, $795.60 per year for critical illness insurance, and $283.92 per year for hospital indemnity insurance. As described in more detail below, Mr. Lynn overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor the accident, critical illness, and hospital indemnity insurance.

15.     Donna Patton resides in York, South Carolina, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Patton began her employment with Allied Universal 2022. Ms. Patton worked as a site supervisor, and as a participant of the Plan was enrolled in accident, critical illness, and hospital indemnity insurance. Ms. Patton paid approximately $89.96 per year for accident insurance, $574.08 per year for critical illness insurance, and $124.28 per year for hospital indemnity insurance. Ms. Patton ended her employment at Allied in 2025. As described in more detail below, Ms. Patton overpaid for critical illness insurance because of Defendants' failure to negotiate the price of and monitor the accident, critical illness, and hospital indemnity insurance.

16.     Wesley Hall resides in Lynnwood, Washington, and is a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Hall began his employment with Allied Universal in 2021, and is currently employed by Allied Universal. Mr. Hall works as a security guard, and as a participant of the Plan is enrolled in accident, critical illness, and hospital indemnity insurance. Mr. Hall pays approximately $76.44 per year for accident insurance, $126.88 per year for critical illness insurance, and $112.32 per year for hospital indemnity insurance. As described in more detail below, Mr. Hall overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor the accident, critical illness, and hospital indemnity insurance.

17.     Nina Bustamante-Vicario resides in Houston, Texas, and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Bustamante-Vicario began her employment with Allied Universal in 2018, and is currently employed by Allied Universal. Ms. Bustamante-Vicario works as a shift supervisor, and as a participant of the Plan was enrolled in accident, critical illness, and hospital indemnity insurance. Ms. Bustamante-Vicario paid approximately $89.96 per year for accident insurance, $280.80 per year for critical illness insurance, and $124.28 per year for hospital indemnity insurance. As described in more detail below, Ms. Bustamante-Vicario overpaid for accident, critical illness, and hospital indemnity insurance because of Defendants' failure to negotiate the price of and monitor the accident, critical illness, and hospital indemnity insurance.

## II.    Defendants

### A.    Allied Universal

18.     Allied Universal is a privately held security and facilities company, with dual headquarters in Irvine, California and Conshohocken, Pennsylvania.

19.     Allied Universal employs over 800,000 people globally and over 300,000 people in the United States. Its total yearly revenues exceed $20 billion.

20.     Allied Universal is the Plan's sponsor under 29 U.S.C. § 1002(16)(B).

21.     Allied Universal also is the named fiduciary of the Plan under 29 U.S.C. § 1102(a)(2).

22.     Allied Universal served in these roles throughout the class period.

23.     As alleged herein, Allied Universal exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

24.     As the employer of the participants in the Plan and fiduciary of the Plan, Allied Universal is a party in interest. 29 U.S.C. § 1002(14)(A) and (C).

25.     The Allied Universal Employee Benefits Committee (the "Committee") is the Plan's administrator pursuant to 29 U.S.C. § 1002(16)(A)(i). The Committee has fiduciary responsibility for the Plan. As alleged herein, the Committee exercised discretionary authority or discretionary management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. §§ 1002(21)(A)(i) and (iii).

26.     John Does 1–20 are Allied Universal's delegees who exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, were fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

B.    Mercer

27.    Mercer[2] is a subsidiary of Marsh McLennan (NYSE: MMC), a publicly traded professional services and insurance brokerage firm, organized under the laws of Delaware, with its principal place of business in New York, New York.

28.    Marsh McLennan reported that it had over 90,000 employees and over $24.5 billion in revenue in 2024.

29.    As alleged herein, Mercer exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

30.    Mercer has engaged in a consistent business practice of providing things of value to employers in exchange for permitting excessive commissions to be embedded in employee premiums.

31.    Allied Universal likewise received improper benefits in connection with the excessive commissions charged to Voluntary Benefits Insurance participants in this case.

32.    As an entity providing services to the Plan, Mercer is a party in interest. 29 U.S.C. § 1002(14)(B).

---

[2] The Plan's Form 5500s filed with the Department of Labor in some years list Mercer Health & Benefits, LLC as broker and in other years list Mercer Health & Benefits Administration, LLC as broker. Mercer Health & Benefits Administration, LLC is the entity most recently listed as broker on the Plan's Form 5500.

C.      Lockton Companies, LLC

33.     Lockton is a privately held insurance brokerage firm organized under the laws of Delaware, with its principal place of business in Kansas City, Missouri.

34.     Lockton reports that it has over 13,000 employees and annual revenue of over $4 billion.

35.     As alleged herein, Lockton exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

36.     Lockton has engaged in a consistent business practice of providing things of value to employers in exchange for permitting excessive commissions to be embedded in employee premiums.

37.     Allied Universal likewise received improper benefits in connection with the excessive commissions charged to Voluntary Benefits Insurance participants in this case.

38.     As an entity providing services to the Plan, Lockton is a party in interest. 29 U.S.C. § 1002(14)(B).

**ERISA'S FIDUCIARY STANDARDS**

39.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

. . . [and]

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

40.    Under ERISA, fiduciaries that exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets is no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

41.    Supplementing these general fiduciary duties, certain transactions are prohibited *per se* by 29 U.S.C. § 1106 because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that the fiduciary

shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or]
…
(C) furnishing of goods, services, or facilities between the plan and party in interest; [or]

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

42.     Under 29 U.S.C. § 1106(b), fiduciaries are prohibited from engaging in self-dealing with Plan assets. Section 1106(b) provides that the fiduciary shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

43.     Section 1106(b) "is designed to prevent a fiduciary 'from being put into a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Leber v. Citigroup, Inc.*, No. 07-9329-SHS, 2010 U.S. Dist. LEXIS 25097, at *32 (S.D.N.Y. Mar. 16, 2010) (quoting *NLRB v. Amax Coal Co.*, 453 U.S. 322, 333–34 (1981)); *see also* 29 C.F.R. § 2550.408b-2(e)(1).

44.     As further set forth in 29 C.F.R. § 2550.408b-2(e)(1):

These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

45.     ERISA also imposes co-fiduciary liability upon plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

In addition to any liability which he may have under any other provisions of this part . . . , a fiduciary with respect to a plan shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)    if, by his failure to comply with section [1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## FACTS APPLICABLE TO ALL COUNTS

### I. Voluntary Benefit Plans

A.    Overview

46.    In addition to traditional employee welfare benefits (*e.g.*, medical, dental, life, and disability insurance), employers often provide their employees with the opportunity to purchase voluntary benefits, such as accident, critical illness, hospital indemnity, and cancer insurance. Unlike traditional benefits, which are usually subsidized by the employer, the entire cost of these voluntary benefits is paid by the employee through a payroll deduction.

47.    Some employer-sponsored voluntary insurance programs cover specific health-related events, paying out a lump-sum or fixed amount when participants file a claim.[3]

48.    Because medical costs are rising, voluntary benefits are often marketed by their promoters as a way to close the gap between traditional health insurance coverage and additional medical costs incurred by participants.[4]

---

[3] Cindy Goff, *Model 171 Benefits Overview: Presented to the NAIC Accident and Sickness Minimum Standards (B) Subgroup*, AMERICAN COUNCIL OF LIFE INSURERS, 8 (Sept. 20, 2021), https://content.naic.org/sites/default/files/call_materials/Supplemental%20Benefits%20Overview.pdf archived at https://perma.cc/RX89-6UC4.

[4] *Voluntary Benefits*, BAMBOOHR, https://www.bamboohr.com/resources/hr-glossary/voluntary-benefits (last visited Dec. 22, 2025) archived at https://perma.cc/2UV2-VZMV.

49.     Because the benefits are designed to address financial distress that may occur in the case of unexpected injuries, illnesses and hospitalizations, the types of employees who typically purchase voluntary benefits, and those to whom the benefits are marketed, are often rank-and-file employees.

50.     Examples of employer-sponsored voluntary insurance policies include accident-only, critical illness, hospital indemnity, and cancer insurance.[5]

51.     Accident-only policies are marketed by their promoters as paying participants a lump-sum or fixed amount when the participant incurs an accident that results in injuries that require hospitalization. The funds are promoted as needed for out-of-pocket or unexpected medical costs not covered by traditional health insurance.[6]

52.     Critical illness policies are marketed by their promoters as paying participants a lump sum when they are diagnosed with a major illness.[7]

53.     Cancer policies similarly are marketed by their promoters as paying participants a lump sum if they are diagnosed with cancer.[8]

54.     Hospital indemnity policies are marketed by their promoters as paying participants a fixed amount when they are admitted to the hospital or need other outpatient care. These policies typically pay a daily benefit for each day of hospitalization, as well as a fixed amount based on certain medical events occurring.[9]

---

[5] *Id.*
[6] Goff, *Model 171 Benefits Overview*, *supra* note 3.
[7] *Id.*
[8] *Id.*
[9] *Id.*

55.     While voluntary benefits have existed for decades, recent market trends indicate that employers increasingly offer voluntary benefits.[10]

56.     A recent study found a 27% increase in the number of employers offering voluntary benefits.[11]

57.     In 2018, nearly one-third of eligible employees enrolled in voluntary benefits. "According to a study conducted by Eastbridge Consulting Group, the overall average participation rate increased from 21% in 2014 to 28% in 2017. Those rates have been increasing over the last two to three years, according to data from survey participants found in the 2017 'Voluntary Participation Rates Spotlight Report.'"[12]

58.     In 2021, nearly 60% of employers elected to offer four or more income protection and/or specialty products.[13]

59.     Employers who sponsor these plans must comply with ERISA.[14]

60.     "A recent analysis by ComplianceBug… discovered more than 80% of 'worksite and voluntary benefits' plans are . . . subject to ERISA despite employers (and their brokers) believing the plans were exempt from compliance requirements under DOL Reg. § 2510.3-1(j) 'voluntary plan safe harbor.'"[15]

---

[10] Prabal Lakhanpal, *Tackling employee benefits and third party risks*, SPRING CONSULTING GROUP (Aug. 12, 2021), https://www.springgroup.com/tackling-employee-benefits-and-third-party-risks/ archived at https://perma.cc/N8YC-R3T3.

[11] Amanda Umpierrez, *More Employers Are Engaging With Voluntary Benefits*, PLANSPONSOR (Apr. 15, 2021), https://www.plansponsor.com/employers-engaging-voluntary-benefits/ archived at https://perma.cc/7TD9-3T78.

[12] Phil Albinus, *Voluntary enrollment rates rise 'higher than predicted'*, EMPLOYEE BENEFIT NEWS (Jan. 1, 2018), https://www.benefitnews.com/advisers/news/voluntary-enrollment-rates-rise-higher-than-predicted archived at https://perma.cc/6WY4-WK5H.

[13] Umpierrez, *More Employers Are Engaging With Voluntary Benefits*, *supra* note 11.

[14] *Worksite & voluntary benefits carry significant ERISA compliance risk*, COMPLIANCEBUG, https://www.compliancebug.com/voluntary-benefits-carry-significant-compliance-risk/ (last visited Dec. 22, 2025) archived at https://perma.cc/R7VU-W5FC.

[15] *Id.*

61.     For a voluntary benefit plan to be eligible for the voluntary plan safe harbor

provision contained in 29 C.F.R. § 2510.3-1(j), the Plan must meet all four of the following

requirements:

> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or
> members;
> (3) The sole functions of the employer or employee organization with respect to the
> program are, without endorsing the program, to permit the insurer to publicize the
> program to employees or members, to collect premiums through payroll deductions
> or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form
> of cash or otherwise in connection with the program, other than reasonable
> compensation, excluding any profit, for administrative services actually rendered
> in connection with payroll deductions or dues checkoffs.

62.     But "[a]n [employer] will be considered to have endorsed a group . . . insurance

program if the [employer] expresses . . . any positive, normative judgment regarding the

program." DOL Adv. Op. 1994-23A.

63.     Additional actions that may subject voluntary benefit plans to ERISA's

requirements include "exclusively notifying the [insurance] carrier of newly eligible employees,

issuing exclusive enrollment reminders via email (considered endorsement), and receiving

additional services from brokers which can be considered 'compensation'" as well as taking

"credit" for the voluntary plan by "including the employer's logo on communication materials,

and assisting with 'marketing' the plan."[16]

64.     Here, not only do Allied Universal's actions subject the Plan to ERISA's

requirements, but Allied Universal concedes in its Form 5500s publicly filed with the U.S.

Department of Labor ("DOL") that the Plan is subject to ERISA.

---

[16] *Id.*

B.    Role of Employers

65.    ERISA imposes fiduciary responsibilities with respect to the administration of voluntary benefit plans upon employers offering such plans.

66.    An entity "is a fiduciary with respect to a plan" if it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

67.    Under ERISA, employers have a duty to select insurers for their employees with care. *Radford Tr. v. First UNUM Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 249 (D. Mass. 2004).

68.    Plan sponsors have a fiduciary duty to diligently and prudently select voluntary insurance benefit administrators. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008) (describing the process of "buy[ing] insurance for others" in an ERISA-governed plan, including selecting an administrator and evaluating rates and claims processing ability); *see also* 29 U.S.C. § 1002(21) (fiduciary is one who exercises "discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets").

69.    Prudent fiduciaries monitor compensation of *all* plan service providers, to ensure those service providers are receiving only reasonable compensation for services to the plan. *E.g.*, *Neufeld v. Cigna Health & Life Ins. Co.*, No. 17-01693, 2018 U.S. Dist. LEXIS 147726, at *37–41 (D. Conn. Aug. 30, 2018) (excessive undisclosed spread compensation collected by defendants breached their fiduciary duties of loyalty and prudence).

70.    "[P]lan fiduciaries must ensure that fees paid to third-party service providers are not excessive relative to the services rendered." *Collins v. Ne. Grocery, Inc.*, 747 F. Supp. 3d 398, 415 (N.D.N.Y. 2024), *aff'd in part, vacated in part*, 2025 U.S. App. LEXIS 20979 (2d Cir. Aug. 18, 2025).

71.    This includes indirect compensation, which is "compensation received from *any source other than the covered plan*, the plan sponsor, the covered service provider, or an affiliate." 29 C.F.R. § 2550.408b-2 (c)(viii)(B)(2) (emphasis added).

72.    Accordingly, fiduciaries who select and monitor insurance programs, brokers, and carriers for ERISA-governed voluntary benefit plans must do so prudently and loyally, and refrain from accepting anything of value in connection with such selection and monitoring.

73.    Prudent fiduciaries of voluntary benefit programs have a regular process in place to review benefits, premiums, carriers, claims, and commissions, among other things, and to compare the fees the program charges to reasonable fees in the market, ensuring that plan service providers receive only reasonable compensation.

74.    It is especially important that prudent fiduciaries investigate premiums, commissions, and brokerage fees to determine whether fees are reasonable in voluntary benefit plans because participants are paying the full cost.

75.    The higher the fees, commissions, and brokerage fees, the higher costs which participants incur.

76.    Industry professionals advising employers recognize that a prudent process for selecting and monitoring voluntary insurance products to be offered as part of an ERISA-governed plan includes, at minimum, regularly establishing that their service providers are competent, integrous, fairly priced, transparent, and accountable, monitoring and controlling premiums to ensure they remain reasonable for the benefits provided, monitoring the non-commission compensation received by brokers from carriers to determine the amount of additional fees brokers are receiving, issuing regular requests for competitive bids to assess available alternative insurance products and brokers, issuing regular requests for competitive

bids to assess broker fees (if using a broker), regularly reviewing broker compensation, ensuring that brokers are not overselling product, ensuring that participant claims requests are supported, and regularly reviewing loss ratios to ensure participants are receiving adequate value for their premiums.

77.    Despite these obligations, some employers, like Allied Universal, allow brokers to aggressively sell products to their employees that are unduly expensive and have low loss ratios, with carriers incentivized to systemically deny claims.

78.    Indeed, a recent industry publication warns employers that they "may not be fully aware of the proportion of dollars that are feeding profits to a benefits ecosystem – instead of contributing to the value of the benefits to their employees," and advises employers to "conduct the due diligence that is necessary to understand where their employees' supplemental health plan dollars are going."[17]

C.    Role of Brokers

79.    No law requires private employers to use a middleman to shop or contract for a supplemental insurance program offered to their employees as a benefit of employment.

80.    If an employer-fiduciary of an ERISA-governed voluntary benefit program chooses to delegate to a broker plan administration tasks (*e.g.*, issuing RFPs to insurance carriers, conducting enrollment, selecting insurance carriers, claims assistance, and employee education), the fiduciary has a duty to monitor those delegated tasks to ensure they are carried out consistently with the employer's fiduciary duties. The employer-fiduciary also has a duty to ensure that the service provider to whom the tasks have been delegated does not receive excessive compensation.

---

[17] Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health Plans the next class action risk for plan sponsors?*, EMPLOYEES FIRST (June 2025).

81.    Mercer markets itself as a "full-service provider" that offers "turnkey" solutions.[18]

82.    Voluntary benefits brokers have a financial incentive to maximize commissions and maximize sales.

83.    For example, Arthur J. Gallagher & Co., a large brokerage firm, reports that its "primary source of revenues for [its] brokerage services is commissions[.]"[19]

84.    Commissions to brokers impact premiums to participants dollar-for-dollar. For the Allied Universal Plan, Mercer and Lockton's interest in maximizing its commissions is in direct conflict with that of participants, whose interest is in having the lowest fees from Mercer and Lockton.

85.    Moreover, in the Allied Universal Plan, Mercer and Lockton's commissions were not paid by Allied Universal, the entity which hired Mercer and Lockton, but by the insurance company whose interest in obtaining the highest premium is also in direct conflict with the interest of participants.

86.    Thus, Allied Universal enabled an arrangement whereby Mercer and Lockton, the brokers recommending the insurance company, stood to benefit from recommending the company with the highest price, rather than the lowest price.

87.    The insurance industry views voluntary benefits as a cash cow: "[v]oluntary benefits offer a quick fix for a stagnant book of steady, satisfied clients."[20]

---

[18] Brian Russell, *What are Voluntary Benefits?*, MERCER U.S. (Feb. 8, 2018), https://www.mercer.com/en-us/insights/us-health-news/what-are-voluntary-benefits/ archived at https://perma.cc/9JKR-HYVJ. This article, published by Defendant Mercer, urges employers to "[l]ook for a full-service provider who can manage the program for you and provide an exceptional enrollment experience for employees."

[19] *2024 Annual Report*, ARTHUR J. GALLAGHER & CO., https://s28.q4cdn.com/872121257/files/doc_financials/2024/ar/ARTHUR-J-GALLAGHER-ARS.pdf (last visited Dec. 22, 2025) archived at https://perma.cc/2UFB-4S59.

[20] Dagny Taggart, *Volunteering for Trouble – The Compliance Traps, Administrative Nightmares, Subtle Discrediting & Employee Frustration Voluntary Benefits Often Bring*, BENEFIT REVOLUTION (Mar. 2023), https://www.benefit-revolution.com/2023/03/volunteering-for-trouble.html archived at https://perma.cc/A2P6-VWDL.

88.    These plans offer "commission . . . of an additional 15 percent to 55 percent, depending on the line of insurance offered."[21]

89.    One industry publication asked "[h]ow can an insurer afford to sell you something that is half commission? _Hint_: it is not by undercharging for the product."[22] The answer is that there are only two ways an insurer can afford to sell such products: increasing premiums or denying claims – or both.

90.    As a matter of industry practice, brokers functioning as Mercer and Lockton did with respect to Allied Universal and the Plan are functional fiduciaries, because they exercise discretion in administering voluntary benefit plans.

91.    Voluntary benefit plan brokers such as Mercer and Lockton may screen the bids they receive from carriers, selectively presenting to the employer only a curated set of alternatives, removing from consideration options which the broker deems to provide an insufficient commission.

92.    Brokers that do this – screening the employer's choices down to only options where commissions are favorable to the broker – are rendered a fiduciary, because the broker, in doing so, unilaterally "exercises . . . discretionary authority or discretionary control respecting management of" the plan. 29 U.S. C. § 1002(21)(A)(i).

93.    A broker can likewise become a fiduciary by setting its own compensation. _Id._

D.    <u>Loss Ratios (aka "Claims Ratios")</u>

94.    A "loss ratio represents the relationship between total premiums earned and actual losses incurred over a given period of time. It reveals how much an insurance company spent on

---

paying claims and other expenses compared to the premium received. It is a metric that specifically measures the profitability of insurance companies."[23]

95.    Specifically, a loss ratio is the insurance claims paid plus loss adjustment expenses divided by the premiums earned. "The lower the ratio, the higher the insurance company's profitability."[24] The higher the ratio, the better the insurance from the purchaser's perspective.

96.    For comparison purposes, the Affordable Care Act mandates that an employer-sponsored health plan maintained by an employer of Allied Universal's size must achieve an 85% medical loss ratio ("MLR") – that is, for every $1 spent on premiums, the insurer must pay $0.85 in benefits.[25]

97.    This MLR requirement not only demonstrates the MLR that the federal government considers reasonable in an employer-paid plan, but also has resulted in some insurers finding ways to obtain additional revenue through voluntary benefits insurance.

98.    Brokers have been using voluntary benefits as a way to generate extra revenue for themselves, and to offer products where MLR limitations imposed by the Affordable Care Act do not apply.[26]

---

[23] *Understanding Loss Ratios*, INSURANCE TRAINING CENTER, https://insurancetrainingcenter.com/resource/loss-ratio/ (last visited Dec. 22, 2025) archived at https://perma.cc/UVC3-GRET.
[24] *Id.*
[25] *Medical Loss Ratio*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Sept. 10, 2024), https://www.cms.gov/marketplace/private-health-insurance/medical-loss-ratio archived at https://perma.cc/9UQN-QHPA.
[26] Dave Willis, *Voluntary Benefits: Ten Things Brokers Do Right-And Ten They Do Wrong*, ROUGH NOTES, https://roughnotes.com/benefitsereport/archives/v29_february2013/BenefitsSpecialReport/page53.htm (last visited Dec. 22, 2025) archived at https://perma.cc/X8DT-P2LY.

99.    Some state insurance laws similarly mandate loss ratios for certain insurances, which typically range from 55% to 85%.[27]

100.    "Medigap" policies, which are private insurance policies that supplement Medicare, are required to have a loss ratio of at least 65% for individual policies and 75% for group policies.[28]

101.    However, "[a] review of loss ratio data in the [National Association of Insurance Commissioners ("NAIC")]'s Experience Reports indicates that supplemental products return scant, and declining, compensation to consumers."[29]

102.    "When loss ratios drop below 50%, the principal purpose of the product is no longer spreading risk and compensating consumers, but perpetuation of sales for their own sake."[30]

103.    In New York, the minimum loss ratio for individual policies, including those providing hospital, medical, surgical coverage and hospital indemnity insurance ranges from 50% to 60%. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45.

104.    The minimum loss ratio for specified disease policies in New York ranges from 60% to 70%. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45.

105.    The minimum loss ratio for Medicare supplemental insurance in New York is 75% for group policies and 65% for individuals. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45.

---

[27] Suzanne M. Kirchhoff, *Medical Loss Ratio Requirements Under the Patient Protection and Affordable Care Act (ACA): Issues for Congress*, CONGRESSIONAL RESEARCH SERVICE, 22 (Aug. 26, 2014), https://sgp.fas.org/crs/misc/R42735.pdf archived at https://perma.cc/K6LK-FXQT.
[28] U.S. GEN. ACCOUNTING OFFICE, GAO/HEHS-95-151, MEDIGAP INSURANCE: INSURERS' COMPLIANCE WITH FEDERAL MINIMUM LOSS RATIO STANDARDS, 1988-93 2 (1995).
[29] Jackson Williams, *Addressing Low-Value Insurance Products with Improved Consumer Information: The Case of Ancillary Health Products*, JOURNAL OF INSURANCE REGULATION 1, 18 (2023).
[30] *Id.*

106.     "[A] downward trend [in loss ratios] is evident across several categories of [voluntary benefit] products[.]"[31]

107.     Factors that decrease loss ratios in voluntary benefit plans include higher than necessary premiums, systemic claims denials, selling products to employees who do not need the products, poor communication (employees do not know they have claims when they do have claims), payments to the employer and excessive compensation to the broker.

## II.     The Plan and the Voluntary Benefits Insurance

108.     The Core Plan[32] had approximately 89,000 participants in 2019 and 171,000 participants in the beginning of 2024.

109.     Between 2019 and 2024, the Voluntary Benefits Insurance covered between approximately 47,000 and 82,000 lives.

110.     The Plan's large size gives it enormous bargaining power to command lower broker fees and better deals on insurance premiums.

111.     The Plan's sole broker was Mercer from 2019 to 2020. Mercer and Lockton split commissions in 2021, 2022, and 2024. In 2023, Lockton was the Plan's sole broker administering the Voluntary Benefits Insurance.[33] The Voluntary Benefits Insurance is carried by Continental American Insurance Company, a subsidiary of Aflac.

112.     The insurance carrier for the Plan has been the same since 2019.

---

[31] *Id.*

[32] The Form 5500 for the Voluntary Benefits Insurance is filed as if the Voluntary Benefits Insurance and all other medical and other welfare benefits provided to Allied Universal employees are provided under the same "plan." This "one plan" approach appears to be a legal fiction embraced by Allied Universal as a filing strategy. There is no indication that, besides governmental reporting/filing, the Voluntary Benefits Insurance on the one hand and the employer-paid medical and other insurances on the other are made available under a unified arrangement that can reasonably be considered a single "plan." Nevertheless, this complaint indulges the fiction, but does not concede, that the Voluntary Benefits Insurance and the employer-paid benefits are all part of one "plan."

[33] Acrisure of California ("Acrisure") is also listed as a broker in 2019, 2022, 2023, and 2024 although the commissions it received are negligible. Acrisure received as little as -$16 and as much as $1,389.53 in commissions, according to the Form 5500s filed with the DOL.

113.    It is reasonable to infer that Allied Universal never conducted request for proposals to determine if the marketplace offered a better value for the premium dollars of Allied Universal's employees.

114.    From 2019 to 2024, Mercer and Lockton were paid over $23 million in commissions related to the Voluntary Benefits Insurance policies.

115.    It is reasonable to infer that Mercer and Lockton collected additional undisclosed compensation, based on Mercer and Lockton's known practices and those in the industry.

116.    The premium for at-issue accident insurance ranges from approximately $90–$191 per year; the premium for critical illness insurance ranges from approximately $127–$796 per year; and the premium for hospital indemnity insurance ranges from approximately $112–$284 per year.

A.    Allied Universal breached its fiduciary duties by failing to diligently select and monitor voluntary benefits offerings and providers.

117.    At all relevant times, Allied Universal had no process in place to select or monitor insurance carriers for the Voluntary Benefits Insurance.

118.    At all relevant times, Allied Universal had no process in place to select or monitor insurance brokers for the Voluntary Benefits Insurance.

119.    Allied Universal took no action to ensure that Mercer and Lockton's commissions were reasonable.

120.    Allied Universal lacked a diligent process to assess Mercer and Lockton's commissions, because the Mercer, Lockton, and the carrier were retained throughout the entire period and participants in the Plan paid far more to Mercer and Lockton in commissions than was reasonable.

121.    Allied Universal took no action to ensure that the Voluntary Benefits Insurance was reasonably priced relative to other similar, available coverage.

122.    Allied Universal could not have prudently monitored the Voluntary Benefits Insurance policies because it allowed Mercer and Lockton to receive excessive compensation from the Plan.

B.    Allied Universal engaged in prohibited transactions when it allowed Mercer and Lockton to collect excessive commissions from Plan assets.

123.    Allied Universal, as plan sponsor, and Mercer and Lockton, as plan service providers, are parties in interest.

124.    Continental American Insurance Company, as a plan service provider, is a party in interest.

125.    Employee contributions to a plan constitute plan assets. *See Hi-Lex Controls, Inc. v. Blue Cross Blue Shield*, 751 F.3d 740, 745 (6th Cir. 2014) ("Department of Labor regulations state that employee contributions constitute plan assets under ERISA once they are 'segregated from the employer's general assets.'" (quoting 29 C.F.R. § 2510.3-102(a)(1))); *Trs. of the Rd. Carriers Local 707 Welfare Fund v. Goldberg*, No. 08-0884, 2009 U.S. Dist. LEXIS 101778, at *6 (E.D.N.Y. Sept. 25, 2009) ("The employees' contributions to the plan became plan assets when the contributions were withheld from the employees' wages.").

126.    By selecting and retaining Mercer and Lockton as brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer and Lockton as payment for premiums, Allied Universal caused the Plan to engage in a transaction with Mercer and Lockton constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

127.    By selecting and retaining Mercer and Lockton as brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer and Lockton as payment for premiums, Allied Universal caused the Plan to engage in transactions with Mercer and Lockton constituting "furnishing of goods, services, or facilities between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C).

128.    By selecting and retaining Mercer and Lockton as brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be used as payment for premiums, Allied Universal caused the Plan to engage in transactions with Mercer and Lockton constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1)(D).

129.    Mercer and Lockton have engaged in a consistent business practice of offering to employers lower-cost employer-paid services in exchange for the employer permitting excessive commissions to be embedded in employee-paid voluntary benefits.

130.    Thus, Allied Universal likewise received improper benefits in connection with the excessive commissions charged to Plaintiffs in the Plan.

C.    <u>Mercer and Lockton breached their fiduciary duties and engaged in prohibited transactions by causing excessive compensation to be paid to themselves from the Plan.</u>

i.    *Mercer and Lockton acted as fiduciaries.*

131.    Mercer and Lockton acted as fiduciaries in taking the actions alleged herein related to the Plan.

132.    Merely selling insurance to a Plan, with nothing more, does not automatically create a fiduciary relationship. *In re Ins. Brokerage Antitrust Litig.*, No. 1663, 2008 U.S. Dist. LEXIS 2818, at *80 (D.N.J. Jan. 14, 2008).

133.    However, a broker is a fiduciary if it manages or controls an insurance policy which is an asset of the plan. *Eversole v. Metro. Life Ins. Co.*, 500 F. Supp. 1162, 1165 (C.D. Cal. 1980) (citing 29 U.S.C. § 1101(b)(2) (assets of the plan include insurance policy)); *see also Hi-Lex Controls*, 751 F.3d at 745 ("Department of Labor regulations state that employee contributions constitute plan assets under ERISA once they are 'segregated from the employer's general assets.'" (quoting 29 C.F.R. § 2510.3-102(a)(1))); *Pipefitters Local 636 v. Blue Cross & Blue Shield*, 213 F. App'x 473, 478 (6th Cir. 2007).

134.    An insurance broker that selects an insurance carrier for an employee benefit plan is an ERISA fiduciary. *Access Servs. of N. Ill. v. Capitol Adm'rs, Inc.*, No. 19-50050, 2021 U.S. Dist. LEXIS 37582, at *10 (N.D. Ill. Mar. 1, 2021).

135.    Similarly, where a broker selects or recommends a carrier for an employee benefits program, the broker acts in a fiduciary capacity. *Georgas v. Kreindler & Kreindler*, 41 F. Supp. 2d 470, 475 (S.D.N.Y. 1999).

> Where an insurance agent or broker acts as [an] agent for [the] insured, there is a fiduciary relationship between them, and the agent or broker has a fiduciary responsibility to [the] insured. Thus, an agent or broker employed to effect insurance for another, like other agents, owes to his principal the duty to discharge with loyalty and good faith the trust imposed in him, to obey the instructions given to him by [the] insured, and to exercise reasonable skill, care, and diligence in effecting the insurance.

*Chao v. Day*, 436 F.3d 234, 237 (D.C. Cir. 2006) (quoting 44 C.J.S. Insurance § 215).

136.    Here, Mercer and Lockton acted as fiduciaries because they selected and recommended Continental American Insurance Company as the insurance carrier.

137.    Mercer and Lockton also acted as fiduciaries by administering and managing the Voluntary Benefits Insurance, including by managing claims, controlling communications, and conducting enrollment.

138.    Mercer and Lockton also acted as fiduciaries by selectively withholding information from Allied Universal about lower-cost voluntary benefits insurance options, in order to prevent Allied Universal from having sufficient information to prudently manage the Voluntary Benefits Insurance plan, and to maximize Mercer and Lockton's compensation.

139.    Additionally, Mercer and Lockton are fiduciaries because they were agents for Allied Universal and for the Plan in procuring and renewing insurance policies and managing claims.

140.    Even if Mercer and Lockton were not fiduciaries (and Mercer and Lockton *are* fiduciaries), because Mercer and Lockton were knowing participants in Allied Universal's fiduciary breach, they are liable for disgorgement of the profit Mercer and Lockton collected therefrom, and other equitable remedies.

ii.    *Mercer and Lockton received excessive compensation.*

141.    Since 2019 Mercer and Lockton received a staggering $23 million in commissions from Allied Universal's accident, critical illness, and hospital indemnity voluntary benefit program, averaging 39.8% of premiums.

142.    In other words, for every dollar an Allied Universal employee spent on buying one of the at-issue policies, $0.39–39% (on average)—went to Mercer and Lockton as a commission.

143.    Broker commissions for voluntary insurance in similarly-sized plans are far lower, approximately 10%. The commission that Mercer and Lockton were paid is *almost 4 times* this amount.

144.    There is no indication that Mercer and Lockton did anything to earn their $23 million in commissions and Mercer and Lockton have remained Allied Universal's brokers for the Plan's Voluntary Benefits Insurance since 2019.

### III.    Plan Participants' Injuries

145.    Plaintiffs and other Plan participants were injured because they overpaid for premiums.

146.    Mercer and Lockton's $23 million in commissions since 2019 from Allied Universal's accident, critical illness, and hospital indemnity voluntary benefit policies came directly out of Plan participants' premium payments.

147.    Even though the typical broker commission for voluntary insurance for this size plan in the industry is approximately 10%, these averages are driven up by the presence of outliers, such as the Plan, where Defendants have allowed excessive commissions to be charged.

148.    In fact, in the insurance industry outside of outlier brokers such as Mercer and Lockton, commissions of 2–8% are common.[34]

149.    Because Mercer and Lockton's commissions average about 40%, it is impossible for purchasers of the Voluntary Benefits Insurance to obtain better than an 60% loss ratio – in other words, even if the insurance carrier's costs were $0 to administer claims, beneficiaries would never see more than a return of (an average of) 60 cents per dollar spent on premiums.

150.    In light of reported industry averages and sources, and taking into account the fact that data reported on the Plan's Form 5500s show this Plan to be an extreme outlier in terms of

---

[34] Somer Anderson, *How Does an Insurance Broker Make Money?*, INVESTOPEDIA (Dec. 19, 2021), https://www.investopedia.com/ask/answers/050715/how-does-insurance-broker-make-money.asp archived at https://perma.cc/YZ3B-QTB7.

excessive broker compensation, the estimated true historical loss ratio of the Voluntary Benefits Insurance during the applicable time period is significantly less than 50%.

151.    In other words, based on the best available public data, Plaintiffs estimate that participants and beneficiaries of the Voluntary Benefits Insurance received far less than 50 cents in benefits (on average) for every one dollar in premiums paid.

152.    Broker commissions and administrative costs are paid – dollar for dollar – from premiums paid by participants.

153.    Participants, accordingly, are directly damaged by paying increased and excessive premiums relative to benefits received.

154.    By way of hypothetical example, if a participant pays $100 per month for a policy that should have a 60% loss ratio, but instead has a 30% average loss ratio, the participant suffers a direct, out-of-pocket loss of $30 per month. This is because the true value of the policy (which should be reflected as the premium) is $30 per month less than the actual premium paid.

155.    Loss ratio is an "all-in" metric that accounts for variables such as quality of service. That is because better services (*e.g.*, enrollment, website, and claims processing) will result in more claims paid.

156.    Poor or predatory service (*e.g.*, inadequate claims processing, poor customer support, lack of website portal, ineffective messaging, and unsuitable sales) results in fewer claims paid.

157.    This does not mean that a loss ratio is the only thing a prudent employer should consider in evaluating or monitoring a voluntary benefit program. But it does mean that lower loss ratios are far more likely to corelate to poor value in terms of benefits received, and also poor service quality.

158.    Here, every Plan participant who was a purchaser of the Voluntary Benefits Insurance in the Plan during the applicable time period suffered a direct, out of pocket loss, because each such participant paid more than what the policy was worth; this overpayment was a direct result of Defendants' fiduciary failures as outlined herein.

159.    As the loss ratio of the Voluntary Benefits Insurance is significantly less than 50%, Defendants' imprudent actions caused the loss ratio to decrease below a reasonable level.

160.    Because broker commissions are paid dollar-for-dollar from premiums, every dollar of excessive commission collected by Mercer and Lockton is an out-of-pocket loss for Plaintiffs.

161.    The commissions Defendants allowed Mercer and Lockton to collect from Plan participants, as outlined in the table below, dwarfed commissions collected by Mercer and Lockton that were reported by other similar plans in publicly available Form 5500 data.

| Year | Insured Persons | Premiums Paid | Mercer Comm.[35] | Lockton Comm. | Total Broker Comm. | Comm. as a % of Premiums |
|------|------|------|------|------|------|------|
| 2019 | 65,691 | $ 8,023,853 | $2,940,564 | $        0 | $2,940,564 | 36.65% |
| 2020 | 81,137 | $ 8,078,145 | $3,242,806 | $        0 | $3,242,806 | 40.14% |
| 2021 | 82,184 | $ 8,618,371 | $2,562,590 | $1,325,073 | $3,887,663 | 45.11% |
| 2022 | 47,848 | $10,501,532 | $   204,443 | $4,253,334 | $4,457,777 | 42.45% |
| 2023 | 47,599 | $11,912,506 | $        0 | $4,507,524 | $4,507,524 | 37.84% |
| 2024 | 61,317 | $12,608,457 | $     2,706 | $4,613,604 | $4,616,310 | 36.61% |
|  |  |  |  |  | **Total: $23,652,643.57** | **Average: 39.80%** |

*Table 1 – Commissions as a Percentage of Premiums*

162.    For example, the Circle K Stores Employee Benefit Plan reported in 2024 that Mercer was the broker for its accident, critical illness, and hospital indemnity policies through

---

[35] For purposes of Table 1, "Comm." is defined as commissions.

the Guardian Life Insurance Company of America, covering over 60,000 lives. Mercer collected less than 6% in commissions and fees from participants in that plan.

163.    Similarly, the PVH Corp. Welfare Benefits Plan reported that Mercer was the broker for its accident, critical illness, and hospital policies through Metropolitan Life Insurance Company in 2024, covering approximately 1,900 lives. Mercer only collected 2.1% in commissions and fees from participants in that plan.

164.    And the Kohl's Group Health Plan reported Mercer as its broker for its critical illness, accident, and hospital indemnity (added in 2020) policies through UnitedHealthcare Insurance Company from 2019 through 2024, covering between approximately 4,800 and 12,800 lives. Mercer collected less than 19% commissions each year, with an average amount (across the Plan's various Form 5500 filings) of 10.1%.

165.    The Dollar Tree Inc. Group Health Benefit Plan reported Lockton and Alliant Insurance Services, Inc. as its brokers for its critical illness, accident, and hospital indemnity policies through Metropolitan Life Insurance Company in 2021 and 2022. It reported Lockton and BenefitFocus.Com as its brokers for its critical illness, accident, and hospital indemnity policies through Unum Insurance Company from 2023 to 2024. From 2021 to 2024, the plan covered between approximately 16,000 and 22,000 lives. Together, the brokers collected less than 13.9% in commissions and fees each year, with an average amount (across the Plan's various Form 5500 filings) of 10.7%.

166.    And in 2024, the Owens & Minor Flexible Benefits Plan reported Lockton as its broker for its accident, critical illness, and hospital indemnity policies through Cigna Health and Life Insurance Company, covering over 4,500 lives. Lockton only collected 9.4% of the premiums paid in commissions from participants in that plan.

167. In stark contrast, for the Plan at issue involving Allied Universal, with its accident, critical illness, and hospital indemnity policies covering between 47,000 and 82,000 lives, Mercer and Lockton collected an average of almost 40% in commissions, over $2 million each year from 2019 through 2024 (and averaging over $3.9 million).

168. Had Allied Universal exercised the due diligence required in carrying out its ERISA-imposed fiduciary duties of prudence and loyalty, it would have monitored and reduced Mercer and Lockton's commissions to the levels paid by other comparable plans, thereby lowering, on a dollar-for-dollar basis, premiums paid by Plaintiffs and the class.

## CLASS ACTION ALLEGATIONS

169. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

170. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Allied Universal Health and Welfare Benefit Plan enrolled in an accident, critical illness, and/or hospital indemnity policy from December 23, 2019, through the date of judgment, excluding the Defendants.

171. This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a. The class includes thousands of members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to the class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; whether the fiduciaries engaged in prohibited transactions with Plan assets; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of duty.

c.   Plaintiffs' claims are typical of the claims of the class because Plaintiffs were participants during the relevant time period and all participants in the Plan enrolled in the voluntary benefit policies were harmed by Defendants' misconduct.

d.   Plaintiffs are adequate representatives of the class because they were participants in the Plan and enrolled in voluntary benefit policies during the class period, have no interest that is in conflict with any other member of the class, are committed to the vigorous representation of the class, and have engaged experienced and competent attorneys to represent the class.

e.   Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (i) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (ii) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical

matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

172.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

173.    Plaintiffs' counsel, Schlichter Bogard LLC, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has vast experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 45 ERISA fiduciary breach actions.

174.    Dating back to 2006, the firm has a well-established track record of success in vigorously pursuing the rights of ERISA plan participants. Before the firm filed the first 401(k) excessive fee case under ERISA, no law firm in the United States had ever filed such a claim. The firm was the first to try an ERISA excessive fee case and successfully obtain a judgment on behalf of plan participants. *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012). After multiple appeals to the Eighth Circuit and remands to the

district court, and over 25,000 hours of attorney and paralegal time, the parties ultimately settled the action in 2019, almost 14 years after filing. *Tussey v. ABB, Inc.*, No. 06-4305, 2019 U.S. Dist. LEXIS 138880, at *4 (W.D. Mo. Aug. 16, 2019). Judge Laughrey noted in that case, "[i]t is well established that complex ERISA litigation involves a national standard and special expertise. Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *9–10 (W.D. Mo. Nov. 2, 2012), *rev'd on other grounds*, 746 F.3d 327 (8th Cir. 2014) (citations omitted).

175.    *Tibble v. Edison International* is another example of the firm's unwavering efforts to protect the rights of ERISA plan participants. After a dismissal upheld by the Ninth Circuit, the firm successfully petitioned the Supreme Court and obtained a unanimous decision in the Supreme Court, reversing the Ninth Circuit. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). This was the first ever 401(k) ERISA excessive fee case in the Supreme Court. This was a landmark decision in ERISA litigation. Thereafter, sitting *en banc*, ten judges of the Ninth Circuit on remand unanimously vacated a Ninth Circuit panel decision and remanded to the district court to determine whether the defendants violated their continuing duty to monitor the 401(k) plan's investments, stating that "cost-conscious management is fundamental to prudence in the investment function." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (citation omitted). Following remand, in August 2017, the plaintiffs obtained a judgment of $13.4 million in plan losses and lost investment opportunity. *Tibble v. Edison Int'l*, No. 07-5359, 2017 U.S. Dist. LEXIS 130806 (C.D. Cal. Aug. 16, 2017); *Tibble*, ECF 570, 572.

176.    In 2016, after over a year of investigation of 403(b) plans, Schlichter Bogard filed a group of cases on behalf of employees and retirees against major national universities involving claims of excessive fees in 403(b) plans. These were also the first of their kind against

403(b) plan sponsors. 403(b) plans are defined contribution retirement plans for non-profit organizations. Employers in such plans have the same fiduciary duties as employers in 401(k) plans.

177.    Schlichter Bogard asked the Supreme Court to take a 403(b) plan excessive fee case that had been dismissed and was again successful in the Supreme Court in its second-ever ERISA excessive fee case. In *Hughes v. Northwestern University*, 595 U.S. 170 (2022), the Supreme Court ruled in plaintiffs' favor, holding that the inclusion of prudent options in a plan does not offset the inclusion of imprudent ones, and that a plan sponsor must monitor each fund in a plan and remove those that are imprudent. Again, the Supreme Court's decision was unanimous.

178.    And when Schlichter Bogard asked the Supreme Court to take its third-ever ERISA case, another 403(b) plan excessive fee case, it was once again successful. In *Cunningham v. Cornell Univ.*, 604 U.S. 693 (2025), the Supreme Court *again* unanimously ruled in plaintiffs' favor, holding that to plausibly allege a prohibited transaction, plaintiffs' need not plead around exemptions under ERISA.

179.    Indeed, the firm's efforts have "led to enormous fee savings for plan participants." *Cates v. Trs. of Columbia Univ.*, No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (noting that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees") (citation omitted).

180.    With these efforts, the firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation."

*Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012).

181.    In *Beesley v. International Paper*, a 401(k) ERISA excessive fee case that resulted in a settlement of $30 million plus substantial affirmative relief following seven years of litigation, Judge David Herndon observed: "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination. [Schlichter Bogard's] diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general." No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014).

182.    In *Will v. General Dynamics*, another ERISA excessive fee case, Judge Patrick Murphy found that litigating the case and achieving a successful result for the class "required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans." No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *9 (S.D. Ill. Nov. 22, 2010).

183.    Judge Harold Baker, in *Nolte v. Cigna*, stated that Schlichter Bogard is the "preeminent firm in 401(k) fee litigation" and has "persevered in the face of the enormous risks of representing employees and retirees in this area." No. 07-2046, ECF 413 at 1, 5 (C.D. Ill. Oct. 15, 2013).

184.    In approving a settlement including $32 million plus significant affirmative relief in a 403(b) excessive fee case, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, ECF 61 at 7–8 (M.D.N.C. Sept. 29, 2016), found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to

the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

185.    After recognizing "their persistence and skill of their attorneys," Judge Nancy Rosenstengel similarly noted:

> Class Counsel has been committed to the interests of the participants and beneficiaries of Boeing's 401(k) plan in pursuing this case and several other 401(k) fee cases of first impression. The law firm [Schlichter Bogard] has significantly improved 401(k) plans across the country by bringing cases such as this one[.]

*Spano v. Boeing Co.*, No. 06-743, 2016 U.S. Dist. LEXIS 161078, at *9 (S.D. Ill. Mar. 31, 2016).

186.    Judge Catherine Eagles noted that "these [ERISA] cases require a high level of skill on behalf of plaintiffs to achieve any recovery." *Clark v. Duke*, No. 16-1044, 2019 U.S. Dist. LEXIS 105696, at *9 (M.D.N.C. June 24, 2019). Judge Eagles concluded that "Class Counsel has demonstrated diligence, skill, and determination in this matter and, more generally, in an area of law in which few attorneys and law firms are willing or capable of practicing." *Id.* at *11.

187.    The Honorable George L. Russell, III noted that Schlichter Bogard's "work on behalf of participants in large 401(k) and 403(b) plans has significantly improved these plans, brought to light fiduciary misconduct that has detrimentally impacted the retirement savings of American workers, and dramatically brought down fees in defined contribution plans." *Kelly v. Johns Hopkins Univ.*, No. 16-2835, 2020 U.S. Dist. LEXIS 14772, at *4 (D. Md. Jan. 28, 2020). Judge Russell continued, "[w]ithout the unique and unparalleled foresight for this novel area of litigation by [Schlichter Bogard], the class would not have obtained any recovery for the alleged fiduciary breaches that affected the Johns Hopkins University 403(b) plan for years prior." *Id.* at *11.

188.    In *Cates v. Trustees of Columbia University*, Judge George B. Daniles noted that Schlichter Bogard's "fee litigation and the Department of Labor's fee disclosure regulations approach $2.8 billion in annual savings for American workers and retirees." No. 16-06524, 2021 U.S. Dist. LEXIS 200890, at *15–16 (S.D.N.Y. Oct. 18, 2021) (citation omitted).

189.    In many of these cases, settlements were reached only after years of litigation and after Schlichter Bogard conducted extensive discovery, defeated motions to dismiss and for summary judgment, obtained class certification, and, in some, handled one or more interlocutory appeals. Examples, in addition to the 12-year history of *Tussey v. ABB*, *supra*, and nearly 14-year history of *Tibble v. Edison International*, *supra*, include *Spano v. Boeing Co.*, No. 06-743 (S.D. Ill.) (nine years of litigation including a Seventh Circuit appeal) and *Abbott v. Lockheed Martin Corp.*, No. 06-701 (S.D. Ill.) (eight years of litigation including a Seventh Circuit appeal). ERISA fiduciary breach class actions involve tremendous risk and require review and analysis of thousands of documents, finding and obtaining opinions from expensive, unconflicted, consulting and testifying national experts in finance, investment management, fiduciary practices, recordkeeping practices, and related fields, and are extremely hard-fought and well-defended.

190.    The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); Jim Zarroli, *Lockheed*

*Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg (Oct. 2, 2014).

## CAUSES OF ACTION

### COUNT I: BREACH OF FIDUCIARY DUTY OF PRUDENCE
### (U.S.C. § 1104(a)(1)(B))

191.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

192.    This Count alleges breach of fiduciary duties against all Defendants.

193.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

194.    Prudent fiduciaries monitor compensation of *all* plan service providers, to ensure those service providers are receiving only reasonable compensation for services to the plan. *E.g.*, *Neufeld*, 2018 U.S. Dist. LEXIS 147726, at *37–41 (excessive undisclosed spread compensation collected by defendants breached their fiduciary duties of loyalty and prudence).

195.    "[P]lan fiduciaries must ensure that fees paid to third-party service providers are not excessive relative to the services rendered." *Collins*, 747 F. Supp. 3d at 415.

196.    This includes indirect compensation, which is "compensation received from *any source other than the covered plan*, the plan sponsor, the covered service provider, or an affiliate." 29 C.F.R. § 2550.408b-2 (c)(viii)(B)(2)(emphasis added).

197.    "Fiduciaries must . . . understand and monitor plan expenses." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

198.    "An ERISA fiduciary's duty of prudence encompasses a duty to prevent plan participants from incurring excessive and unreasonable fees." *Vellali v. Yale Univ.*, No. 16-1345, 2022 U.S. Dist. LEXIS 192235, at *25 (D. Conn. Oct. 21, 2022); *see also Tibble*, 843 F.3d at 1197 ("[A] trustee is to incur only costs that are reasonable in amount[.]" (citations and quotation marks omitted)).

199.    Fiduciaries must "be vigilant in 'negotiation of the specific formula and methodology' by which fee payments . . . [']will be credited to the plan and paid back to the plan or to plan service providers.'" *Sweda*, 923 F.3d at 328 (quoting DOL Advisory Opinion 2013-03A, 2013 ERISA LEXIS 3, *10).

200.    Defendants failed to use any fiduciary process to monitor and control premiums or broker commissions for the Voluntary Benefits Insurance.

201.    Defendants failed to monitor the amount of broker commissions and determine if those amounts were competitive or reasonable for the services provided to the Plan.

202.    Defendants failed to use competitive bidding or leverage the Plan's size to reduce premiums or broker fees.

203.    Total Plan losses are continuing and will be determined at trial after complete discovery in this case.

204.    Each Defendant is jointly and personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

205.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants

and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II: FAILURE TO MONITOR FIDUCIARIES
### (28 U.S.C. § 1104(A)(1)(a)(ii))

206.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

207.    This Count alleges breach of fiduciary duties against Allied Universal.

208.    Allied Universal is the Plan Administrator of the Plan under 29 U.S.C. §§ 1002(16)(A)(iii), 1002(21)(A) and a named fiduciary under 29 U.S.C. § 1102(a) with overall authority to control and manage the operation and administration of the Plan.

209.    Allied Universal delegated certain of its fiduciary responsibilities for administrative matters to Mercer, Lockton, and John Does 1–20. Having delegated those duties, Allied Universal remained responsible for monitoring its delegees, Mercer, Lockton, and John Does 1–20, to ensure that the delegated tasks were being performed prudently and loyally.

210.    Appointing a fiduciary is a fiduciary act. *Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 569 (7th Cir. 1991); *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988); *Erickson v. Born*, No. 17-1176, 2017 U.S. Dist. LEXIS 140804, at *6 (D. Minn. Aug. 31, 2017); *Howell v. Motorola, Inc.*, 633 F.3d 552, 562 (7th Cir. 2011) ("[A] company can be a plan fiduciary when there is evidence that it played a role in appointing the administrators of the plan (and thus had a duty to choose appointees wisely and to monitor their activities).").

211.    If a monitoring fiduciary knows or should know that the monitored fiduciaries are not properly performing their fiduciary obligations, the monitoring fiduciary must take prompt and effective action to protect the plan and participants.

212.    Defendant Allied Universal breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach;

c.    Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Voluntary Benefits Insurance, ensuring that the commissions, premiums, and loss ratios were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's service providers; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan; and

d.    Failing to remove appointees whose performance was inadequate.

213.    Had Defendant Allied Universal discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members, lost tens of millions of dollars.

## COUNT III: PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(a)(1))

214.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

215.    This Count alleges prohibited transactions committed by Allied Universal.

216.    As provider of services to the Plan, Mercer and Lockton are parties in interest. 29 U.S.C. § 1002(14)(B).

217.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— (A) sale or exchange, or leasing, of any property between the plan and a party in interest[.]" 29 U.S.C. § 1106(a)(1)(A).

218.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . . (C) furnishing of goods, services, or facilities between the plan and party in interest[.]" 29 U.S.C. § 1106(a)(1)(C).

219.    "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . . (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106 (a)(1)(D).

220.    By selecting and retaining Mercer and Lockton as the brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer and Lockton as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction with Mercer and Lockton constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

221.    By selecting and retaining Mercer and Lockton as the brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer and Lockton as payment for premiums and/or commissions, Allied Universal caused the plan to engage in transactions with Mercer and Lockton constituting "furnishing of goods, services, or facilities between the plan and party in interest[.]" 29 U.S.C. § 1106(a)(1)(C).

222.    By selecting and retaining Mercer and Lockton as brokers for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer and Lockton as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in transactions with Mercer and Lockton constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106 (a)(1)(D).

223.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

224.    Under 29 U.S.C. § 1109(a), Allied Universal is personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT IV: PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(b))

225.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

226.    This Count alleges prohibited transactions were committed by Mercer.

227.    "A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

228.    "A fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

229.    As a Plan fiduciary, by collecting excessive commissions and other payments from Plan assets in connection with the Voluntary Benefits Insurance, Mercer dealt with assets of

the Plan in its own interests and received consideration for its own personal account in connection with a transaction involving Plan assets, in violation of 29 U.S.C. § 1106(b).

230.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

231.    Under 29 U.S.C. § 1109(a), Mercer is personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

### COUNT V: PROHIBITED TRANSACTIONS
### (29 U.S.C. § 1106(b))

232.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

233.    This Count alleges prohibited transactions were committed by Lockton.

234.    "A fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

235.    "A fiduciary with respect to a plan shall not . . . receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

236.    As a Plan fiduciary, by collecting excessive commissions and other payments from Plan assets in connection with the Voluntary Benefits Insurance, Lockton dealt with assets of the Plan in its own interests and received consideration for its own personal account in connection with a transaction involving Plan assets, in violation of 29 U.S.C. § 1106(b).

237.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

238.    Under 29 U.S.C. § 1109(a), Lockton is personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and is subject to other appropriate equitable or remedial relief.

## COUNT VI: KNOWING PARTICIPATION IN FIDUCIARY BREACH
### (29 U.S.C. §§ 1104(a), 1132(a)(3))

239.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

240.    This Count alleges that Mercer is liable as a knowing participant in Allied Universal's fiduciary breaches.

241.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

242.    The Plan's fiduciaries owed a duty of prudence to the Plan and its participants and beneficiaries, which they violated, as alleged herein.

243.    A "participant, beneficiary, or fiduciary may bring suit against an 'other person' under" 29 U.S.C. § 1132(a)(3) who "'knowingly' participates in a fiduciary's violation." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248–49 (2000).

244.    "To state a claim [for knowing participation in a fiduciary breach], plaintiffs must establish that an ERISA fiduciary breached its duty, that defendants knowingly participated in the breach, and damages. . . . 'Knowing participation' includes: (1) knowledge of the primary violator's status as a fiduciary, and (2) knowledge that the primary violator's conduct

contravenes a fiduciary duty." *Romano v. Verizon Communs., Inc.*, 01-6737, 2002 U.S. Dist. LEXIS 5135, at *11 n.1 (S.D.N.Y. Mar. 26, 2002) (citations omitted).

245.    A "non-fiduciary need only have actual or constructive notice that they participated in a breach of fiduciary duty." *Carfora v. Teachers Ins. Annuity Ass'n of Am.*, No. 21-8384, 2023 U.S. Dist. LEXIS 148435, at *33 (S.D.N.Y. Aug. 21, 2023).

246.    Mercer knew that its own course of conduct described herein was unlawful. Mercer also knew of the circumstances that rendered the Plan sponsor's conduct a breach of fiduciary duties and the circumstances that rendered the transactions involving their services and transfers and use of Plan assets unlawful.

247.    Mercer knew that the Plan's fiduciaries were failing to monitor and control premiums or broker commissions for the Voluntary Benefits Insurance, failing to monitor the amount of broker commissions and determine if those amounts were competitive or reasonable for the services provided to the Plan, and failing to use competitive bidding or leverage the Plan's size to reduce premiums or broker fees.

248.    As a result of their own misconduct and the Plan sponsor's ERISA violations, Mercer knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

249.    Thus, even if Mercer was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

### COUNT VII: KNOWING PARTICIPATION IN FIDUCIARY BREACH
### (29 U.S.C. §§ 1104(a), 1132(a)(3))

250.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

251.    This Count alleges that Lockton is liable as a knowing participant in Allied Universal's fiduciary breaches.

252.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. Fiduciary status is not a prerequisite to liability. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

253.    The Plan's fiduciaries owed a duty of prudence to the Plan and its participants and beneficiaries, which they violated, as alleged herein.

254.    A "participant, beneficiary, or fiduciary may bring suit against an 'other person' under" 29 U.S.C. § 1132(a)(3) who "'knowingly' participates in a fiduciary's violation." *Harris Tr.*, 530 U.S. at 248–49.

255.    "To state a claim [for knowing participation in a fiduciary breach], plaintiffs must establish that an ERISA fiduciary breached its duty, that defendants knowingly participated in the breach, and damages. . . . 'Knowing participation' includes: (1) knowledge of the primary violator's status as a fiduciary, and (2) knowledge that the primary violator's conduct contravenes a fiduciary duty." *Romano*, 2002 U.S. Dist. LEXIS 5135, at *11 n.1 (citations omitted).

256.    A "non-fiduciary need only have actual or constructive notice that they participated in a breach of fiduciary duty." *Carfora*, 2023 U.S. Dist. LEXIS 148435, at *33.

257.    Lockton knew that its own course of conduct described herein was unlawful. Lockton also knew of the circumstances that rendered the Plan sponsor's conduct a breach of

fiduciary duties and the circumstances that rendered the transactions involving their services and transfers and use of Plan assets unlawful.

258.    Lockton knew that the Plan's fiduciaries were failing to monitor and control premiums or broker commissions for the Voluntary Benefits Insurance, failing to monitor the amount of broker commissions and determine if those amounts were competitive or reasonable for the services provided to the Plan, and failing to use competitive bidding or leverage the Plan's size to reduce premiums or broker fees.

259.    As a result of their own misconduct and the Plan sponsor's ERISA violations, Lockton knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

260.    Thus, even if Lockton was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

### COUNT VIII: KNOWING PARTICIPATION IN PROHIBITED TRANSACTIONS
### (29 U.S.C. §§ 1106(a)(1), 1132(a)(3))

261.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

262.    This Count alleges that Mercer is liable as a knowing participant in Allied Universal's prohibited transactions.

263.    The Plan's fiduciaries were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between the Plan and party-in-interest service providers like Mercer.

264.    A nonfiduciary knowing participant is liable for participating in a prohibited transaction if it was a party to that transaction and "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr.*, 530 U.S. at 251.

265.    Mercer knew that its own course of conduct described herein was unlawful. Mercer also knew of the circumstances that rendered the transactions involving its services and transfers and use of plan assets was unlawful.

266.    Mercer knew that by selecting and retaining Mercer as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction with Mercer constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

267.    Mercer knew that by selecting and retaining Mercer as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction with Mercer constituting "furnishing of goods, services, or facilities between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C).

268.    Mercer knew that by selecting and retaining Mercer as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction with Mercer constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

269.    As a result of their own misconduct and the Plan sponsor's ERISA violations, Mercer knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

270.    Thus, even if Mercer was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

## COUNT IX: KNOWING PARTICIPATION IN PROHIBITED TRANSACTIONS
### (29 U.S.C. §§ 1106(a)(1), 1132(a)(3))

271.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

272.    This Count alleges that Lockton is liable as a knowing participant in Allied Universal's prohibited transactions.

273.    The Plan's fiduciaries were bound by ERISA's prohibited transactions provisions, which render *per se* unlawful certain transactions between the Plan and party-in-interest service providers like Lockton.

274.    A nonfiduciary knowing participant is liable for participating in a prohibited transaction if it was a party to that transaction and "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr.*, 530 U.S. at 251.

275.    Lockton knew that its own course of conduct described herein was unlawful. Lockton also knew of the circumstances that rendered the transactions involving its services and transfers and use of plan assets was unlawful.

276.    Lockton knew that by selecting and retaining Lockton as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Lockton as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction with Lockton constituting an "exchange . . . of . . . property" between the Plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A).

277.    Lockton knew that by selecting and retaining Lockton as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Lockton as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in a transaction

with Lockton constituting "furnishing of goods, services, or facilities between the plan and party in interest." 29 U.S.C. § 1106(a)(1)(C).

278.    Lockton knew that by selecting and retaining Lockton as a broker for the Voluntary Benefits Insurance, and by causing Plan assets to be transferred to Lockton as payment for premiums and/or commissions, Allied Universal caused the Plan to engage in transactions with Lockton constituting "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

279.    As a result of their own misconduct and the Plan sponsor's ERISA violations, Lockton knowingly received ERISA plan assets or improper profits derived from ERISA plan assets. Those assets and profits rightfully belong to Plaintiffs and class members.

280.    Thus, even if Lockton was not an ERISA fiduciary, it is subject to equitable remedies under 29 U.S.C. § 1132(a)(3), such as restitution, disgorgement, or a constructive trust.

## JURY TRIAL DEMANDED

281.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

282.    For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

a.    find and declare that Defendants have breached their fiduciary duties as described above and engaged in prohibited transactions as described above;

b.   find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each ERISA violation described above, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

c.   order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

d.   order the reversal of all non-exempt prohibited transactions;

e.   determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

f.   order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under § 1109(a);

g.   remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

h.   surcharge the Defendants in favor of the Plan, requiring all amounts involved in all transactions that the accounting reveals were improper, excessive and/or in violation of ERISA be restored to the Plan;

i.   reform the Plan to include only prudent voluntary insurance;

j.   certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter Bogard LLC as Class Counsel;

k.   award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

l.   order the payment of interest to the extent it is allowed by law; and

m.   grant other equitable or remedial relief as the Court deems appropriate.

December 23, 2025

Respectfully submitted,

/s/ Andrew D. Schlichter
Andrew D. Schlichter, Bar No. 4403267
Alexander L. Braitberg*
Patrick R. Kutz*
Kaitlin Minkler*
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
(314) 621-6115
(314) 621-5934 (fax)
aschlichter@uselaws.com
abraitberg@uselaws.com
pkutz@uselaws.com
kminkler@uselaws.com

Ruben R. Chapa*
SCHLICHTER BOGARD LLC
33 North Dearborn Street, Suite 1170
Chicago, IL 60602
(630) 919-9301
(314) 621-5934 (fax)
rchapa@uselaws.com

*Pro Hac Vice Pending

*Attorneys for Plaintiffs*