## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- X

SABRINA FELLOWS, EDMUND LYNN
III, DONNA PATTON, WESLEY HALL,
and NINA BUSTAMANTE-VICARIO,
Individually and as Representatives of a
Class of Participants and Beneficiaries on
Behalf of the ALLIED UNIVERSAL
HEALTH AND WELFARE BENEFIT
PLAN,

        Plaintiffs,

        v.

UNIVERSAL SERVICES OF AMERICA,
LP d/b/a ALLIED UNIVERSAL, ALLIED
UNIVERSAL EMPLOYEE BENEFITS
COMMITTEE, MERCER HEALTH AND
BENEFITS ADMINISTRATION, LLC,
LOCKTON COMPANIES, LLC, and
JOHN DOES 1–20,

        Defendants.

----------------------------------------------------- X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.
1:25-cv-10659-GHW-BCM

**ORAL ARGUMENT
REQUESTED**


## MERCER HEALTH & BENEFITS ADMINISTRATION, LLC'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
## PLAINTIFFS' CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION .......................................................................................... 1

FACTUAL BACKGROUND ........................................................................... 2

LEGAL STANDARD ..................................................................................... 4

ARGUMENT ................................................................................................. 6

I.   Plaintiffs Fail to Meet Their Burden to Establish Article III Standing. ............. 6

II.  Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law......... 8

    A.   Count I Fails to State a Fiduciary-Breach Claim Against Mercer. .............. 8

        1.   Plaintiffs Fail to Plead that Mercer Acted in a Fiduciary Capacity with Respect to Selection of the Plan's Voluntary Benefits Insurer or Its Commissions........................................................................... 8

            a.   Plaintiffs Fail to Plausibly Allege that Mercer Had any Discretionary Fiduciary Authority over Allied's Selection of the Plan's Voluntary Benefits Insurer and the Associated Premiums. ...................................................................10

            b.   Plaintiffs Fail to Plausibly Allege that Mercer Had any Discretionary Fiduciary Authority with Respect to Insurer-Paid Commissions. ..............................................................15

        2.   Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty.......19

            a.   Plaintiffs Fail to Allege Excessive Premiums. ...........................20

            b.   Plaintiffs Fail to Allege Excessive Commissions........................23

    B.   Count VI Fails to State a Claim Against Mercer Based on Any Purported Fiduciary Breaches by Allied.....................................................27

III. Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of Law. ........................................................................................29

A.    Count IV Fails to State a Prohibited-Transaction Claim Against Mercer. 29

    1.   Plaintiffs Fail to Plausibly Allege Mercer's Fiduciary Status. ............29

    2.   Count IV Fails Because Commissions Are Not Plan Assets. ...............30

B.    Count VIII Fails to Allege that Mercer Is Liable as a Knowing Participant in Any Prohibited Transactions. .................................................................30

    1.   Count VIII is Too Conclusory to Survive a Motion to Dismiss. ..........30

    2.   Plaintiffs Fail to Plead a Transaction Between the Plan and Mercer Involving Plan Assets. ...........................................................................32

    3.   Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-Interest for the Transactions Underlying Count VIII. .............................................33

IV.  Plaintiffs Fail to Show Entitlement to any Equitable Relief Against Mercer as a Non-Fiduciary. ....................................................................................................34

CONCLUSION ..........................................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*Access Servs. of N. Ill. v. Capitol Adm'rs*,
  2021 U.S. Dist. LEXIS 37582 (N.D. Ill. Mar. 1, 2021) ....................................13

*Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable
  Life Assurance Soc'y of the U.S.*,
  841 F.2d 658 (5th Cir. 1988) ............................................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................4, 5, 10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................4, 5, 11

*Black v. Bresee's Oneonta Dep't Store, Inc. Sec. Plan*,
  919 F. Supp. 597 (N.D.N.Y. 1996) ...................................................................13

*Boyette v. Montefiore Med. Ctr.*,
  2025 WL 48108 (2d Cir. Jan. 8, 2025) .......................................................21, 25

*Chao v. Day*,
  436 F.3d 234 (D.C. Cir. 2006)..........................................................................14

*Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*,
  1996 WL 665610 (S.D.N.Y. Nov. 18, 1996).....................................................29

*Collins v. Northeast Grocery, Inc.*,
  149 F.4th 163 (2d Cir. 2025) ..............................................................................4

*Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp.
  Benefits Assocs., Inc.*,
  2012 WL 12948705 (N.D. Ga. Jan. 11, 2012)...................................................17

*Consol. Beef Indus. v. N.Y. Life Ins. Co.*,
  949 F.2d 960 (8th Cir. 1991) ............................................................................13

*Cotton v. Mass. Mut. Life Ins. Co.*,
  402 F.3d 1267 (11th Cir. 2005) ...................................................................11, 12

*Coulter v. Morgan Stanley & Co.*,
    753 F.3d 361 (2d Cir. 2014) ...............................................................9

*D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*,
    88 F.4th 602 (5th Cir. 2023) .............................................................33

*Danza v. Fidelity Mgmt. Tr. Co.*,
    533 F. App'x 120 (3d Cir. 2013) .......................................................33

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) .............................................................16

*Eversole v. Metro. Life Ins. Co.*,
    500 F. Supp. 1162 (C.D. Cal. 1980) .................................................14

*Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*,
    2008 WL 2754069 (S.D.N.Y. June 30, 2008) ..................................35

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)......................................................................5, 27

*Fink v. Union Cent. Life Ins. Co.*,
    94 F.3d 489 (8th Cir. 1996) ...............................................................18

*Forgione v. Gaglio*,
    2015 WL 718270 (S.D.N.Y. Feb. 13, 2015) ...............................19, 28

*Georgas v. Kreindler & Kreindler*,
    41 F. Supp. 2d 470 (S.D.N.Y. 1999) .................................................14

*Gonzalez v. Northwell Health, Inc.*,
    632 F. Supp. 3d 148 (E.D.N.Y. 2022) ..............................................21

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
    530 U.S. 238 (2000).........................................................................33

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) .......................................................23, 24

*Hughes v. Nw. Univ.*,
    63 F.4th 615 (7th Cir. 2023) ........................................................20, 27

*Humphries v. Mitsubishi Chem. Am., Inc.*,
2024 WL 4711296 (S.D.N.Y. Nov. 7, 2024)......................................................16

*Humphries v. Mitsubishi Chem. Am., Inc.*,
2025 WL 2402281 (S.D.N.Y. Aug. 19, 2025)....................................................25

*Jacobs v. Verizon Commc'ns*,
2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ...................................................24

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*,
768 F.3d 284 (3d Cir. 2014) .................................................................................18

*Johnston v. Paul Revere Life Ins. Co.*,
241 F.3d 623 (8th Cir. 2001) ...............................................................................18

*Lalonde v. Mass. Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024)..................................................................27

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)..............................................................................................32

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................................................................7

*Mahoney v. J.J. Weiser & Co.*,
564 F. Supp. 2d 248 (S.D.N.Y. 2008) .............................................9, 13, 15, 18

*Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*,
2022 WL 952247 (D. Mass. Mar. 30, 2022) .....................................................16

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ...............................................................................21

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
811 F.3d 998 (8th Cir. 2016) ...............................................................................17

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993)........................................................................................34, 35

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
577 U.S. 136 (2016)..............................................................................................36

*Patrico v. Voya Fin., Inc.*,
   2017 WL 2684065 (S.D.N.Y. June 20, 2017) ...............................................17, 19

*Pegram v. Herdrich*,
   530 U.S. 211 (2000).................................................................................9

*Piercy v. AT&T, Inc.*,
   2025 WL 2505660 (D. Mass. Aug. 29, 2025) ......................................28

*Ramos v. Banner Health*,
   1 F.4th 769 (10th Cir. 2021) ...............................................................33

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) .................................................................18

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   718 F. App'x 3 (2d Cir. 2017) ..............................................................31

*Santomenno v. Transamerica Life Ins. Co.*,
   883 F.3d 833 (9th Cir. 2018) ................................................................17

*Sereboff v. Mid Atl. Med. Servs., Inc.*,
   547 U.S. 356 (2006)................................................................................35

*Singh v. Deloitte LLP*,
   123 F.4th 88 (2d Cir. 2024) ...............................................21, 22, 25

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret.*
   *Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) .......................................5, 12, 20, 27

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020)................................................................................6

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) ......................................................27, 28

*Turner v. Schneider Elec. Holdings, Inc.*,
   530 F. Supp. 3d 127 (D. Mass. 2021)..................................................18

*Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*,
   617 F. Supp. 2d 131 (E.D.N.Y. 2008) .................................................35

vi

**Statutes**

ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) .........................................................33

ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii) ....................................9

ERISA § 404(a), 29 U.S.C. § 1104(a) ..............................................................9, 21

ERISA § 405(a), 29 U.S.C. § 1105(a) ...................................................................19

ERISA § 406(a), 29 U.S.C. § 1106(a) .......................................................30, 31, 33

ERISA § 406(b), 29 U.S.C. § 1106(b) ...................................................................29

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(1) ...............................................................4

Federal Rule of Civil Procedure 12(b)(6) ...............................................................4

Defendant Mercer Health & Benefits Administration, LLC ("Mercer") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## **INTRODUCTION**

Voluntary benefits insurance offers additional protection against unexpected costs arising from accidents, critical illnesses, and hospital stays. Plaintiffs— employees of Allied Universal Services of America, LP ("Allied") who elected to purchase such coverage made available by their employer—do not claim they were denied what they paid for or that their policies were administered improperly. Their core complaint is that they paid too much in premiums for the insurance—an assertion that they fail to back up with facts.

Unable to support their excessive-premium claim, Plaintiffs turn their sights on Mercer and Lockton Companies, LLC ("Lockton"), who provided brokerage services to Allied in connection with Allied's selection of insurer. Plaintiffs allege that the brokers received excessive commissions from the insurer. Their Complaint lodges four claims against Mercer under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"): breach of fiduciary duty of prudence (Count I); liability for Allied's alleged breach of fiduciary duty (Count VI); prohibited transactions (Count IV); and liability for Allied's alleged prohibited transactions (Count VIII). None of these claims hold any water.

1

Plaintiffs attempt to impose ERISA obligations where those duties do not reside. As an insurance broker, Mercer had no fiduciary authority with respect to Allied's selection of insurer, the costs of the insurance about which Plaintiffs complain, or the commissions that the insurer paid to Mercer. That ends the case as to Mercer. Plaintiffs' claims additionally fail because they fail to plausibly allege any breaches of duties imposed by ERISA or prohibited transactions. Relying on nothing more than generalized grievances about the voluntary-benefit industry, Plaintiffs fail to allege that the insurance they elected was available on the market for *any* less than they paid here, or that Mercer's commissions (paid by the insurer and not by Plaintiffs) were excessive in relation to services rendered or impacted their premiums at all.

Having received the benefits of the policies they purchased, Plaintiffs' Complaint is nothing more than an attempt to leverage ERISA to obtain an unwarranted windfall. Their conclusory and implausible ERISA claims should be dismissed with prejudice.

## FACTUAL BACKGROUND

Allied employees have the option of participating in a voluntary benefits plan (the "Plan") that makes available elective coverages under accident, critical illness, and hospital indemnity insurance policies provided by Continental American Insurance Company ("Continental"). Compl. ¶¶ 2, 111. Plaintiffs are current and

former employees who elected to participate in the Plan. *Id.* ¶¶ 13–17. They allege that Allied sponsors the Plan as an employer, is the Plan's named fiduciary, and, along with its Employee Benefits Committee, exercises fiduciary authority with respect to the Plan, its assets, and its administration. *Id.* ¶¶ 20–25.

Mercer is an insurance brokerage firm. *Id.* ¶ 27. Plaintiffs allege that Mercer (and Allied's other broker, Lockton) recommended to Allied certain insurance companies to offer voluntary benefits policies. *Id.* ¶ 86. Plaintiffs claim that, "[a]s a matter of industry practice," brokers like Mercer are functional fiduciaries under ERISA because they exercise discretion in administering voluntary-benefit plans. *Id.* ¶ 90. They claim that "brokers such as Mercer . . . may screen the bids" they receive from insurers and present employers with a "curated set of alternatives." *Id.* ¶ 91. Plaintiffs allege that Mercer is compensated for its role through commissions paid by the insurer out of premiums collected from Plan participants, which premiums and commissions are disclosed to Allied and reported on its annual Forms 5500 filed with the U.S. Department of Labor. *Id.* ¶¶ 85, 161.

Although the Complaint refers to industry practice and what brokers *may* do, its factual allegations about what Mercer actually did *here* are scant. It conclusorily alleges that Mercer exercised authority or control over administration or management of the Plan and its assets. *Id.* ¶ 29. It also alleges that Mercer served as the Plan's "sole broker" from 2019-2020 and received commissions in 2021,

2022, and 2024.  *Id*. ¶¶ 111, 114.  Plaintiffs concede that these commissions were paid by insurers, not by the Plan, its participants, or Allied.  *Id*. ¶ 85.

Based on these allegations, Plaintiffs assert that Mercer acted as a fiduciary to the Plan, breached fiduciary duties, and engaged in prohibited transactions by causing participants to pay excessive premiums and by receiving excessive commissions.  Count I alleges a breach of the duty of prudence as to Mercer and all Defendants.  *Id.* ¶¶ 191–205.  Count IV alleges that Mercer acted as a fiduciary and, by collecting commissions, caused the Plan to engage in prohibited transactions by dealing with assets of the Plan for its own account and/or receiving consideration for its own account in connection with a transaction involving the assets of the Plan.  *Id*. ¶ 229.  Counts VI and VIII allege that Mercer knowingly participated in Allied's fiduciary breaches and prohibited transactions.  *Id*. ¶¶ 240, 262.

## **LEGAL STANDARD**[1]

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a

---

[1] This section cites Rule 12(b)(6) cases applying the *Twombly* and *Iqbal* pleading standard, but that standard also applies to Rule 12(b)(1).  *See Collins v. Northeast Grocery, Inc.*, 149 F.4th 163, 170 (2d Cir. 2025) ("Factual allegations of standing must be plausible and nonconclusory to survive a motion to dismiss.").

cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To withstand dismissal, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At minimum, a "complaint must demonstrate more than a sheer possibility that a defendant has acted unlawfully." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013).

The Supreme Court has emphasized that motions to dismiss are an "important mechanism for weeding out meritless claims" in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "[C]areful, context-sensitive scrutiny of a complaint's allegations," is necessary to accomplish the "important task" of "divid[ing] the plausible sheep from the meritless goats." *Id*. Absent careful scrutiny at the pleading stage, the Second Circuit has recognized that a "plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *PBGC*, 712 F.3d at 719 (alteration in original) (internal quotations omitted). This makes it imperative to ensure that a complaint "allege[s] a *factual* predicate concrete enough to warrant further proceedings." *Id.* (internal quotations omitted).

## ARGUMENT

## I. Plaintiffs Fail to Meet Their Burden to Establish Article III Standing.[2]

Plaintiffs' claims fail at the outset for lack of Article III standing. To establish standing, a plaintiff must "demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). Even if Plaintiffs had alleged a statutory violation of ERISA, their failure "to plausibly and clearly allege a concrete injury" compels dismissal. *Id.* at 544.

To begin, Plaintiffs do not allege any deficiency in the benefits they purchased or received, such as flaws in the nature or quality of the coverage. Their sole purported harm is that they paid too much for those benefits. But they fail to support that claim with factual allegations sufficient to survive dismissal.

Despite all of their noise about commissions that Mercer received, Plaintiffs do not allege that *they* paid those commissions. Instead, they allege that commissions are an expense of *the insurance carriers*. Compl. ¶¶ 85, 152, 160. Accordingly, while commission rates affect the insurer's bottom lines, but they do

---

[2] Mercer joins Lockton's argument (at Part I of its Motion to Dismiss) that Plaintiffs lack Article III standing, which applies equally to Mercer as to Lockton.

not directly affect Plaintiffs.  As such, Plaintiffs do not have a dog in the fight about the insurer's cost of delivering and servicing its insurance product.

To satisfy standing, Plaintiffs had to allege more than "excessive" commissions; they needed to plausibly and clearly allege that *they* could have paid less.  While Plaintiffs assert that "they overpaid for premiums," *id.* ¶ 145, they come well short of plausibly or clearly alleging such overpayments.  As discussed *infra*, Part II.A.2.a, Plaintiffs have not alleged any facts to show that lower premiums were available at all, much less for comparable benefits.  Plaintiffs ground their conclusory overpayment assertions exclusively in a theory that high commissions *must* mean high premiums, *id.* ¶¶ 146–168—a theory that Plaintiffs present with sarcasm but without factual support, *id.* ¶ 89.  Rather than supporting the theory with facts, Plaintiffs invite the Court to make an inferential leap by crediting their conclusion that "[c]ommissions to brokers impact premiums to participants dollar-for-dollar." Compl. ¶ 84.[3]  But this speculative theory falls well short of satisfying Plaintiffs' burden to plead an injury that is "concrete and particularized," rather than "conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

---

[3] If the commissions at issue were reduced by ten percent tomorrow, nothing beyond Plaintiffs' mere speculation (and wishful thinking) says that those reductions would inure to Plaintiffs' benefit.  Quite the opposite, the insurers who pay the commissions may well choose to keep the difference as added profits.

Rather than pleading an injury-in-fact, Plaintiffs plead facts that *negate* their own standing. Plaintiffs point to several other voluntary-benefit insurance plans that—according to Plaintiffs—had lower broker-commission rates than they compute for Allied Plan. Compl. ¶¶ 161–166. As Allied's Motion to Dismiss demonstrates (at Part V.A, which Mercer joins), those "lower commission" plans that Plaintiffs point to actually had *higher* per-participant premiums than the Allied Plan. This confirms Plaintiffs' lack of standing.

## II. Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law.[4]

### A. Count I Fails to State a Fiduciary-Breach Claim Against Mercer.

Plaintiffs' Count I fails as a matter of law as to Mercer on several grounds, including that Plaintiffs fail to plead that Mercer has any relevant fiduciary authority with respect to the benefits, premiums, and commissions at issue in the Complaint, and that Plaintiffs fail to plead any breach of duty.

#### 1. Plaintiffs Fail to Plead that Mercer Acted in a Fiduciary Capacity with Respect to Selection of the Plan's Voluntary Benefits Insurer or Its Commissions.

Plaintiffs' fiduciary-breach claim against Mercer stumbles out of the gate for a simple reason: the Complaint does not plausibly allege that Mercer was a fiduciary.

---

[4] Mercer joins Allied's Motion to Dismiss (at Part V.B) on the additional ground that Plaintiffs fail to plausibly allege that the Plans are subject to ERISA.

ERISA's fiduciary duties—including the duty of prudence on which Plaintiffs base Count I—bind only those who qualify as "a fiduciary." 29 U.S.C. § 1104(a)(1). This makes "the threshold question" for any ERISA fiduciary-breach claim whether a "person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366–67 (2d Cir. 2014) (quoting *Pegram* and affirming dismissal for lack of fiduciary status).

An entity is an ERISA fiduciary only "to the extent" it (a) "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets," or (b) "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). "The 'to the extent' language in ERISA limits the reach of the fiduciary obligation to only those activities over which the alleged fiduciary has discretion." *Mahoney v. J.J. Weiser & Co.*, 564 F. Supp. 2d 248, 257 (S.D.N.Y. 2008), *aff'd*, 339 F. App'x 46 (2d Cir. 2009).

Here, Plaintiffs attribute to Mercer discretionary fiduciary authority over the selection of Continental as the Plan's insurer, the setting of premium rates, and Mercer's own commissions. The Complaint, however, pleads no factual predicate to support any of these conclusions.

### a. Plaintiffs Fail to Plausibly Allege that Mercer Had any Discretionary Fiduciary Authority over Allied's Selection of the Plan's Voluntary Benefits Insurer and the Associated Premiums.

Plaintiffs concede that Allied— not Mercer—is the "named fiduciary of the Plan." Compl. ¶ 21. As to Mercer, Plaintiffs assert that it "function[ed]" as a fiduciary by exercising discretion over the Plan. *Id.* ¶ 90. However, most of the Complaint's allegations are not specific to Mercer at all, but rather are inapplicable legal principles and conclusions or generalized industry observations.

For example, Plaintiffs baldly allege that Mercer is a fiduciary of the Plan because it "exercised discretionary authority or discretionary control over the administration and management of the Plan, exercised authority or control over the management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii)." Compl. ¶ 29. But such "[t]hreadbare recitals" of ERISA's fiduciary definition, "supported by mere conclusory statements," are the paradigm of what *Iqbal* deems insufficient. 556 U.S. at 678. Plaintiffs further cite and quote numerous legal authorities, but they fail to link these holdings (and their unrelated parties and facts) to any conduct by Mercer here. Compl. ¶¶ 131–140. Plainly missing from the Complaint is any factual development about *Mercer* and the broking services it *actually* provided to Allied. Boilerplate allegations tracking language from other cases cannot substitute for

factual development.  *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (rejecting similar boilerplate "conclusions of law" regarding an alleged fiduciary's "discretionary authority").

Similarly, Plaintiffs' generalized allegations about the insurance and brokerage industry provide no basis from which to infer that Mercer had discretionary authority over the selection of Continental.  At best, the Complaint offers generic descriptions of the "role of brokers" "[a]s a matter of industry practice" that shed no light on Mercer's actual role here.  *E.g.*, Compl. ¶¶ 79–93 (discussing unrelated broker Arthur J. Gallagher & Co. and citing industry publications).  Indeed, Plaintiffs concede that their allegations about Mercer's role are mere speculation, describing the legal duties that would attach "*if* an employer-fiduciary . . . chooses to delegate to a broker," and noting that some brokers "*may* screen" bids from insurers or limit an employer's choices "to only options where commissions are favorable to the broker" such that they exercise "discretionary authority or discretionary control respecting management of the plan."  Compl. ¶¶ 80, 91–92 (emphases added).  These are not factual allegations; they are rote speculation.  Pleading only a mere "possibility" that Mercer performed fiduciary functions that other brokers in the industry might have performed elsewhere fails to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–57.

Setting aside Plaintiffs' "formulaic recitation of the elements of a cause of action," "labels," and "conclusions," *PBGC*, 712 F.3d at 717, the Complaint is left with no facts from which the Court may plausibly infer that Mercer acted in a discretionary fiduciary capacity with respect to the selection of Continental's voluntary benefits insurance for the Plan or the associated premiums. Rather, the Complaint supports only the inference that Mercer lacked such authority.

According to Plaintiffs' own allegations, Allied was the named fiduciary of the Plan, "with overall authority to control and manage the operation and administration of the Plan." Compl. ¶¶ 21, 208. Plaintiffs do not allege, nor could they, that Allied delegated to Mercer its authority to select an insurer. At most, the Complaint alleges that Mercer (and Lockton) "recommend[ed] the insurance company." *Id.* ¶ 86.[5] But Mercer does not assume fiduciary status by presenting Allied with possible insurance-carrier options. As Plaintiffs themselves acknowledge, "[m]erely selling insurance to a Plan, with nothing more, does not automatically create a fiduciary relationship." Compl. ¶ 132.

Indeed, "[s]imply urging the purchase of its products does not make [one] an ERISA fiduciary with respect to those products." *Cotton*, 402 F.3d at 1278 (internal

---

[5] To the extent that the Complaint also uses the term "selected," Compl. ¶ 136, that must be read in context to say (at most) that Mercer selected which *options* to present, as Plaintiffs do not plausibly allege that Mercer had the authority to make any final selection decisions on behalf of the Plan.

quotations omitted); *see also Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) (same). When a service provider to a plan merely functions in the role of "a salesperson earning commissions," the provider is "not a fiduciary under ERISA." *Consol. Beef Indus. v. N.Y. Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991).

This applies to insurance brokers too. Even where a commission-based brokerage firm *also* served as a benefits plan administrator (not alleged here), the broker did not become a fiduciary simply by recommending to a plan which insurance policies to purchase. *See Mahoney*, 564 F. Supp. 2d at 256–57. This did not "convert [the broker] into a fiduciary" absent an allegation that the broker "had the authority to force the [Plan] to accept" its recommendations. *Id.* at 256; *see also Black v. Bresee's Oneonta Dep't Store, Inc. Sec. Plan*, 919 F. Supp. 597, 606–07 (N.D.N.Y. 1996) (agent not a fiduciary by proposing that employer create a life insurance plan, recommending products for plan, and collecting commissions, because he lacked "discretionary power or control over the plan").

Plaintiffs' cases do not say otherwise. *Access Services of Northern Illinois v. Capitol Administrators, Inc.* (cited Compl. ¶ 134) merely stands for the proposition that a broker's act in "exercising final discretion in the choice of which insurance provider and plan to choose does create a fiduciary duty under ERISA." 2021 U.S. Dist. LEXIS 37582, at *11 (N.D. Ill. Mar. 1, 2021). But it acknowledges "that

offering insurance plans for sale or recommending options does not create the type of discretion required for a party to become an ERISA fiduciary." *Id.* Plaintiffs' own allegations place Mercer in the latter camp, not the former.[6] *Georgas v. Kreindler & Kreindler* (cited Compl. ¶ 135), dismissed allegations that a broker was a plan fiduciary. 41 F. Supp. 2d 470, 475 (S.D.N.Y. 1999).

Additionally, Plaintiffs' allegation that Mercer administered claims and controlled communications under the policies (Compl. ¶ 137) does not plead any fiduciary status relevant to Plaintiffs' premium claims. For one thing, Plaintiffs offer zero factual detail about what Mercer purportedly did to administer claims or control communications under the policies. Once again, Plaintiffs' cited authority is off point. *Eversole v. Metropolitan Life Insurance Co.* (cited Compl. ¶ 133) merely recognizes that an *insurer* "may . . . be a fiduciary by virtue of its management or control" of an insurance policy where it was delegated discretionary "authority to grant or deny claims." 500 F. Supp. 1162, 1165–66 (C.D. Cal. 1980). Plaintiffs make no such allegations here. Even if they had, Plaintiffs' allegations that Mercer administered claims are detached from any alleged breach, and thus cannot supply the requisite fiduciary status for that breach. "[T]here must be some connection

---

[6] Plaintiffs' citation to *Chao v. Day*, 436 F.3d 234, 237–38 (D.C. Cir. 2006) (Compl. ¶ 135) is far off-base, as *Day* discusses a scenario in which where a broker "solicited, accepted, and then pilfered the plans' assets by reneging on his promise to purchase insurance for the plans' members," instead taking the money for his own use.

between the discretion exercised and the breach of duty." *Mahoney*, 564 F. Supp. 2d at 257 (allegations that broker was a fiduciary "with regard to the processing of claims" were irrelevant to whether it was also a fiduciary with regard to collecting excessive premiums and commissions, where broker did not have the ultimate authority to choose the insurance carrier for the plan).

> **b.** **Plaintiffs Fail to Plausibly Allege that Mercer Had any Discretionary Fiduciary Authority with Respect to Insurer-Paid Commissions.**

Plaintiffs broadly allege that Mercer had fiduciary duties under ERISA with respect to the commissions it received from Continental. Compl. at p. 26. This theory fails under well-settled authority, on two grounds.

First, Plaintiffs' theory that Mercer "exercised authority or control over the management or disposition of the Plan's assets" by receiving "excessive commissions from Plan assets" is falsely premised on the notion that commissions are paid "from Plan assets." Compl. ¶ 29 & pp. 25–26. Plaintiffs themselves concede that Mercer's commissions are paid "by the insurance company," not by Allied, the Plan, or the Plan's participants. Compl. ¶ 85.[7] Accordingly, Mercer's

---

[7] The Plan's Forms 5500 further confirm that the commissions are paid by the insurer, not the Plan. For example, Plaintiffs plead that Mercer received $2,706 in commissions in 2024. Compl. ¶ 161. These commissions were reported in line 3(b) of Schedule A to the Plan's 2024 Form 5500. Ex. 1, 2024 Form 5500, at 9. (All "Ex. __" cites are to the exhibits attached to the accompanying Declaration of Alison V. Douglass.) The DOL's Form 5500 instructions make clear that any commissions reported in line 3(b) are "paid by an insurer," not by the Plan. Ex. 2, Form 5500

receipt of commissions does not constitute any exercise of control over plan assets.

Plaintiffs' allegation that Mercer's commissions came "directly out of Plan participants' premium payments" (Compl. ¶ 146) does not salvage this theory of fiduciary authority.  Even if the premiums themselves were plan assets *before* going to insurers, they certainly were not plan assets once in the insurer's hands.  *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 657–59 (9th Cir. 2019) ("Premiums paid to an insurance company in return for coverage under a fully insured insurance policy are not 'plan assets.'").  *Depot* arrived at that conclusion by applying "ordinary notions of property rights," consistent with Second Circuit authority.  *Id.* at 657–58 (citing *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 105 (2d Cir. 2011)).  Once premiums are paid to insurers, a plan no longer retains any property interest in them, and the premiums cease to be plan assets (if they ever were) moving forward.  *Id.*; *see also Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2022 WL 952247, at *12–13 (D. Mass. Mar. 30, 2022) (premiums paid to insurer were not plan assets), *aff'd*, 66 F.4th 307 (1st Cir. 2023).  Therefore, if commissions are taken from premium payments in the hands of an

_____

Instructions, at 4 (instructing plan to "[r]eport all sales and base commissions here.  For purposes of this element, sales and/or base commissions are monetary amounts *paid by an insurer* that are charged directly to the contract or policy and that are paid to a licensed agent or broker for the sale or placement of the contract or policy") (emphasis added).  The Court may take judicial notice of the Plan's Form 5500 filings, because the Complaint relies on them (at ¶ 161).  *Humphries v. Mitsubishi Chem. Am., Inc.*, 2024 WL 4711296, at *5 (S.D.N.Y. Nov. 7, 2024).

insurer, those commissions are "paid from assets of the carriers," not from "plan assets." *Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*, 2012 WL 12948705, at *15-16 (N.D. Ga. Jan. 11, 2012).

Second, even if Mercer's commissions were paid by the Plan (which Plaintiffs concede they are not) Mercer cannot be held liable as a fiduciary for its own compensation.

A "service provider 'is not an ERISA fiduciary with respect to the terms of the agreement for its compensation.'" *Patrico v. Voya Fin., Inc.*, 2017 WL 2684065, at *3 (S.D.N.Y. June 20, 2017) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)). This is because "a service provider in such a situation 'has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement." *Id.* (quoting *F.H. Krear*, 810 F.2d at 1259). Fiduciary status arises only when a service provider exercises an "ability to control *unilaterally* the amount of compensation it receives." *Id*. (emphasis added).

Courts around the country agree that—absent this level of control—service providers generally do not assume fiduciary status with respect to their own compensation. *See Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) ("[A] service provider owes no fiduciary duty with respect to the negotiation of its fee compensation."); *McCaffree Fin. Corp. v. Principal Life Ins.*

*Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) (holding that where a plan sponsor "remained free" to reject a service provider's terms, the service provider "could not have maintained or exercised any 'authority' over the plan and thus could not have owed a fiduciary duty under ERISA"); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011) ("[Service provider] owes no fiduciary duty with respect to the negotiation of its fee compensation by [plan sponsor].").  This principle is "well-established." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 139 (D. Mass. 2021). It also "makes sense," as "when a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms." *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 293 (3d Cir. 2014).

These principles apply equally to insurance brokers.  Even where an insurance brokerage firm allegedly received "excessive premiums" and "high commissions" after making insurance-policy purchase recommendations to a plan, this did not transform the brokerage firm "into an ERISA fiduciary."  *Mahoney*, 564 F. Supp. 2d at 256–57.  Insurance brokers, like other entities that provide professional services to plan administrators, "are not ERISA fiduciaries unless they transcend the normal role and exercise discretionary authority." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 632 (8th Cir. 2001) (internal quotations omitted); *see also Fink v. Union*

*Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996) (collecting commissions after recommending insurance options does not turn a broker into a "fiduciary").

Here, Plaintiffs do not allege that Mercer exercised any discretion with respect to rates of commissions paid by Continental, or that Allied was not "free to select a different . . . service provider or none at all." *Patrico*, 2017 WL 2684065, at *3. This freedom to choose a provider other than Mercer means that Mercer "could not have unilaterally controlled the compensation [it] would receive." *Id.* Where, as here, a complaint "fails adequately to allege that any Defendant exercised the requisite control over its compensation," the complaint "fails to allege that any Defendant was an ERISA fiduciary with respect" that compensation. *Id.*[8]

## 2. Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty.

Even if Plaintiffs had plausibly alleged that Mercer acted in a fiduciary capacity with respect to the Plan (which they have not and cannot), Count I fails as a matter of law because Plaintiffs fail to plead a breach of duty.

Count I alleges that Defendants breached the duty of prudence by failing to use any fiduciary process to monitor and control premiums or broker commissions

---

[8] The same goes for Plaintiffs' "co-fiduciary" theory of liability. Compl. ¶ 205. Co-fiduciary liability under 29 U.S.C. § 1105(a) extends only to "a fiduciary with respect to a plan." Even if Plaintiffs had adequately alleged a fiduciary breach by Allied, Mercer was not a fiduciary, and as such, "cannot be held liable as a co-fiduciary." *Forgione v. Gaglio*, 2015 WL 718270, at *13 (S.D.N.Y. Feb. 13, 2015).

and causing participants to overpay for voluntary benefits insurance. *See, e.g.*, Compl. ¶¶ 7, 200–202. Fiduciary prudence under ERISA "focuses on a fiduciary's conduct in arriving at . . . [a] decision, not on its results." *PBGC*, 712 F.3d at 716. Plaintiffs plead no facts concerning any act or process undertaken by any Defendant with respect to the Plan's voluntary benefits insurance, let alone any specific allegations concerning Mercer's role in that process. Compl. ¶¶ 200–202. They offer instead only conclusory assertions that Defendants' process was deficient.

Absent actual allegations of imprudent conduct, Plaintiffs must allege facts from which the court can "reasonably infer . . . that the process was flawed." *PBGC*, 712 F.3d. at 718 (quotations omitted). The Complaint's allegations that participants "overpaid for premiums" (*e.g.*, ¶ 145) and that brokers received "excessive commissions" (*e.g.*, ¶ 147) support no inference of a flawed fiduciary process.

### a. Plaintiffs Fail to Allege Excessive Premiums.

The crux of Plaintiffs' case is that the total cost of the voluntary benefits insurance—the premiums paid by participants—was excessive. Yet Plaintiffs offer no factual allegations to support this premise.

To state an ERISA imprudence claim based on purportedly excessive fees, a plaintiff must "plead[] sufficient facts to render it plausible that [the plan] incurred ***unreasonable*** . . . fees." *Hughes v. Nw. Univ.*, 63 F.4th 615, 631 (7th Cir. 2023) (emphasis added). To meet this burden, "a plaintiff alleging excessive . . . fees must

provide 'meaningful benchmark[s]' and cannot rely on bare allegations that other plans paid less." *Boyette v. Montefiore Med. Ctr.*, 2025 WL 48108, at *1 (2d Cir. Jan. 8, 2025) (summary order); *see also Singh v. Deloitte LLP*, 123 F.4th 88, 95 (2d Cir. 2024) (rejecting the notion that "a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence"). A "meaningful benchmark" must "provid[e] a sound basis for comparison"—a "like-for-like comparison" based on plausible allegations that "similarly sized plans spend less" than the challenged plan for the same thing. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278–79 (8th Cir. 2022) (affirming dismissal).[9]

A complaint must allege ***facts***—not conclusory statements—showing the plan could have received similar benefits for less. *See Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148, 165–68 (E.D.N.Y. 2022). Accordingly, to withstand dismissal, an excessive-fee claim must plausibly "allege that challenged fees were excessive *relative to the services rendered*, or . . . provide allegations concerning other factors relevant to determining whether a fee is excessive under the circumstances." *Singh*, 123 F.4th at 93–94 (emphasis added) (internal quotations omitted).

---

[9] This requirement that an excessive-fee imprudence claim plead comparators or other context comes from ERISA's prudent-man standard, which holds fiduciaries to the standard that a prudent person "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *Singh*, 123 F.4th at 93.

Here, Plaintiffs fail to support their assertion that they paid "excessive and unreasonable premiums" with any factual development. Compl. ¶ 3. The Complaint alleges ranges of annual premiums for the Plan for each category of voluntary benefit (at ¶ 116), but provides no basis of comparison, let alone a meaningful benchmark, from which the Court could conclude that premiums were excessive. Plaintiffs do not identify any insurer that offer lowers premiums for comparable coverages, or any plan receiving comparable coverages for lower rates. Without more, Plaintiffs' conclusory assertion that their premiums were "excessive" is insufficient as a matter of law. *See Singh*, 123 F.4th at 93–94.

While the Court may end its inquiry there, it is notable that Plaintiffs' own allegations undercut their claim that the Plan paid excessive premiums. In attacking Mercer's commission, Plaintiffs identify five plans for which Mercer or Lockton served as the broker on voluntary benefits insurance. Compl. ¶¶ 162–166. As Allied's summary of the information reported on those "comparator" plans' Forms 5500 demonstrates, Plaintiffs received a deal on their premiums for this Plan. *See* Allied's Motion to Dismiss at Part V.A (showing Plaintiffs received "allegedly comparable [voluntary benefits insurance] at a lower price point than [their own] cited comparators"). Mercer joins and incorporates Allied's analysis here.

This analysis also undercuts Plaintiffs' theory that purportedly excessive commissions to Mercer led to higher premiums, as the Form 5500 data show that

these supposedly lower-commission plans had higher premiums than the Plan.

In short, the Complaint fails to plausibly allege that Plaintiffs paid *any* more than they should have for the insurance products they purchased. On that basis, the fiduciary-breach claim against Mercer should be dismissed with prejudice.

### b. Plaintiffs Fail to Allege Excessive Commissions.

Unable to allege that the Plan's premiums were excessive, Plaintiffs attempt to argue that premiums must have been excessive because broker commissions paid out of premiums were excessive (they claim) and thus must have driven up premiums. Compl. ¶¶ 89, 152–153. Plaintiffs' attempt fails for several reasons.

First, Plaintiffs fail to establish that anything about Mercer's commissions caused participants to overpay for their benefits. Premiums alone—regardless of commissions—reflect the total cost to participants of voluntary benefits insurance. *See supra*, Part II.A.2.a. Plaintiffs merely invite the Court to make an inferential leap—"[c]ommissions to brokers impact premiums to participants dollar-for-dollar," Compl. ¶ 84—without any factual basis. Plaintiffs' failure to plead that total premiums were excessive (*see supra*, Part II.A.2.a) forecloses their fiduciary-breach claim. Courts have rejected fiduciary-breach claims premised on post-collection allocation of participants' fees between multiple entities, holding that "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for" participants. *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), *abrogated*

*on other grounds by Hughes v. Nw. Univ.*, 595 U.S. 170 (2022); *see also Jacobs v. Verizon Commc'ns*, 2017 WL 8809714, at \*13 (S.D.N.Y. Sept. 28, 2017).[10]  This reflects ERISA's focus on total costs to participants and plans.  All that matters is whether the premiums *participants* paid were comparatively high, not whether the commissions *insurers* paid to Mercer were comparatively high.

Second, Plaintiffs fail to plausibly allege that commissions paid by Continental to Mercer on voluntary benefits insurance were excessive.  Plaintiffs' excessive-commission claim is based on their comparison of the total average commissions that Mercer and Lockton received on a combined basis (Compl. ¶¶ 141–142, 167) with purportedly "typical" commission rates "in the industry" (*id.* ¶¶ 147–148) and commission rates that Plaintiffs allege Mercer received in connection with benefits offered under other, unrelated plans (*id.* ¶¶ 161–166).

Plaintiffs' wholly unsupported allegations about "typical" broker commissions fall well short of supporting a plausible inference that Mercer's commissions were excessive.  The Complaint's benchmarks are internally inconsistent—alleging at ¶ 88 that voluntary-benefit-insurance commissions range from 15% to 55% on average, and at ¶¶ 147–148 that the average is 2-10%.

---

[10] This issue frequently arises in the context of revenue-sharing arrangements, where mutual funds pay a portion of the fees they collect to service providers. *E.g., Hecker*, 556 F.3d at 586.  What matters to the participant is how much they pay, not the distribution of that payment between insurers, brokers, and others.

Plaintiffs also provide no source or data to support these purported benchmarks. *Id.* ¶ 147 (no source); *id.* ¶ 148 (citing Investopedia but no data). They also plead nothing about the nature or quality of the coverages reflected in the supposed benchmarks to confirm comparability to the coverages at issue here. In any event, the average commissions Plaintiffs estimate for the Plan (39.8%) fall squarely in the 15%-55% range that they allege to be typical of other plans. *Id.* ¶¶ 88, 161.

Plaintiffs' comparison of Mercer's commissions from Continental to its commissions from other insurers likewise fail to state a claim. The Second Circuit has made clear that a complaint cannot survive if it "fails to do more than allege conclusorily that the . . . fees exceeded those of a select handful among the many other plans available on the market." *Singh*, 123 F.4th at 93. Plaintiffs' allegations at ¶¶ 161–166 do no more than that. Plaintiffs offer no facts concerning the nature and quality of the insurance or broking services for those plans compared to the Plan, and their Complaint therefore "lacks sufficient context to infer that the services these plans provided are comparable" such that they might provide a "meaningful benchmark for use in assessing" the commissions at issue. *Id.* at 96.

Courts regularly dismiss excessive-fee imprudence claims for lack of appropriate comparators. *Singh*, 123 F.4th at 98 (affirming dismissal of imprudence claim for lack of adequate comparators); *see also Boyette*, 2025 WL 48108, at *1 (same); *Humphries v. Mitsubishi Chem. Am., Inc.*, 2025 WL 2402281, at *11–14

(S.D.N.Y. Aug. 19, 2025) (same).  This Court should do the same.

Third, Plaintiffs' extensive discussion of loss ratios is a red herring and provides no support for allegations that premiums and/or commissions were too high.  Compl. ¶¶ 94–107.  Loss ratios speak only to how much of each dollar collected in premiums is paid out in claims—two factors over which brokers have no control—and therefore only concern the profitability of insurance policies *for insurers*, not whether premiums or broker commissions were excessive.  *Id.* ¶ 94.  An insurer could experience a high loss ratio (*i.e.*, low profitability) on an expensive insurance coverage if it faces an unexpected onslaught of claims, but experience a low loss ratio (*i.e.*, high profitability) on a less expensive coverage if it receives fewer claims.  In any event, Plaintiffs do not plausibly plead loss ratios for the Plan here (they speculate that it has an "estimated" loss ratio of "significantly less than 50%," *id.* ¶ 150, but do not ground this in any facts specific to the Plan), and concede that the loss ratio benchmark they plead from the Affordable Care Act does not even apply to voluntary benefits.  *Id.* ¶¶ 96–98.

Finally, Plaintiffs' attempt to tease a fiduciary breach claim from the widespread practice of insurance commissions also fails.  Plaintiffs' assertion that, under a commission-based system, Mercer "stood to benefit from recommending the company with the highest price, rather than the lowest price" (Compl. ¶ 86) sounds in disloyalty, not imprudence—and Plaintiffs do not assert any such claim.  Even if

they had, alleging a mere "potential conflict of interest" is insufficient to state a fiduciary disloyalty claim. *See Lalonde v. Mass. Mut. Ins. Co.*, 728 F. Supp. 3d 141, 155 (D. Mass. 2024); *PBGC*, 712 F.3d at 718 (alleging no more than a "sheer possibility" of unlawful conduct does not suffice to state a claim). More fundamentally, Plaintiffs' theory would create near-universal liability for commission-based insurance sales to ERISA plans. Ascribing *per se* ERISA liability for a standard insurance-industry practice violates the basic principle that fiduciary standards are necessarily "context specific." *Dudenhoeffer*, 573 U.S. at 425. "[C]ategorical rule[s] [are] inconsistent with the context-specific inquiry that ERISA requires." *Hughes*, 595 U.S. at 173.

## B. Count VI Fails to State a Claim Against Mercer Based on Any Purported Fiduciary Breaches by Allied.

Plaintiffs also claim that Mercer is liable for fiduciary breaches purportedly committed by Allied, even if Mercer did not possess or breach any fiduciary duties on its own.

To pursue a claim against a non-fiduciary for participating in a fiduciary breach, a plaintiff must allege "1) breach by a fiduciary of a duty owed to plaintiff, 2) defendant's knowing participation in the breach, and 3) damages." *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016) (internal quotations omitted). Count VI fails under this standard.

First, Plaintiffs fail to plausibly allege any fiduciary breach by Allied. Count

VI assumes that Allied failed to monitor and control premiums or broker commissions. But Plaintiffs fail to plead an ERISA violation as to either. *See supra*, Part II.A.2; *see also* Allied's Motion to Dismiss at Part V.C. Absent a viable claim that any fiduciary breached a duty in the first place, any attempt to ascribe secondary liability for such a breach necessarily fails. *See, e.g.*, *Piercy v. AT&T, Inc.*, 2025 WL 2505660, at *42–43 (D. Mass. Aug. 29, 2025) (dismissing co-fiduciary-breach claim due to failure to allege that any defendant breached a fiduciary duty); *Forgione v. Gaglio*, 2015 WL 718270, at *13 (S.D.N.Y. Feb. 13, 2015) (dismissing co-fiduciary breach claim "for lack of an antecedent co-fiduciary breach").

Second, Plaintiffs fail to plead that Mercer knowingly participated in any breach by Allied. *See Ivy Asset Mgmt.*, 843 F.3d at 571 ("knowing participation in the breach" is an essential element of a fiduciary-breach claim against a non-fiduciary). Plaintiffs do not allege that Mercer had any knowledge of, or even reason to second-guess, Allied's monitoring of premiums and broker commissions. Moreover, the Complaint fails to plead that Mercer—even if it knew of a breach—"affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the breach of fiduciary duty] to proceed" by participating in it. *Id.* (internal quotations omitted) (alterations in original).

Even if allowing Mercer to collect excessive commissions could constitute a breach (*contra supra*, Part II.A.2), any theory that Mercer is secondarily liable for

the breach because it should have known its commissions were excessive (which the Complaint fails to demonstrate) still fails. Plaintiffs do not allege that Mercer received more than the commissions it bargained for, and service providers have no duty to monitor plan fiduciaries or negotiate against themselves when negotiating compensation for their services. *See supra* Part II.A; *see also Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*, 1996 WL 665610, at *14 (S.D.N.Y. Nov. 18, 1996) (rejecting a theory that "non-fiduciaries are under an affirmative obligation to oversee and to ensure that fiduciaries do not breach their ERISA duties").

### III. Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of Law.

#### A. Count IV Fails to State a Prohibited-Transaction Claim Against Mercer.

Count IV alleges that Mercer engaged in prohibited transactions by "collecting excessive commissions and other payments from Plan assets" in violation of the prohibitions set forth in ERISA §§ 1106(b)(1) and (b)(3). Compl. ¶¶ 227–229. This prohibited-transaction claim fails for two independent reasons.

##### 1. Plaintiffs Fail to Plausibly Allege Mercer's Fiduciary Status.

Section 406(b) of ERISA only applies to a "fiduciary." 29 U.S.C. § 1106(b) ("A fiduciary with respect to a plan shall not . . . ."). As explained *supra* Part II.A.1, Plaintiffs fail to allege that Mercer functioned as a fiduciary in any manner, let alone in the complained-of conduct (here, collecting commissions). Because fiduciary

status is an element of any Section 406(b) prohibited-transaction claim, Plaintiffs' failure to plead Mercer's fiduciary status requires dismissal of Count IV as well.

### 2. Count IV Fails Because Commissions Are Not Plan Assets.

Even if Plaintiffs had plausibly alleged that Mercer functioned as a fiduciary, Count IV would still fail because it is premised on Plaintiffs' assertion that Mercer "collected excessive commissions and other payments from Plan assets" (Compl. ¶ 229), but, as discussed *supra*, Part II.A.1.b, commissions are not plan assets.

### B. Count VIII Fails to Allege that Mercer Is Liable as a Knowing Participant in Any Prohibited Transactions.

Count VIII attempts to hold Mercer liable for prohibited transactions under three provisions of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), all of which prohibit certain transactions between a plan and a "party in interest." This claim fails for several reasons.

### 1. Count VIII is Too Conclusory to Survive a Motion to Dismiss.

Plaintiffs allege that Mercer "knew that by selecting and retaining Mercer as a broker for the voluntary benefits insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, Allied caused the Plan to engage" in three types of prohibited transactions. Compl. ¶¶ 266–268. These purported prohibited transactions were: (1) the "exchange . . . of . . . property between the plan and a party in interest," 29 U.S.C. § 1106(a)(1)(A); (2) the

"furnishing of goods, services, or facilities between the plan and a party in interest," *id.* § 1106(a)(1)(C); and (3) the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," *id.* § 1106(a)(1)(D).[11]

These conclusory allegations do nothing more than recite statutory provisions; they do not identify any particular transaction, let alone one involving property of the Plan, or any furnishing of goods, services or facilities to the Plan. The Second Circuit rejected such "threadbare recitals of the elements of a cause of action" under analogous facts in *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). In *Rosen*, the plaintiff challenged fee-sharing payments that a service provider received in connection with services to a plan, and alleged prohibited transactions relating to the receipt of such payments. The Second Circuit affirmed the dismissal of such claims as "conclusory" where the complaint merely "rehearse[d] the statutory definitions of prohibited transactions and attache[d] them to allegations of unlawful [payments]." *Id.* at 6–7. Count VIII's threadbare allegations fail for the same reason.

---

[11] Paragraph 115 also states that "[i]t is reasonable to infer that Mercer and Lockton collected additional undisclosed compensation, based on Mercer and Lockton's known practices and those in the industry." Compl. ¶ 115. It is unclear what this allegation refers to, what it is based on, or why it is supposedly "reasonable."

### 2. Plaintiffs Fail to Plead a Transaction Between the Plan and Mercer Involving Plan Assets.

Count VIII hinges on the allegation that Allied caused the Plan to engage in prohibited transactions with Mercer by "causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions." Compl. ¶¶ 266–268. Plaintiffs fail to plausibly allege that Mercer received premiums; indeed—they plead the opposite: that premiums were paid to the insurer. *Id*. ¶ 85; Ex. 1, 2024 Form 5500, at 9 (reporting premiums collected *by Continental*); *see also* n.8, *supra*. There is no non-conclusory allegation in the Complaint that Mercer itself received any premium payments—even assuming those payments were plan assets at some point. And the commissions paid to Mercer cannot form the basis for a prohibited transaction, as they did not involve plan assets.

Section 406(a)(1) of ERISA is designed to prevent "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve *uses of plan assets* that are potentially harmful to the plan." *Id.* (emphasis added).

Plaintiffs' allegations regarding Mercer's receipt of commissions from an insurer fails to plead any transaction involving "plan assets" subject to Section 406(a). While the Complaint *does* allege that Mercer received commission

payments, it makes clear that those payments were made by insurers rather than the Plan or its participants.  As such, those commissions were *not* plan assets, *see supra*, Part II.A.2.b, thus and cannot form the basis for a claim under Section 406(a)(1).

### 3. Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-Interest for the Transactions Underlying Count VIII.

Count VIII fails for another, independent reason:  Plaintiffs fail to plausibly allege that Mercer was a "party in interest" of the Plan at the relevant time.  Each of Section 406(a)'s subparts describes a plan's transaction with a "party in interest," 29 U.S.C. § 1106(a), which ERISA defines to include "a person providing services to [a] plan."  29 U.S.C. § 1002(14)(B).  "Congress defined 'party in interest' to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries."  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000).

Courts have recognized that a service provider is not a "party in interest" of the plan at the time it negotiates its contract, even if it becomes one later.  *See D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 609–12 (5th Cir. 2023) ("Because [the provider] was not yet providing services to the Plan, we conclude that [the provider] was not a 'party in interest' under § 1106(a) when it entered the . . . Contract."), *cert. denied*, 144 S. Ct. 2525 (2024); *Danza v. Fidelity Mgmt. Tr. Co.*, 533 F. App'x 120, 125–26 (3d Cir. 2013) (same); *see also Ramos v. Banner Health*, 1 F.4th 769, 787 (10th Cir. 2021) ("[S]ome prior

relationship must exist between the fiduciary and the service provider to make the provider a party in interest under § 1106."). This reading of ERISA best accords with Congress's design for §§ 1106(a) and 1002(14)(B), which together prevent transactions more likely to involve insider favoritism rather than arm's-length transactions. *See supra*, pp. 32–33 (citing *Spink* and *Harris Trust*).

Plaintiffs nowhere allege that Mercer had somehow become a party in interest to the Plan *before* negotiating any agreement to broker insurance coverage, and it is the payments that Mercer received pursuant to its brokerage agreement that Plaintiffs attack as prohibited transactions in Count VIII.

## IV. Plaintiffs Fail to Show Entitlement to any Equitable Relief Against Mercer as a Non-Fiduciary.

Counts VI and VIII rest on the theory that Plaintiffs are entitled to relief from Mercer for fiduciary breaches and prohibited transactions, even though Mercer was not a *fiduciary* who caused the Plan to engage in any such breaches or transactions. That theory crumbles upon inspection.

The Supreme Court has held that ERISA forecloses damages remedies against non-fiduciaries, even if they participate in a fiduciary's breach. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255–59 (1993). Congress designed ERISA this way because exposing non-fiduciaries to "joint and several liability, for *all* direct and consequential damages suffered by the plan, on the part of persons who had no real power to control what the plan did . . . would impose high insurance costs upon

persons who regularly deal with and offer advice to ERISA plans, and hence upon ERISA plans themselves." *Id.* at 262. Because Mercer was not a fiduciary to the Plan, *see supra*, Part II.A.1, Plaintiffs cannot obtain monetary damages from it.

Plaintiffs claim Mercer is liable for "equitable relief" under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Compl. ¶ 249. Putting aside the labels they use, however, it is apparent that Plaintiffs are actually seeking legal (monetary) relief, not equitable relief, from Mercer. Section 502(a)(3) only allows recovery from a "particular fund" in the defendant's possession, "distinct from [defendant's] general assets." *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363–64 (2006). Such a claim fails if it does not "identify segregated funds in [defendant's] possession, but merely attempts to impose a personal liability upon [defendant]." *Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*, 2008 WL 2754069, at *4 (S.D.N.Y. June 30, 2008).

Here, Plaintiffs have not alleged any "particular fund" in Mercer's possession that represents its alleged ill-gotten gains. Simply "[l]abeling [a] portion of defendants' assets" is insufficient to "identify [a] particular fund in defendants' possession, distinct from its general assets." *Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*, 617 F. Supp. 2d 131, 135 (E.D.N.Y. 2008). As a result, "the restitution sought . . . [is] legal—not equitable—because the *specific funds* to which the [plaintiffs] claim[] an entitlement . . . [a]re not in [the defendant's]

possession." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 143 (2016) (emphasis added).

Because Section 502(a)(3) only provides for equitable relief, and Counts VI and VIII seek monetary rather than equitable relief, those counts must be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: February 25, 2026    Respectfully Submitted,

            /s/ Alison V. Douglass
            Alison V. Douglass, *admitted pro hac vice*
            James O. Fleckner, *admitted pro hac vice*
            Katherine G. McKenney, *admitted pro hac vice*
            GOODWIN PROCTER LLP
            100 Northern Avenue
            Boston, MA 02210
            (617) 570-1000
            ADouglass@goodwinlaw.com
            JFleckner@goodwinlaw.com
            KMcKenney@goodwinlaw.com

            Samuel J. Rubin
            GOODWIN PROCTER LLP
            The New York Times Building
            620 Eighth Avenue
            New York, NY 10018-1405
            SRubin@goodwinlaw.com

            *Attorneys for Defendant Mercer Health*
            *and Benefits Administration, LLC*

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.1(c), the undersigned certifies that the above Memorandum contains a total of 8,747 words, measured by Microsoft Office Word.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Alison V. Douglass*
Alison V. Douglass