**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

SABRINA FELLOWS, EDMUND LYNN
III, DONNA PATTON, WESLEY HALL,
and NINA BUSTAMANTE-VICARIO,
Individually and as Representatives of a
Class of Participants and Beneficiaries on
Behalf of the ALLIED UNIVERSAL
HEALTH AND WELFARE BENEFIT
PLAN,

           Plaintiffs,

        v.

UNIVERSAL SERVICES OF AMERICA,
LP d/b/a ALLIED UNIVERSAL, ALLIED
UNIVERSAL EMPLOYEE BENEFITS
COMMITTEE, MERCER HEALTH AND
BENEFITS ADMINISTRATION, LLC,
LOCKTON COMPANIES, LLC, and
JOHN DOES 1–20,

           Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.
1:25-cv-10659-GHW-BCM

-------------------------------------------------------- X

**MERCER HEALTH AND BENEFITS, LLC'S MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS'**
**<u>AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

LEGAL STANDARD .............................................................................................. 6

ARGUMENT ........................................................................................................... 8

I.     Plaintiffs Fail to Establish Article III Standing ............................................... 8

II.    Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law. 10

     A.    Count I Fails to State That Mercer is a Functional Fiduciary of
the Plan .............................................................................................. 10

          1.    Plaintiffs Fail to Plausibly Allege that Mercer Had Any
Discretionary Fiduciary Authority Over Allied's Selection
of Aflac and Its Premiums ........................................................ 11

          2.    Plaintiffs Fail to Plausibly Allege that Mercer Had Any
Discretionary Fiduciary Authority with Respect to Insurer-Paid
Commissions. ............................................................................ 16

     B.    Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty ..... 21

          1.  Plaintiffs Fail to Allege Excessive Premiums. ........................... 22

          2.  Plaintiffs Fail to Allege Excessive Commissions ........................ 25

     C.    Count VI Fails to State a Claim Against Mercer Based on Any
Purported Fiduciary Breaches by Allied ............................................ 29

III.   Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of
Law .............................................................................................................. 31

     A.    Count IV Fails to State a Prohibited-Transaction Claim Against
Mercer ............................................................................................... 31

     B.    Count VIII Fails to Allege that Mercer Is Liable as a Knowing
Participant in Any Prohibited Transactions. ...................................... 32

          1.    Count VIII is Too Conclusory to Survive a Motion to
Dismiss .................................................................................... 32

          2.  Plaintiffs Fail to Plead a Transaction Involving Plan Assets ........ 33

          3.  Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-
Interest .................................................................................... 34

          4.  Count VIII is Untimely ............................................................. 35

IV.   Plaintiffs Fail to Show Entitlement to any Equitable Relief Against
Mercer. ........................................................................................................ 36

CONCLUSION ..................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Access Serv. of N. Ill. v. Capitol Admin., Inc,.*
  2021 WL 780483 (N.D. Ill. Mar. 1, 2021) ......................................................15

*Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable*
  *Life Assurance Soc'y of the U.S.*,
  841 F.2d 658 (5th Cir. 1988) ...........................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................6, 11

*Barchock v. CVS Health Corp.*,
  886 F.3d 43 (1st Cir. 2018).............................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................6, 7, 12

*Black v. Bresee's Oneonta Dep't Store, Inc. Sec. Plan*,
  919 F. Supp. 597 (N.D.N.Y. 1996)..................................................................14

*Boyette v. Montefiore Med. Ctr.*,
  2025 WL 48108 (2d Cir. Jan. 8, 2025) ........................................................22, 28

*Carfora v. Teachers Ins. Annuity Ass'n of Am.*,
  631 F. Supp. 3d 125 (S.D.N.Y. 2022) .............................................................13

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002). ...........................................................................4

*Chao v. Day*,
  436 F.3d 234 (D.C. Cir. 2006)..........................................................................15

*Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*,
  1996 WL 665610 (S.D.N.Y. Nov. 18, 1996)....................................................30

*Collins v. Northeast Grocery, Inc.*,
  149 F.4th 163 (2d Cir. 2025) ...........................................................................6

*Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp.*
  *Benefits Assocs., Inc.*,
  2012 WL 12948705 (N.D. Ga. Jan. 11, 2012)..................................................18

*Consol. Beef Indus. v. N.Y. Life Ins. Co.*,
    949 F.2d 960 (8th Cir. 1991) ...................................................................14

*Cotton v. Mass. Mut. Life Ins. Co.*,
    402 F.3d 1267 (11th Cir. 2005) ...........................................................12, 14

*Coulter v. Morgan Stanley & Co.*,
    753 F.3d 361 (2d Cir. 2014) ..................................................................10

*D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*,
    88 F.4th 602 (5th Cir. 2023) ..................................................................35

*Danza v. Fid. Mgmt. Tr. Co.*,
    533 F. App'x 120 (3d Cir. 2013) ..............................................................35

*David v. Alphin*,
    704 F.3d 327 (4th Cir. 2013) ..................................................................36

*Depot, Inc. v. Caring for Montanans, Inc.*,
    915 F.3d 643 (9th Cir. 2019) .............................................................17, 18

*Eversole v. Metro. Life Ins. Co.*,
    500 F. Supp. 1162 (C.D. Cal. 1980) ..........................................................16

*Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*,
    2008 WL 2754069 (S.D.N.Y. June 30, 2008) ...............................................37

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014)..........................................................................7, 29

*Fink v. Union Cent. Life Ins. Co.*,
    94 F.3d 489 (8th Cir. 1996) ..................................................................19

*Forgione v. Gaglio*,
    2015 WL 718270 (S.D.N.Y. Feb. 13, 2015) .............................................21, 30

*Georgas v. Kreindler & Kreindler*,
    41 F. Supp. 2d 470 (S.D.N.Y. 1999) .........................................................15

*Gonzalez v. Northwell Health, Inc.*,
    632 F. Supp. 3d 148 (E.D.N.Y. 2022).......................................................23

iv

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
   530 U.S. 238 (2000)...................................................................................35

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .............................................................25, 26

*Hughes v. Nw. Univ.*,
   63 F.4th 615 (7th Cir. 2023) ..............................................................22, 29

*Humphries v. Mitsubishi Chem. Am., Inc.*,
   2024 WL 4711296 (S.D.N.Y. Nov. 7, 2024)...........................................17

*Humphries v. Mitsubishi Chem. Am., Inc.*,
   2025 WL 2402281 (S.D.N.Y. Aug. 19, 2025)..........................................28

*Johnston v. Paul Revere Life Ins. Co.*,
   241 F.3d 623 (8th Cir. 2001) ...................................................................19

*Lalonde v. Mass. Mut. Ins. Co.*,
   728 F. Supp. 3d 141 (D. Mass. 2024)......................................................29

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996)..................................................................................34

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)....................................................................................9

*Mahoney v. J.J. Weiser & Co.*,
   564 F. Supp. 2d 248 (S.D.N.Y. 2008) ...............................11, 14, 16, 19

*Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*,
   2022 WL 952247 (D. Mass. Mar. 30, 2022) ...........................................18

*Matousek v. MidAmerican Energy Co.*,
   51 F.4th 274 (8th Cir. 2022) ....................................................................23

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993)..................................................................................36

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
   577 U.S. 136 (2016)..................................................................................37

v

*Patrico v. Voya Fin., Inc.*,
   2017 WL 2684065 (S.D.N.Y. June 20, 2017) .........................................18, 19, 21

*Pegram v. Herdrich*,
   530 U.S. 211 (2000).........................................................................................10

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011) ............................................................................19

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   718 F. App'x 3 (2d Cir. 2017) .........................................................................33

*Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*,
   768 F.3d 284 (3d Cir. 2014) ........................................................................13, 19

*Santomenno v. Transamerica Life Ins. Co.*,
   883 F.3d 833 (9th Cir. 2018) ...........................................................................19

*Sereboff v. Mid Atl. Med. Servs., Inc.*,
   547 U.S. 356 (2006).........................................................................................37

*Singh v. Deloitte LLP*,
   123 F.4th 88 (2d Cir. 2024) ........................................................................*passim*

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret.*
   *Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ........................................................................*passim*

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020)............................................................................................8

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016) .......................................................................29, 30

*Turner v. Schneider Elec. Holdings, Inc.*,
   530 F. Supp. 3d 127 (D. Mass. 2021)...............................................................19

*Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*,
   617 F. Supp. 2d 131 (E.D.N.Y. 2008)...............................................................37

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) ........................................................................23

vi

## Statutes

ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B) ......................................................34

ERISA § 3(21)(A)(i), (iii), 29 U.S.C. § 1002(21)(A)(i), (iii) ...........................10, 11

ERISA § 404(a), 29 U.S.C. § 1104(a) .........................................................10, 23

ERISA § 406(a), 29 U.S.C. § 1106(a) .......................................................32, 34, 36

ERISA § 406(b), 29 U.S.C. § 1106(b).............................................................31

ERISA § 408(b), 29 U.S.C. § 1108(b)..............................................................20

ERISA § 413(1), 29 U.S.C. § 1113(1)...............................................................35

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).......................................................37

## Other Authorities

Fed. R. Civ. P. 12(b)(1)......................................................................3, 6, 10

Fed. R. Civ. P. 12(b)(6)......................................................................3, 6, 10

Field Assistance Bulletin No. 2021-03 (December 30, 2021),
     https://www.dol.gov/agencies/ebsa/employers-and-
     advisers/guidance/field-assistance-bulletins/2021-03 ......................................20

Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health
     Plans the next class action risk for plan sponsors?,* Employees
     First (June 2025) ..................................................................................15

Mike Prendes, Focus on Voluntary Benefits, The Actuary (Sept.
     2019), https://www.theactuarymagazine.org/focus-on-voluntary-
     benefits/ archived at https://perma.cc/63GM-HKC7............................................5

*OGC Opinion* No. 02-12-23, NYS Dep't. of Fin. Serv.,
     https://www.dfs.ny.gov/insurance/ogco2002/rg021223.htm ...............................5

## INTRODUCTION

Plaintiffs' Amended Complaint ("AC") fails to remedy the pleading deficiencies that compel dismissal of Mercer Health & Benefits Administration, LLC ("Mercer") from this case. The AC offers no new allegation whatsoever as to Mercer's role with respect to the selection of voluntary-benefits insurance by Allied Universal Services of America, LP ("Allied"),[1] and Plaintiffs continue to fail to plausibly allege that Mercer had a discretionary fiduciary role with respect to the selection of Continental American Insurance Company/Aflac ("Aflac") for the Allied voluntary benefits plan (the "Plan"). This defect is fatal to Plaintiffs' claims against Mercer under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

The AC also fails to plausibly allege that the premiums Aflac collected were too high, or that the commissions Aflac paid to Mercer for its broker services breached any duty owed under ERISA. As with the original complaint, the AC fails to support Plaintiffs' allegation that they paid "excessive and unreasonable premiums" (¶ 3)[2] with any basis of comparison, as they fail to plead that the same insurance they elected was available on the market for *any* less. Unable to support

---

[1] Mercer joins the dismiss grounds set forth by Allied and Lockton Companies, LLC ("Lockton").

[2] "¶" citations refer to paragraphs of the AC.

1

their excessive-premium claim, Plaintiffs assert that Aflac paid excessive commissions to Mercer (and Lockton), and that their premiums must therefore have been excessive.   However, Plaintiffs fail to support any inference that the commissions Aflac elected to pay the brokers had any bearing on the premiums charged to Plaintiffs.   The comparator plan data they plead do not support any inference that, but for broker commissions, Plaintiffs would have paid lower premiums.   Plaintiffs also do not (and cannot) allege that Aflac's payment of commissions to the brokers resulted in any reduction in value of the benefits that Plaintiffs purchased.   And even if Mercer's commissions were relevant to Plaintiffs' benefits, Plaintiffs make no apples-to-apples comparisons from which the Court could infer that Mercer's commissions were excessive compared to commissions paid to any other broker for comparable services.

At bottom, the AC does nothing more than launch a generalized attack on the use of commissions to compensate brokers for their services—a practice that Plaintiffs concede is a widespread industry norm.   In the absence of plausible allegations that the total cost of their voluntary benefits was excessive (and thus indicative of a fiduciary breach), Plaintiffs ask the Court to adopt the unprecedented view that any insurer that pays broker commissions *must be* charging excessive premiums.   The Court should decline Plaintiffs' invitation to effectively outlaw the common and lawful practice of compensating brokers through commissions.

2

The AC should be dismissed, with prejudice, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## FACTUAL BACKGROUND

Plaintiffs are current and former employees who elected to purchase voluntary accident, critical-illness, and/or hospital-indemnity insurance policies through the Plan at disclosed premium rates. ¶¶ 2, 13-17, 134. They allege that Allied sponsors the Plan, is the Plan's named fiduciary, and, along with its Employee Benefits Committee, exercises fiduciary authority with respect to the Plan, its assets, and its administration. ¶¶ 20-25.

Mercer is an insurance-brokerage firm. ¶ 27. Plaintiffs claim that, "[a]s a matter of industry practice," brokers like Mercer are functional fiduciaries under ERISA because they exercise discretion in administering voluntary-benefit plans. ¶ 102. They claim that "brokers such as Mercer … may … screen the bids" they receive from insurers and present employers with a "curated set of alternatives." ¶ 103. Although the AC refers to industry practice and what brokers *may* do, its factual allegations about what Mercer actually did *here* are scant. Plaintiffs allege that Mercer served as the Plan's "sole broker" from 2019-2020. ¶ 125. Plaintiffs allege that Mercer recommended to Allied certain insurance companies to offer voluntary benefits policies. ¶ 94.

3

Plaintiffs assert that Mercer exercised discretionary authority or discretionary control over the Plan and its assets, and acted as a fiduciary with respect to the Plan's voluntary benefits. ¶ 29; Count I. In fact, Mercer provided services to Allied pursuant to an agreement ("Mercer Agreement") in which Allied expressly acknowledged that Mercer was not an "administrator" of the Plan "within the meaning [of ERISA]" and not "a fiduciary." Ex. 3 at MercerMTD0016.[3] Rather than performing a fiduciary role with respect *to the Plan*, the Mercer Agreement makes clear that Mercer provided services *to Allied*, including acting as a liaison between Allied and the insurer, and providing carrier and insurance-product sourcing, communications support, and other non-fiduciary services. *Id.* at MercerMTD0012-14.

Plaintiffs allege that Mercer is compensated for its services through commissions paid by the insurer out of premiums collected from participants, which premiums and commissions are disclosed to Allied and reported on its annual Forms 5500 filed with the U.S. Department of Labor. ¶¶ 93, 188. Plaintiffs concede these commissions were paid by insurers, not by the Plan or participants. ¶ 93. Plaintiffs and the authorities upon which they rely concede that the use of commissions to

---

[3] Although the absence of plausible allegations that Mercer acted as a fiduciary with respect to Allied's selection of Aflac is dispositive of Plaintiffs' claims, the Court may further consider the Mercer Agreement, because it is "integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). ("Ex. __" cites are to exhibits attached to the Declaration of Alison V. Douglass.).

4

compensate brokers for their services is a "common industry practice." *E.g.*, ¶¶ 86, 89, n.21.

Plaintiffs also acknowledge that commissions are "part of an insurer's expenses." AC at n.22. As explained by *OGC Opinion No. 02-12-23*, New York State Department of Financial Services (cited AC n.22)[4], commission "rates are established contractually between the insurer and the broker" and "are part of an insurer's expenses." Insurance is a highly regulated industry and "the expense portion of an insurer's rate must be included in support of its rate filings made with" insurance regulators. *Id.* Plaintiffs acknowledge that commission structures vary, with some insurers paying brokers a higher rate of commission in the first year of certain policies, and lower percentages in subsequent renewal years, while other carriers may pay level annual commissions. ¶¶ 98-100. The use of higher upfront commissions is "common." *See* Mike Prendes, *Focus on Voluntary Benefits*, THE ACTUARY (Sept. 2019)[5] (cited AC at n.25).

Absent from the AC are any allegations about commission rates that Aflac paid Mercer in connection with the Plan. Insurers set the rates of commissions that they pay on certain lines of insurance, and Mercer disclosed in its contract with

---

[4] https://www.dfs.ny.gov/insurance/ogco2002/rg021223.htm (last visited April 28, 2026).

[5] https://www.theactuarymagazine.org/focus-on-voluntary-benefits/ archived at https://perma.cc/63GM-HKC7.

Allied that Aflac would pay it 70% of premiums for new critical-illness policies, and 55% of premiums for new hospital-indemnity policies, and 8% and 10% respectively for renewals (Ex. 3 at MercerMTD0022)—the same commission rates that Aflac pays Lockton, Allied current broker. *See* ¶¶ 129-130.

The AC asserts that Mercer acted as an ERISA fiduciary with respect to the selection of Aflac for the Plan, and breached fiduciary duties and engaged in prohibited transactions by causing participants to pay excessive premiums and by receiving excessive commissions. Plaintiffs also allege that Mercer knowingly participated in Allied's fiduciary breaches and prohibited transactions. ¶¶ 288, 310.

## LEGAL STANDARD[6]

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). To withstand dismissal, a

---

[6] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted. This section cites Rule 12(b)(6) cases applying the *Twombly* and *Iqbal* pleading standard, but that standard also applies to Rule 12(b)(1). *See Collins v. Northeast Grocery, Inc.*, 149 F.4th 163, 170 (2d Cir. 2025) ("Factual allegations of standing must be plausible and nonconclusory to survive a motion to dismiss.").

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At minimum, a "complaint must demonstrate more than a sheer possibility that a defendant has acted unlawfully." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013).

The Supreme Court has emphasized that motions to dismiss are an "important mechanism for weeding out meritless claims" in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "[C]areful, context-sensitive scrutiny of a complaint's allegations" is necessary to accomplish the "important task" of "divid[ing] the plausible sheep from the meritless goats." *Id*. Absent careful scrutiny at the pleading stage, a "plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *PBGC*, 712 F.3d at 719 (alteration in original). This makes it imperative to ensure that a complaint "allege[s] a *factual* predicate concrete enough to warrant further proceedings." *Id*.

7

## ARGUMENT

### I.    Plaintiffs Fail to Establish Article III Standing.[7]

To establish standing, a plaintiff must "demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). Failure "to plausibly and clearly allege a concrete injury" compels dismissal. *Id.* at 544.

Plaintiffs do not allege any deficiency in the benefits they purchased or received, such as flaws in the nature or quality of the coverage. Their sole purported harm is that they paid too much for those benefits. But they fail to support that claim with factual allegations sufficient to survive dismissal.

Notwithstanding their complaints about Mercer's commissions, Plaintiffs do not allege that *they* paid those commissions. They allege that commissions are an expense of *the insurer*. ¶¶ 93, 179, 187. Accordingly, while commission rates affect the insurer's bottom line, they do not affect Plaintiffs.

To satisfy standing, Plaintiffs must plausibly and clearly allege that *they* could have paid less for their voluntary benefits. While Plaintiffs assert that "they overpaid

---

[7] Mercer joins Lockton's argument (at Part I of its Motion to Dismiss) that Plaintiffs lack Article III standing, which applies equally to Mercer as to Lockton.

for premiums," ¶ 170, as discussed *infra*, Part II.B.1, Plaintiffs have not alleged any facts to show that lower premiums were available at all, much less for comparable benefits.    Plaintiffs ground their conclusory overpayment assertions on the assumption that high commissions *must* mean high premiums, and that lower commissions would have resulted in lower premiums, ¶¶ 171-214—a theory without factual support, ¶ 101.  Plaintiffs invite the Court to make an inferential leap by crediting their conclusion that "[c]ommissions to brokers impact premiums to participants dollar-for-dollar." ¶ 88.[8]  But this speculative theory is "conjectural or hypothetical" and not "concrete and particularized." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  It is also undercut by Plaintiffs' allegations that factors *other than commissions* drive premium rates.  *Infra*, Part II.B.1.

Plaintiffs further plead facts that *negate* their own standing.  They point to several other voluntary-benefit plans that they claim had lower broker-commission rates than they compute for Allied's Plan.  ¶¶ 188-203.  As Allied's Motion to Dismiss demonstrates (at Part V.B.2-V.C, which Mercer joins), many of Plaintiffs' "lower commission" plans actually had *higher* per-participant premiums than the

---

[8] If commissions were reduced tomorrow, nothing beyond Plaintiffs' mere speculation (and wishful thinking) says that those reductions would inure to Plaintiffs' benefit.  The insurer may well choose to keep the difference as added profits.

Allied Plan.  This confirms Plaintiffs' lack of standing and their claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## II.   Plaintiffs' Fiduciary-Breach Claims as to Mercer Fail as a Matter of Law.

### A.   Count I Fails to State That Mercer is a Functional Fiduciary of the Plan.

The AC fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) because it does not plausibly allege that Mercer was a fiduciary.

ERISA's fiduciary duties bind only those who qualify as "a fiduciary."  29 U.S.C. § 1104(a)(1).  This makes "the threshold question" for any ERISA fiduciary-breach claim whether a "person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 366-67 (2d Cir. 2014) (affirming dismissal for lack of fiduciary status).

An entity is an ERISA fiduciary only "to the extent" it (a) "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets," or (b) "has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A)(i), (iii).  "The 'to the extent' language in ERISA limits the reach of the fiduciary obligation to only those activities

10

over which the alleged fiduciary has discretion." *Mahoney v. J.J. Weiser & Co.*, 564 F.Supp.2d 248, 257 (S.D.N.Y. 2008), *aff'd*, 339 F. App'x 46 (2d Cir. 2009).

Here, Plaintiffs attribute to Mercer fiduciary authority over the selection of Aflac, the setting of premium rates, and Mercer's own commissions. The AC, however, pleads no factual predicate to support these conclusions.

### 1. Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Fiduciary Authority Over Allied's Selection of Aflac and Its Premiums.

Plaintiffs concede that Allied— not Mercer—is the "named fiduciary of the Plan." ¶ 21. Plaintiffs assert that Mercer "function[ed]" as a fiduciary by exercising discretion over the Plan. ¶ 102. However, most of Plaintiffs' allegations are not specific to Mercer at all, but rather are inapplicable legal principles and conclusions or generalized industry observations.

Plaintiffs baldly allege that Mercer is a fiduciary of the Plan by reciting the text of 29 U.S.C. §§ 1002(21)(A)(i) and (iii). ¶ 29. Such "[t]hreadbare recitals" of ERISA's fiduciary definition, "supported by mere conclusory statements," are the paradigm of what *Iqbal* deems insufficient. 556 U.S. at 678. Plaintiffs further cite and quote numerous legal authorities, but they fail to link these holdings to any conduct by Mercer here. ¶¶ 153-157. Plainly missing from the AC is any factual development about *Mercer* and the broking services it *actually* provided to Allied. Boilerplate allegations tracking language from other cases cannot substitute for

11

factual development. *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (rejecting boilerplate "conclusions of law" regarding alleged fiduciary's "discretionary authority").

Similarly, Plaintiffs' generalized allegations about the insurance and brokerage industry provide no basis from which to infer that Mercer had discretionary authority over the selection of Aflac. At best, the AC offers generic descriptions of the "role of brokers" "[a]s a matter of industry practice" that shed no light on Mercer's actual role here. *E.g.*, ¶¶ 82-86 (discussing unrelated broker and citing industry publications). Indeed, Plaintiffs concede that their allegations about Mercer's role are mere speculation, describing the legal duties that would attach "*if* an employer-fiduciary … chooses to delegate to a broker," and noting that some brokers "*may* also screen" bids from insurers, "present" the options to the employer, or limit an employer's choices "to only options where commissions are favorable to the broker" such that they exercise "discretionary authority or discretionary control respecting management of the plan." ¶¶ 83, 103-105. These are not factual allegations; they are rote speculation. Pleading only a mere "possibility" that Mercer performed functions that other brokers in the industry might have performed elsewhere fails to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-57. And even if these generalized allegations were credited as to Mercer, at best they describe a role consisting only of reviewing and presenting options *for*

12

*the employer's ultimate selection*, which supports no inference of discretionary authority on Mercer's part. *Santomenno v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 296 (3d Cir. 2014) (provider's monitoring of plan features did not give rise to fiduciary status where plan sponsor retained "ultimate authority" for selection); *Carfora v. Teachers Ins. Annuity Ass'n of Am.*, 631 F.Supp.3d 125, 153 (S.D.N.Y. 2022) ("limit[ing] the investment options available to the plan" does not create fiduciary status).

Setting aside Plaintiffs' "formulaic recitation of the elements of a cause of action," "labels," and "conclusions," *PBGC*, 712 F.3d at 717, the AC is left with no facts from which the Court may plausibly infer that Mercer acted in a discretionary fiduciary capacity with respect to the selection of Aflac or its premiums. Rather, the AC supports only the opposite inference—that Mercer lacked such authority.

According to Plaintiffs' own allegations, Allied was the named fiduciary of the Plan, "with overall authority to control and manage the operation and administration of the Plan." ¶¶ 21, 255. Plaintiffs do not allege, nor could they, that Allied delegated to Mercer its authority to select an insurer. At most, the AC alleges that Mercer (and Lockton) "recommend[ed] the insurance company." ¶ 94. But Mercer does not assume fiduciary status by presenting Allied with possible insurance-carrier options. As Plaintiffs acknowledge, "[m]erely selling insurance to

13

a Plan, with nothing more, does not automatically create a fiduciary relationship." ¶ 154.

Indeed, "[s]imply urging the purchase of its products does not make [one] an ERISA fiduciary with respect to those products." *Cotton*, 402 F.3d at 1278; *see also Am. Fed'n of Unions Loc. 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y of the U.S.*, 841 F.2d 658, 664 (5th Cir. 1988) (same). When a service provider to a plan merely functions in the role of "a salesperson earning commissions," the provider is "not a fiduciary under ERISA." *Consol. Beef Indus. v. N.Y. Life Ins. Co.*, 949 F.2d 960, 965 (8th Cir. 1991).

This applies to brokers too. Even where a commission-based brokerage firm *also* served as a benefits plan administrator (not alleged here), the broker did not become a fiduciary simply by recommending to a plan which insurance policies to purchase. *See Mahoney*, 564 F.Supp.2d at 256-57. This did not "convert [the broker] into a fiduciary" absent an allegation that the broker "had the authority to force the [Plan] to accept" its recommendations. *Id.* at 256; *see also Black v. Bresee's Oneonta Dep't Store, Inc. Sec. Plan*, 919 F.Supp. 597, 606-07 (N.D.N.Y. 1996) (agent not a fiduciary by proposing that employer create a life insurance plan, recommending products for plan, and collecting commissions, because he lacked "discretionary power or control over the plan").

Plaintiffs' authorities do not say otherwise. One such authority notes that

14

"brokers themselves are not fiduciaries" and "do not owe a fiduciary duty to the employer, the plan or the participants."[9]  *Access Services of Northern Illinois v. Capitol Administrators, Inc.* (cited ¶ 156) merely stands for the proposition that a broker's act in "exercising *final discretion* in the choice of which insurance provider and plan to choose does create a fiduciary duty under ERISA."  2021 WL 780483, at *4 (N.D. Ill. Mar. 1, 2021).  But it acknowledges "that offering insurance plans for sale or recommending options does not create the type of discretion required for a party to become an ERISA fiduciary." *Id.*  Plaintiffs' own allegations place Mercer in the latter camp, not the former.[10]  *Georgas v. Kreindler & Kreindler* (cited ¶ 157) dismissed allegations that a broker was a plan fiduciary.  41 F.Supp.2d 470, 475 (S.D.N.Y. 1999).

Additionally, Plaintiffs' allegation that Mercer administered claims and controlled communications under the policies (¶ 160) does not plead any fiduciary status relevant to Plaintiffs' premium.  Plaintiffs offer zero factual detail about what Mercer purportedly did to administer claims or control communications under the

---

[9] Heath Miller & Amy Hollis, *Blindsided: Are Supplemental Health Plans the next class action risk for plan sponsors?*, EMPLOYEES FIRST (June 2025) (cited AC at 18, n.17).

[10] *Chao v. Day*, 436 F.3d 234, 237-38 (D.C. Cir. 2006) (¶ 157) is off-base, as *Day* discusses a scenario in which where a broker "solicited, accepted, and then pilfered the plans' assets by reneging on his promise to purchase insurance for the plans' members," instead taking the money for his own use.

policies. Once again, Plaintiffs' cited authority is off point. *Eversole v. Metropolitan Life Insurance Co.* (cited ¶ 155) merely recognizes that an *insurer* "may … be a fiduciary by virtue of its management or control" of an insurance policy where it was delegated discretionary "authority to grant or deny claims." 500 F.Supp. 1162, 1165-66 (C.D. Cal. 1980). Plaintiffs make no such allegations here. Even if they had, Plaintiffs' allegations that Mercer administered claims are detached from any alleged breach, and thus cannot supply the requisite fiduciary status for that breach. "[T]here must be some connection between the discretion exercised and the breach of duty." *Mahoney*, 564 F.Supp.2d at 257 (allegations that broker was a fiduciary "with regard to the processing of claims" irrelevant to whether it was a fiduciary with regard to premiums and commissions, where broker did not have ultimate authority to choose the insurer).

Finally, while the Court need look no further than the AC to conclude that Plaintiffs fail to plausibly allege Mercer had fiduciary authority, Mercer's Agreement with Allied erases all doubt, as it further confirms that Allied did not delegate to Mercer any discretionary role in the selection of Aflac. *See supra*, p. 4.

### 2. Plaintiffs Fail to Plausibly Allege that Mercer Had Any Discretionary Fiduciary Authority with Respect to Insurer-Paid Commissions.

Plaintiffs assert that Mercer had fiduciary duties with respect to the commissions it received from Aflac. AC at 30. This theory fails under well-settled

16

authority, on two grounds.

First, Plaintiffs' theory that Mercer "exercised authority or control over the management or disposition of the Plan's assets" by receiving "excessive commissions from Plan assets" is falsely premised on the notion that commissions are paid "from Plan assets." ¶ 29 & pp. 28-30. Plaintiffs themselves concede that Mercer's commissions are paid "by the insurance company," not by Allied, the Plan, or participants. ¶ 93.[11] Accordingly, Mercer's receipt of commissions does not constitute any exercise of control over Plan assets.

Plaintiffs' allegation that Mercer's commissions came "directly out of Plan participants' premium payments" (¶ 171) does not salvage this theory of fiduciary authority. Even if premiums were Plan assets *before* going to Aflac, they were not plan assets once in the insurer's hands. *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 657-59 (9th Cir. 2019) (under "ordinary notions of property rights," "[p]remiums paid to an insurance company in return for coverage under a fully insured insurance policy are not 'plan assets'") (citing *Faber v. Metro. Life Ins.*

---

[11] The Plan's Forms 5500 further confirm that the commissions are paid by the insurer, not the Plan. For example, Plaintiffs plead that Mercer received $2,706 in commissions in 2024. ¶ 188. These commissions were reported in line 3(b) of Schedule A to the Plan's 2024 Form 5500. Ex. 1, 2024 Form 5500, at 5. The DOL's Form 5500 instructions make clear that any commissions reported in line 3(b) are "paid by an insurer." Ex. 2, Form 5500 Instructions, at 4. The Court may take judicial notice of the Plan's Form 5500 filings, because the Complaint relies on them (at ¶ 188). *Humphries v. Mitsubishi Chem. Am., Inc.*, 2024 WL 4711296, at *5 (S.D.N.Y. Nov. 7, 2024).

*Co.*, 648 F.3d 98, 105 (2d Cir. 2011)).  Once paid to insurers, a plan no longer retains any property interest in premiums, which cease to be plan assets (if they ever were) moving forward.  *Id.*; *see also Mass. Laborer's Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2022 WL 952247, at *12-13 (D. Mass. Mar. 30, 2022) (premiums not plan assets), *aff'd*, 66 F.4th 307 (1st Cir. 2023).  Therefore, even if commission rates are set as a percentage of premiums, they are "paid from assets of the carriers," not from "plan assets."  *Comerica Bank for DALRC Retiree Benefit Tr. v. Voluntary Emp. Benefits Assocs., Inc.*, 2012 WL 12948705, at *15-16 (N.D. Ga. Jan. 11, 2012).

Second, even if Mercer's commissions were paid by the Plan (which Plaintiffs concede they are not) Mercer cannot be held liable as a fiduciary for its own compensation.

A "service provider 'is not an ERISA fiduciary with respect to the terms of the agreement for its compensation.'"  *Patrico v. Voya Fin., Inc.*, 2017 WL 2684065, at *3 (S.D.N.Y. June 20, 2017) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)).  This is because "a service provider in such a situation 'has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement."  *Id.* (quoting *F.H. Krear*, 810 F.2d at 1259).  Fiduciary status arises only when a service provider exercises an "ability to control *unilaterally*

the amount of compensation it receives." *Id.*

Absent such control, service providers do not assume fiduciary status with respect to their own compensation. *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) ("[A] service provider owes no fiduciary duty with respect to the negotiation of its fee compensation."); *Renfro v. Unisys Corp.*, 671 F.3d 314, 324 (3d Cir. 2011) ("[Service provider] owes no fiduciary duty with respect to the negotiation of its fee compensation by [plan sponsor]."). This principle is "well-established." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F.Supp.3d 127, 139 (D. Mass. 2021); *Santomenno*, 768 F.3d at 293 ("[W]hen a service provider and a plan trustee negotiate at arm's length over the terms of their agreement, discretionary control over plan management lies not with the service provider but with the trustee, who decides whether to agree to the service provider's terms.").

These principles apply equally to insurance brokers. Even where an insurance brokerage firm allegedly received "high commissions" after making insurance-policy recommendations to a plan, it was not transformed "into an ERISA fiduciary." *Mahoney*, 564 F.Supp.2d at 256-57. Insurance brokers "are not ERISA fiduciaries unless they transcend the normal role and exercise discretionary authority." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 632 (8th Cir. 2001); *see also Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996) (collecting commissions after recommending insurance options does not turn a broker into a

19

"fiduciary").

Consistent with this longstanding backdrop treating brokers as non-fiduciaries (absent unusual circumstances not present here), Congress amended ERISA in 2021 to require insurance brokers for group health plans to disclose compensation-related information *to* the "responsible plan fiduciary." *See* 29 U.S.C. § 1108(b)(2)(B)(iii). Congress defined "responsible plan fiduciary" as "a fiduciary with authority to cause the covered plan to enter into, or extend or renew, the contract or arrangement." *Id.* § 1108(b)(2)(B)(ii)(I)(ee).  Department of Labor guidance explains that these "required disclosures are intended to provide the responsible plan fiduciary with sufficient information to assess the reasonableness of the compensation to be received and potential conflicts of interest that may exist." Field Assistance Bulletin No. 2021-03 (December 30, 2021).[12]  These disclosure obligations further confirm that ERISA does not treat brokers *themselves* as the fiduciaries.

Here, Plaintiffs do not allege that Mercer exercised any discretion with respect to rates of commissions paid by Aflac; the fact that Aflac paid Mercer and Lockton identical rates of commission (*see supra*, pp. 5-6) supports only the opposite inference:  that Aflac (and not the brokers) dictated the commission rates.  Nor do Plaintiffs allege that Allied was not "free to select a different … service provider or

---

[12] https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2021-03.

20

none at all." *Patrico*, 2017 WL 2684065, at \*3.  This freedom to choose a provider other than Mercer means that Mercer "could not have unilaterally controlled the compensation [it] would receive." *Id.*  Where the AC "fails adequately to allege that [Mercer] exercised the requisite control over its compensation," it "fails to allege that [Mercer] was an ERISA fiduciary with respect" that compensation.  *Id.*[13]

### B.        Plaintiffs Fail to Plead that Mercer Breached any Fiduciary Duty.

Even if Plaintiffs had plausibly alleged that Mercer acted in a fiduciary capacity with respect to the Plan (which they have not), Count I fails because Plaintiffs fail to plead a breach of duty.

Count I alleges that Defendants breached the duty of prudence by failing to use any fiduciary process to monitor and control premiums or broker commissions and causing participants to overpay for voluntary benefits insurance.  *See, e.g.*, ¶¶ 7, 246-248.  Fiduciary prudence under ERISA "focuses on a fiduciary's conduct in arriving at … [a] decision, not on its results." *PBGC*, 712 F.3d at 716.  Plaintiffs plead no facts concerning any act or process undertaken by any Defendant with respect to the Plan's voluntary benefits insurance, let alone any specific allegations concerning Mercer's role in that process.  ¶¶ 246-248.  Absent such allegations,

---

[13] Plaintiffs' "co-fiduciary" theory of liability (¶ 252) fails for the same reason. *Forgione v. Gaglio*, 2015 WL 718270, at \*13 (S.D.N.Y. Feb. 13, 2015).

21

Plaintiffs must allege facts from which the court can "reasonably infer … that the process was flawed." *PBGC*, 712 F.3d. at 718 (quotations omitted). The AC's allegations that participants "overpaid for premiums" (*e.g.*, ¶ 170) and that brokers received "excessive commissions" (*e.g.*, ¶ 172) support no inference of a flawed fiduciary process.

### 1.    Plaintiffs Fail to Allege Excessive Premiums.

To state an ERISA imprudence claim based on purportedly excessive fees, a plaintiff must "plead[] sufficient facts to render it plausible that [the plan] incurred ***unreasonable*** … fees." *Hughes v. Nw. Univ.*, 63 F.4th 615, 631 (7th Cir. 2023). To meet this burden, "a plaintiff alleging excessive … fees must provide 'meaningful benchmark[s]' and cannot rely on bare allegations that other plans paid less." *Boyette v. Montefiore Med. Ctr.*, 2025 WL 48108, at *1 (2d Cir. Jan. 8, 2025) (summary order); *see also Singh v. Deloitte LLP*, 123 F.4th 88, 95 (2d Cir. 2024) (rejecting the notion that "a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence"). A "meaningful benchmark" must "provid[e] a sound basis for comparison"—a "like-for-like comparison" based on plausible allegations that "similarly sized plans spend less"

for the same thing. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278-79 (8th Cir. 2022) (affirming dismissal).[14]

A complaint must allege *facts*—not conclusory statements—showing the plan could have received similar benefits for less. *See Gonzalez v. Northwell Health, Inc.*, 632 F.Supp.3d 148, 165-68 (E.D.N.Y. 2022). To withstand dismissal, an excessive-fee claim must plausibly "allege that challenged fees were excessive *relative to the services rendered*, or … provide allegations concerning other factors relevant to determining whether a fee is excessive under the circumstances." *Singh*, 123 F.4th at 93-94; *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal absent allegations "that the fees were excessive *relative to the services rendered*").

Here, Plaintiffs fail to support their assertion that they paid "excessive and unreasonable premiums" with any factual development. ¶ 3. The AC alleges ranges of annual premiums for the Plan for each category of voluntary benefit (at ¶ 134), but provides no basis of comparison from which the Court could conclude that premiums were excessive. Plaintiffs do not identify any insurer that offer lowers premiums for comparable coverages, or any plan receiving comparable coverages

---

[14] This requirement that an excessive-fee claim be grounded in like-for-like comparison is borne out of ERISA's prudent-man standard, which holds fiduciaries to the standard that a prudent person "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *Singh*, 123 F.4th at 93.

for lower rates.    Plaintiffs' conclusory assertion that their premiums were "excessive" is insufficient as a matter of law.  *See Singh*, 123 F.4th at 93-94.

While the Court may end its inquiry there, it is notable that Plaintiffs' own allegations undercut their claim that the premiums were excessive.   The AC identifies fourteen "similar" plans that offer voluntary benefit programs.   ¶¶ 189-203.  As Allied's analysis of the information reported on those plans' Forms 5500 demonstrates, the premiums paid by participants in the Allied Plan were lower than the premiums of most of the comparator plans in several years.  *See* Allied's Motion to Dismiss at Part V.B.2-V.C.  In this regard, all that Plaintiffs have demonstrated is that there is a range of premiums in the market, and the Plan falls within that range. *See id.* (showing Plaintiffs were offered "[p]remiums that are more competitive than nearly three-quarters of other average premiums identified as comparators by Plaintiffs").   Mercer joins and incorporates Allied's analysis here.   Fees that fall within a market range support no inference of breach.  *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 52-53 (1st Cir. 2018) (affirming dismissal absent allegations that plan was a "severe outlier").

This analysis also undercuts Plaintiffs' theory that purportedly excessive commissions to Mercer led to higher premiums, as several supposedly lower-commission plans had higher premiums than the Plan.  *See* Allied's Motion to Dismiss at Part V.B.2-V.C.  Rather than support their allegation that commissions

24

dictate premium levels, Plaintiffs plead that premiums are based on "complex actuarial calculations that depend on the demographics of a workforce, the employer's industry, the size of the workforce, and benefits offered."  ¶ 205. Plaintiffs' cited sources (n.43) do not attribute premium rates to brokerage commissions at all.

In short, the AC fails to plausibly allege that Plaintiffs paid *any* more than they should have for the insurance products they elected to purchase.

### 2.    Plaintiffs Fail to Allege Excessive Commissions.

Unable to allege that the Plan's premiums were excessive, Plaintiffs attempt to argue that premiums must have been excessive because broker commissions paid out of premiums were excessive (they claim) and thus must have driven up premiums. ¶¶ 101, 179-180.  Plaintiffs' attempt fails for several reasons.

First, Plaintiffs fail to establish that anything about Mercer's commissions caused participants to overpay for their benefits.  Premiums alone—regardless of commissions—reflect the total cost to participants of voluntary benefits insurance. Plaintiffs' failure to plead that total premiums were excessive (*see supra*, Part II.B.1) forecloses their fiduciary-breach claim.  Courts have rejected fiduciary-breach claims premised on post-collection allocation of participants' fees between multiple entities, holding that "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for" participants. *Hecker v. Deere & Co.*, 556 F.3d 575,

25

586 (7th Cir. 2009); *see also Jacobs v. Verizon Commc'ns*, 2017 WL 8809714, at \*13 (S.D.N.Y. Sept. 28, 2017).[15]   This reflects ERISA's focus on total costs to participants and plans.  All that matters is whether the premiums *participants* paid were comparatively high, not whether the commissions *insurers* paid to Mercer were comparatively high.  Second, Plaintiffs fail to plausibly allege that commissions paid by Aflac to Mercer were excessive.  Plaintiffs' excessive-commission claim is based on their comparison of the total average commissions that Mercer and Lockton received on a combined basis (¶¶ 166-167, 209) with purportedly "typical" commission rates "in the industry" (¶¶ 96, 172-173) and commission rates that Plaintiffs allege various brokers received in connection with benefits offered under other, unrelated plans (¶¶ 189-203).

Plaintiffs' allegations about "typical" broker commissions fall well short of supporting a plausible inference that Mercer's commissions were excessive.  The AC's benchmarks are internally inconsistent—alleging at ¶ 96 that voluntary-benefit-insurance commissions range from 15% to 55% on average, and at ¶¶ 172-173 that the average is 2-10%.  Plaintiffs also provide no source or data to support these purported benchmarks.  ¶ 172 (no source); ¶ 173 (citing a source that offers no data or time period); ¶ 96 (citing a source that offers no data or time period).  They

---

[15] This issue frequently arises in the context of revenue-sharing arrangements, where mutual funds pay a portion of the fees they collect to service providers. *E.g.*, *Hecker*, 556 F.3d at 586.

also plead nothing about the nature or quality of the coverages reflected in the supposed benchmarks to confirm comparability to the coverages at issue here. In any event, the average commission Plaintiffs estimate for the Plan (39.8%) falls squarely in the middle of the 15%-55% range that they allege to be typical of other plans, and is therefore not "an outlier." ¶¶ 96-97, 188.

Plaintiffs' allegations concerning the broker commissions paid in connection with a dozen cherry-picked plans (¶¶ 189-203) likewise fail to support any inference that Mercer's commissions were excessive. The Second Circuit has made clear that a complaint cannot survive if it "fails to do more than allege conclusorily that the … fees exceeded those of a select handful among the many other plans available on the market." *Singh*, 123 F.4th at 93. Plaintiffs' comparator plan allegations do no more than that. Plaintiffs offer no facts concerning the nature and quality of the insurance or broking services for those plans compared to the Plan. Several of the comparator plans used brokers other than Mercer, and Plaintiffs do not (and cannot) allege that all brokers provide identical services. Plaintiffs also plead that broker commission models can vary, with some brokers receiving more in upfront ("heaped") commissions, and other receiving level commissions over time. ¶ 98-100. Yet Plaintiffs fail to plead which commission model their comparator plans utilized, rendering year-to-year commissions comparisons meaningless. Their comparison "lacks sufficient context to infer that the services … are comparable" such that they

might provide a "meaningful benchmark." *Singh*, 123 F.4th at 96 (affirming dismissal for lack of adequate comparators); *see also Boyette*, 2025 WL 48108, at *1 (same); *Humphries v. Mitsubishi Chem. Am., Inc.*, 2025 WL 2402281, at *11-14 (S.D.N.Y. Aug. 19, 2025) (same).

Third, Plaintiffs' extensive discussion of loss ratios is a red herring and provides no support for allegations that premiums and/or commissions were too high. ¶¶ 107-121. Loss ratios speak only to how much of each dollar collected in premiums is paid out in claims—two factors over which brokers have no control— and therefore only concern the profitability of insurance policies *for insurers for a specific time period*, not whether premiums or broker commissions were excessive. ¶ 107. As Plaintiffs concede, an insurer could experience a high loss ratio (*i.e.*, low profitability) on an expensive insurance coverage if it faces an unexpected onslaught of claims, but experience a low loss ratio (*i.e.*, high profitability) on a less expensive coverage if it receives fewer claims. ¶ 109. In any event, Plaintiffs do not plausibly plead loss ratios for the Plan here (they speculate that it has an "estimated" loss ratio of "significantly less than 50%," ¶ 175, but do not ground this in any facts specific to the Plan), and concede that the loss-ratio benchmark they plead from the Affordable Care Act does not even apply to voluntary benefits. ¶¶ 110-112.

Finally, Plaintiffs' attempt to tease a fiduciary-breach claim from the widespread practice of insurance commissions also fails. Plaintiffs' assertion that,

under a commission-based system, Mercer "stood to benefit from recommending the company with the highest price, rather than the lowest price" (¶ 94) sounds in disloyalty, not imprudence—and Plaintiffs do not assert any such claim. Even if they had, alleging a mere "potential conflict of interest" is insufficient to state a fiduciary-disloyalty claim. *See Lalonde v. Mass. Mut. Ins. Co.*, 728 F.Supp.3d 141, 155 (D. Mass. 2024); *PBGC*, 712 F.3d at 718 (alleging no more than a "sheer possibility" of unlawful conduct does not suffice to state a claim). Plaintiffs' theory would create near-universal liability for commission-based insurance sales to ERISA plans. Ascribing *per se* ERISA liability for a standard insurance-industry practice violates the basic principle that fiduciary standards are necessarily "context specific." *Dudenhoeffer*, 573 U.S. at 425. "[C]ategorical rule[s] [are] inconsistent with the context-specific inquiry that ERISA requires." *Hughes*, 595 U.S. at 173.

### C.    Count VI Fails to State a Claim Against Mercer Based on Any Purported Fiduciary Breaches by Allied.

Plaintiffs also claim that, even if it is not a fiduciary, Mercer is liable for fiduciary breaches purportedly committed by Allied. Such a claim requires Plaintiffs to plead: "1) breach by a fiduciary of a duty owed to plaintiff, 2) defendant's knowing participation in the breach, and 3) damages." *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 571 (2d Cir. 2016). Count VI fails under this standard.

First, Plaintiffs fail to plausibly allege excessive premiums or commissions,

and thus any fiduciary breach by Allied. *See supra*, Part II.B; *see also* Allied's Motion to Dismiss at Part V.B.2-V.C. Absent a viable fiduciary breach claim, any attempt to ascribe secondary liability to Mercer fails. *See, e.g.*, *Forgione v. Gaglio*, 2015 WL 718270, at *13 (S.D.N.Y. Feb. 13, 2015) (dismissing claim for lack of "antecedent" breach).

Second, "knowing participation in the breach" is an essential element of a claim against a non-fiduciary. *Ivy Asset Mgmt.*, 843 F.3d at 571. Plaintiffs do not allege that Mercer had any knowledge of, or even reason to second-guess, Allied's monitoring of premiums and broker commissions. Moreover, the AC fails to plead that Mercer—even if it knew of a breach—"affirmatively assist[ed], help[ed] conceal, or by virtue of failing to act when required to do so enable[d] [the fiduciary breach] to proceed" by participating in it. *Id.* (alterations in original).

Even if allowing Mercer to collect excessive commissions could constitute a breach (*contra supra*, Part II.B.2), any theory that Mercer is secondarily liable for the breach because it should have known its commissions were excessive (which the AC fails to demonstrate) still fails. Plaintiffs do not allege that Mercer received more than the commissions it bargained for, and service providers have no duty to monitor plan fiduciaries or negotiate against themselves when negotiating compensation for their services. *See supra* Part II.A; *see also Chauvet v. Local 1199, Drug, Hosp. & Health Care Emps. Union*, 1996 WL 665610, at *14 (S.D.N.Y. Nov. 18, 1996)

(rejecting a theory that "non-fiduciaries are under an affirmative obligation to oversee and to ensure that fiduciaries do not breach their ERISA duties").

## III.   Plaintiffs' Prohibited-Transaction Claims as to Mercer Fail as a Matter of Law.

### A.   Count IV Fails to State a Prohibited-Transaction Claim Against Mercer.

Count IV alleges that Mercer engaged in prohibited transactions by "collecting excessive commissions and other payments from Plan assets" in violation of the prohibitions set forth in 29 U.S.C. §§ 1106(b)(1) and (b)(3). ¶¶ 275-277. This prohibited-transaction claim fails for two independent reasons.

Section 406(b) of ERISA only applies to a "fiduciary." 29 U.S.C. § 1106(b) ("A fiduciary with respect to a plan shall not …"). As explained *supra* Part II.A, Plaintiffs fail to allege that Mercer functioned as a fiduciary in any manner, let alone as to the complained-of conduct (here, collecting commissions). Because fiduciary status is an element of any Section 406(b) prohibited-transaction claim, Plaintiffs' failure to plead Mercer's fiduciary status requires dismissal of Count IV as well.

Even if Plaintiffs had plausibly alleged that Mercer functioned as a fiduciary, Count IV would still fail because it is premised on Plaintiffs' assertion that Mercer "collect[ed] excessive commissions and other payments from Plan assets" (¶ 277),

31

but, as discussed *supra*, Part II.A.2, commissions are not plan assets.

### B.   Count VIII Fails to Allege that Mercer Is Liable as a Knowing Participant in Any Prohibited Transactions.

Count VIII attempts to hold Mercer liable for prohibited transactions under three provisions of ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), all of which prohibit certain transactions between a plan and a "party in interest."  This claim fails for several reasons.

### 1.   Count VIII is Too Conclusory to Survive a Motion to Dismiss.

Plaintiffs allege that Mercer "knew that by selecting and retaining Mercer as a broker for the voluntary benefits insurance, and by causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions, Allied caused the Plan to engage" in three types of prohibited transactions.  ¶¶ 314-316.  These were: (1) the "exchange … of … property between the plan and a party in interest"; (2) the "furnishing of goods, services, or facilities between the plan and a party in interest"; and (3) the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."  29 U.S.C. §§ 1106(a)(1)(A), (C), (D).[16]

---

[16] Paragraph 133 also states that "[i]t is reasonable to infer that Mercer and Lockton collected additional undisclosed compensation, based on Mercer and Lockton's known practices and those in the industry."  ¶ 133.  It is unclear what this allegation refers to, what it is based on, or why such an inference is supposedly "reasonable."

These conclusory allegations merely recite statutory provisions; they do not identify any particular transaction, let alone one involving Plan property, or any furnishing of goods, services, or facilities to the Plan. The Second Circuit rejected such "threadbare recitals of the elements of a cause of action" under analogous facts in *Rosen v. Prudential Retirement Insurance & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017) (quoting *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). In *Rosen*, the plaintiff challenged fee-sharing payments that a service provider received in connection with services to a plan, and alleged prohibited transactions relating to the receipt of such payments. The Second Circuit affirmed the dismissal of such claims as "conclusory" where the complaint merely "rehearse[d] the statutory definitions of prohibited transactions and attache[d] them to allegations of unlawful [payments]." *Id.* at 6-7. Count VIII's threadbare allegations fail for the same reason.

### 2.    Plaintiffs Fail to Plead a Transaction Involving Plan Assets.

Count VIII hinges on the allegation that Allied caused the Plan to engage in prohibited transactions with Mercer by "causing Plan assets to be transferred to Mercer as payment for premiums and/or commissions." ¶¶ 314-316. Plaintiffs fail to plausibly allege that Mercer received premiums; indeed, they plead the opposite: that premiums were paid to the insurer. ¶ 93; Ex. 1, 2024 Form 5500, at 8 (reporting premiums collected *by Aflac*); *see also supra*, Part II.A.2. There is no non-conclusory allegation in the AC that Mercer itself received any premium payments—

even assuming those payments were Plan assets at some point. The commissions paid to Mercer cannot form the basis for a prohibited transaction, as they did not involve plan assets.

Section 406(a)(1) of ERISA is designed to prevent "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). "What the 'transactions' identified in § 406(a) thus have in common is that they generally involve *uses of plan assets* that are potentially harmful to the plan." *Id.* Plaintiffs' allegations regarding Mercer's receipt of commissions from an insurer fail to plead any transaction involving "plan assets" subject to Section 406(a). While the AC *does* allege that Mercer received commission payments, it makes clear that those payments were made by insurers rather than the Plan or its participants. As such, those commissions were *not* plan assets, *see supra*, Part II.A.2, and thus cannot form the basis for a claim under Section 406(a)(1).

### 3. Plaintiffs Fail to Plausibly Plead that Mercer was a Party-in-Interest.

Count VIII fails for another, independent reason: Plaintiffs fail to plausibly allege that Mercer was a "party in interest" of the Plan at the relevant time. Each of Section 406(a)'s subparts describes a plan's transaction with a "party in interest," 29 U.S.C. § 1106(a), which ERISA defines to include "a person providing services to [a] plan," 29 U.S.C. § 1002(14)(B). "Congress defined 'party in interest' to

34

encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000).

Courts have recognized that a service provider is not a "party in interest" of the plan at the time it negotiates its contract, even if it becomes one later. *See D.L. Markham DDS, MSD, Inc. 401(k) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 609-12 (5th Cir. 2023) ("Because [the provider] was not yet providing services to the Plan, we conclude that [the provider] was not a 'party in interest' under § 1106(a) when it entered the … Contract."); *Dempsey v. Verizon Commc'ns, Inc.*, 2026 WL 72197, at *12 (S.D.N.Y. Jan. 8, 2026) ("For a party to be a party in interest some prior relationship must exist between the fiduciary and the service provider."). Plaintiffs nowhere allege that Mercer was a party in interest to the Plan *before* negotiating any agreement to broker insurance coverage, and it is the payments that Mercer received pursuant to its brokerage agreement that Plaintiffs attack as prohibited transactions in Count VIII. *See Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 126 (3d Cir. 2013) (no liability for "merely accepting previously bargained-for fixed compensation that was not prohibited at the time of the bargain").

### 4.    Count VIII is Untimely.

Count VIII is also time-barred. Any ERISA claim must be filed within six years of "the last action which constituted a part of the breach or violation." 29

U.S.C. § 1113(1).  Count VIII alleges a Section 406(a) claim, which requires a "transaction."  *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013).  Only an "affirmative act," not "a failure to act," constitutes a transaction.  *Id.*

Count VIII does not allege any affirmative act within the limitations period. The claim is based solely on Allied's "selecting and retaining Mercer as a broker" and "causing Plan assets to be transferred to Mercer."  ¶¶ 314-316.  Because Plaintiffs do not provide any facts to describe how Allied purportedly caused assets to be transferred to Mercer *other than* by entering into a broker agreement, even the most generous reading of Count VIII must be limited to that agreement.  And *that* action occurred outside the limitations period.  The last amendment to the Mercer-Allied agreement setting Mercer's commissions was in May 2019, more than six years before Plaintiffs filed this action in December 2025.  Ex. 3 at MercerMTD0022.

Given the absence of any facts about a Section 406 "transaction" *other than* Allied's retention of Mercer, Count VIII must be dismissed as untimely.

## IV.    Plaintiffs Fail to Show Entitlement to any Equitable Relief Against Mercer.

The Supreme Court has held that ERISA forecloses damages remedies against non-fiduciaries, even if they participate in a fiduciary's breach.  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-59, 262 (1993).  Because Mercer was not a

36

fiduciary to the Plan, *see supra*, Part II.A, Plaintiffs cannot obtain monetary damages from it.

Although Plaintiffs claim Mercer is liable for "equitable relief" under ERISA § 502(a)(3), ¶ 289, Plaintiffs are actually seeking legal (monetary) relief, not equitable relief, from Mercer.  Section 502(a)(3) only allows recovery from a "particular fund" in the defendant's possession, "distinct from [defendant's] general assets."  *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363-64 (2006).  Such a claim fails if it does not "identify segregated funds in [defendant's] possession, but merely attempts to impose a personal liability upon [defendant]."  *Fehn v. Grp. Long Term Disability Plan for Emps. of JP Morgan Chase Bank*, 2008 WL 2754069, at *4 (S.D.N.Y. June 30, 2008).

Here, Plaintiffs have not alleged any "particular fund" in Mercer's possession that represents its alleged ill-gotten gains.  Simply "[l]abeling [a] portion of defendants' assets" is insufficient to "identify [a] particular fund in defendants' possession, distinct from its general assets."  *Union Labor Life Ins. Co. v. Olsten Corp. Health & Welfare Benefit Plan*, 617 F.Supp.2d 131, 135 (E.D.N.Y. 2008).  As a result, "the restitution sought … [is] legal—not equitable—because the *specific funds* to which the [plaintiffs] claim[] an entitlement … [a]re not in [the defendant's] possession."  *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 143 (2016).

Because Section 502(a)(3) only provides for equitable relief, and Counts VI and VIII seek monetary rather than equitable relief, those counts must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated:  April 30, 2026                    Respectfully Submitted,

*/s/ Alison V. Douglass*
Alison V. Douglass, *admitted pro hac vice*
James O. Fleckner, *admitted pro hac vice*
Katherine G. McKenney, *admitted pro hac vice*
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
ADouglass@goodwinlaw.com
JFleckner@goodwinlaw.com
KMcKenney@goodwinlaw.com

Samuel J. Rubin
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
SRubin@goodwinlaw.com

*Attorneys for Defendant Mercer Health
and Benefits Administration, LLC*

38

## CERTIFICATION OF WORD COUNT

Pursuant to Local Rule 7.1(c), the undersigned certifies that the above Memorandum contains a total of 8,725 words, measured by Microsoft Office Word.

*/s/ Alison V. Douglass*
Alison V. Douglass

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Alison V. Douglass*
Alison V. Douglass

39