**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SABRINA FELLOWS, EDMUND LYNN III, DONNA PATTON, WESLEY HALL, and NINA BUSTAMANTE-VICARIO, individually and as representatives of a class of participants and beneficiaries on behalf of the ALLIED UNIVERSAL HEALTH AND WELFARE BENEFIT PLAN, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNIVERSAL SERVICES OF AMERICA, LP d/b/a ALLIED UNIVERSAL, ALLIED UNIVERSAL EMPLOYEE BENEFITS COMMITTEE, MERCER HEALTH AND BENEFITS ADMINISTRATION, LLC, LOCKTON COMPANIES, LLC, and JOHN DOES 1–20, <br><br> *Defendants*. | No. 1:25-cv-10659 |

**OPPOSITION TO DEFENDANTS' RULE 12(B)(1) MOTIONS [ECF NOS. 72, 75, 81]**

**CONTENTS**

Authorities ............................................................................................................................ ii

Preliminary Statement............................................................................................................ 1

Background ............................................................................................................................. 3

    A.   Statutory background ............................................................................................ 3

    B.   Factual background .............................................................................................. 4

Argument ............................................................................................................................... 6

    I.     Plaintiffs' alleged financial injuries establish Article III standing. ................................ 6

    II.   Defendants' counterarguments do not defeat Plaintiffs' straightforward
          allegations of financial harm....................................................................................... 7

         A.   Comparisons to traditional retirement pensions are inapposite. ........................... 11

         B.   The inference that inflated commissions financially harmed Plaintiffs is far
              from speculative. ................................................................................................ 15

Conclusion ........................................................................................................................... 22

## AUTHORITIES

**Cases**

*Acosta v. Bd. of Trustees of Unite Here Health*,
2023 WL 2744556 (N.D. Ill. Mar. 31, 2023) ........................................................ 13

*All. for Environ. Renewal, Inc. v. Pyramid Crossgates Co.*,
436 F.3d 82 (2d Cir. 2006) .................................................................................... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................. 16

*Barbich v. Northwestern Univ.*,
No. 25-6849, ECF 61 (N.D. Ill. Apr. 2, 2026) ............................................... 12, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................. 16

*Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*,
519 F. Supp. 3d 522 (D. Minn. 2021) ............................................................... 7, 10

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ................................................................................. 4

*Carter v. HealthPort, Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) ............................................. 7, 8, 9, 10, 16, 19

*DaVita, Inc. v. Amy's Kitchen, Inc.*,
379 F. Supp. 3d 960 (N.D. Cal. 2019) ................................................................. 15

*Dempsey v. Verizon Commc'ns, Inc.*,
2026 U.S. Dist. LEXIS 3838 (S.D.N.Y. Jan. 8, 2026) ......................................... 15

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ........................................................................... 10, 17

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) ................................................................................ 21

*Doe v. Blue Cross Blue Shield of Md., Inc.*,
173 F. Supp. 2d 398 (D. Md. 2001) ...................................................................... 15

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) ................................................................................... 1

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
725 F.3d 406 (3d Cir. 2013) .................................................................................. 14

*Franchise Tx. Bd. of Cal. v. Alcan Alum. Ltd.*,
493 U.S. 331 (1990) .............................................................................................. 21

*Gonzalez de Fuente v. Preferred Home Care of New York LLC*,
2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020) ................................................... 14, 15

*Gonzalez de Fuente v. Preferred Home Care of New York LLC*,
858 F. App'x 432 (2d Cir. 2021) ......................................................................... 14

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000) ............................................................................................ 3, 4

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018) ..................................................................................... 9

*Horvath v. Keystone*,
    333 F.3d 450 (3d Cir. 2003) ............................................................................... 13, 14

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022) ................................................................................................ 17

*John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*,
    510 U.S. 86 (1993) ................................................................................................... 3

*John v. Whole Foods Market Grp., Inc.*,
    858 F.3d 732 (2d Cir. 2017) ..................................................................................... 9

*Katz v. Donna Karan Co. Store, L.L.C.*,
    872 F.3d 114 (2d Cir. 2017) ..................................................................................... 2

*Knudsen v. MetLife Group, Inc.*,
    117 F.4th 570 (3rd Cir. 2024) ....................................................................... 11, 13, 14

*Krukas v. AARP, Inc.*, *No.* 18-1124,
    2021 LX 77048 (D.D.C. Nov. 2, 2021) .................................................................. 21

*Lewandowski v. Johnson & Johnson Grp. Health Plan*,
    No. 24-671, 2025 LX 517568 (D.N.J. Nov. 26, 2025) ............................................ 16

*Lewandowski v. Johnson & Johnson*,
    No. 24-671, 2025 LX 110695 (D.N.J. Jan. 24, 2025), *appeal docketed*, No. 26-1107
    (3d Cir. Jan. 21, 2026) ............................................................................................ 11

*London v. Polishook*,
    189 F.3d 196 (2d Cir. 1999) ..................................................................................... 8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ..................................................................................... 2

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 9

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ................................................................................................. 3

*Natural Resources Defense Council, Inc. v. United States Food & Drug Admin.*,
    710 F.3d 71 (2d Cir. 2013) ....................................................................................... 9

*Navarro v. Wells Fargo & Co.*,
    No. 24-3043, 2025 LX 127846 (D. Minn. Mar. 24, 2025) ................................. 12, 14

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ..................................................................................... 3

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................................. 9

*Ross v. Bank of Am., N.A.*,
   524 F.3d 217 (2d Cir. 2008).................................................................................................... 9, 17

*SM Kids, LLC v. Google LLC*,
   963 F.3d 206 (2d Cir. 2020)....................................................................................................... 21

*Stern v. JPMorgan Chase & Co.*,
   No. 1:25-cv-02097 (JLR), 2026 LX 132031 (S.D.N.Y. Mar. 9, 2026) ................. 12, 13, 14, 16

*Su v. BCBSM, Inc.*,
   2024 WL 3904715 (D. Minn. Aug. 22, 2024) ......................................................................... 13

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020) ............................................................................... 1, 11, 12, 14, 15

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015) ...................................................................................................................... 3

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016) (*en banc*) ............................................................................ 3, 10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ................................................................................ 1, 6, 7, 10, 15

*Varity Corp. v. Howe*,
   516 U.S. 489, 497 (1996) .............................................................................................................. 3

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
   62 F.4th 517 (9th Cir. 2023) ..................................................................................................... 13

**Statutes**

29 U.S.C. § 1001(b) ........................................................................................................................ 3

29 U.S.C. § 1002(1) ...................................................................................................................... 11

29 U.S.C. § 1002(16)(A)(i) ............................................................................................................. 5

29 U.S.C. § 1002(16)(B) ................................................................................................................. 5

29 U.S.C. § 1002(2) ...................................................................................................................... 11

29 U.S.C. § 1002(21)(A) ................................................................................................................. 3

29 U.S.C. § 1002(35) .................................................................................................................... 11

29 U.S.C. § 1002(7) ........................................................................................................................ 4

29 U.S.C. § 1002(8) ........................................................................................................................ 4

29 U.S.C. § 1102(a)(2) .................................................................................................................... 5

29 U.S.C. § 1104(a)(1)(B) ......................................................................................................... 3, 10

29 U.S.C. § 1106 ............................................................................................................................. 3

29 U.S.C. § 1109(a) ........................................................................................................................ 4

29 U.S.C. § 1113 ........................................................................................................................... 18

29 U.S.C. § 1132(a)(2) .................................................................................................................... 4

29 U.S.C. § 1132(a)(3)..................................................................................................................... 4

**Other Authorities**

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5B Fed. Prac. & Proc. (June
    2024) ....................................................................................................................................... 8

RESTATEMENT (THIRD) OF TRUSTS ................................................................................................. 4

## PRELIMINARY STATEMENT

To paraphrase the Supreme Court in *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020), litigants "sometimes make standing law more complicated than it needs to be." Defendants' Rule 12(b)(1) motions are a prime example of this phenomenon.[1]

Plaintiffs allege a straightforward financial injury: Defendants' misconduct caused them to overpay for insurance. Plaintiffs paid premiums that included a 40% broker commission, which would have been reduced to roughly 10% if Defendants had fulfilled their duties under the Employee Retirement Income Security Act ("ERISA"). Such "monetary injury" caused by a defendant is the quintessential Article III injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). Defendants nevertheless go to great lengths to try to show that Plaintiffs have not sustained injury, relying on thousands of pages of extrinsic materials to do so. These arguments fail on multiple levels, most fundamentally because they ignore the straightforward overpayment allegation at the heart of the case.

To the extent Defendants raise a factual challenge to Plaintiffs' overpayment allegation, Plaintiffs are entitled to discovery and an evidentiary hearing, because the standing challenge is inextricably intertwined with the ultimate merits question of whether Plaintiffs were, in fact, overcharged due to unreasonable commissions.

As fiduciaries of ERISA-governed benefit plans, Defendants were obligated to act with the utmost care and loyalty to the employees who participate in the plan—duties that are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (Friendly, J.). As described in detail in the Amended Complaint, Defendant Allied fell far short of those standards

---

[1] Defendants filed a total of three motions to dismiss, each of which seeks dismissal under both Rule 12(b)(1) and Rule 12(b)(6). All three of the motions make overlapping arguments and adopt each other's arguments by incorporation. To avoid unnecessary repetition, Plaintiffs address all Rule 12(b)(1) issues in this brief and Rule 12(b)(6) issues in a concurrent separate opposition.

by failing to exercise any due diligence whatsoever in monitoring the brokers' compensation and the broker Defendants (Mercer and Lockton) deliberately enriched themselves at employees' expense. Defendants simply ignore or dispute the alleged facts, which must be taken as true at this stage. Because the complaint presents a case or controversy arising from Defendants' ERISA violations, the Court should deny Defendants' motions.

In any event, Defendants' request for a dismissal "with prejudice" is also inappropriate. Given their position that the Court lacks subject-matter jurisdiction, the request for a dismissal "with prejudice" makes no sense. *Katz v. Donna Karan Co. Store, L.L.C.*, 872 F.3d 114, 116 (2d Cir. 2017) ("[A] complaint must be dismissed without prejudice where the dismissal is due to the court's lack of subject matter jurisdiction."). To the extent Defendants mean that the Court should dismiss *without leave to replead*, that argument also fails. Defendants seek to justify that result by falsely portraying this case as an attack on a widespread insurance-industry practice of paying brokerage commissions. Allied Mem. 25 (ECF 73); Mercer Mem. 28–29 (ECF 76). That assertion does not withstand scrutiny. To the contrary, the complaint repeatedly refers to the exorbitant commission rates paid by Allied's plan as "outliers," while citing numerous examples of prudently managed plans with reasonable commissions. Am. Compl. ("AC") ¶¶ 97, 172, 188–203 (ECF 64). Thus, Defendants' accusation of an industry-wide attack is merely a smokescreen to obscure the egregious overcharges that Defendants inflicted on Allied's rank-and-file workers. In any event, while Defendants' dismissal arguments seek to impose a heightened pleading standard that goes far beyond the short and plain statement required by Rule 8, Plaintiffs would nevertheless be entitled to an opportunity to cure any "specific deficiency" after "the benefit of a ruling" by the Court. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015).

**BACKGROUND**

**A.      Statutory background**

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 715 (2d Cir. 2013) ("*PBGC*"). ERISA accomplishes its protective purposes "by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original); *see* 29 U.S.C. § 1002(21)(A). By defining the term "fiduciary" broadly, Congress ensured that ERISA's strict conduct standards would attach to all persons whose actions affect employees' interests in benefit plans. *See John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993).

ERISA's fiduciary duties require acting "solely in the interest of the participants" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). Congress supplemented those general duties by categorically barring certain "prohibited transactions" that are likely to injure a plan. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000); *see* 29 U.S.C. § 1106.

Because ERISA's fiduciary duties are derived from trust law, the scope of an ERISA fiduciary's duty generally tracks common law trust duties unless inconsistent with the statute. *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Thus, ERISA fiduciaries have a continuing duty to monitor the plan. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). ERISA also incorporates a trust-law duty of "cost-conscious management," because "[w]asting beneficiaries' money is

3

imprudent." *Tibble v. Edison Int'l,* 843 F.3d 1187, 1197–98 (9th Cir. 2016) (*en banc*) (quoting RESTATEMENT (THIRD) OF TRUSTS § 90, cmt. b, and Unif. Prudent Investor Act § 7). Plan fiduciaries "are obliged to minimize costs." *Id.* This means that ERISA fiduciaries "have a duty to avoid fees, transaction costs, and other expenses that are not justified by needs and realistic objectives of the trust's investment program[.]" RESTATEMENT (THIRD) OF TRUSTS, § Scope. "The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees[.]" *Id.*

To enforce these standards, Congress granted a right of action to several classes of plaintiffs, including the Secretary of Labor, or a plan participant, beneficiary, or fiduciary. 29 U.S.C. § 1132(a)(2), (a)(3).[2] The Secretary "depends in part on private litigation to ensure compliance with the statute." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 n.8 (8th Cir. 2009). A fiduciary found to be in breach of its duties is liable for damages and equitable relief such as disgorgement of profits. 29 U.S.C. § 1109(a). A non-fiduciary who "knowingly participates" in a fiduciary's ERISA violation is also subject to such equitable relief. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 246, 250–51 (2000); *see* 29 U.S.C. § 1132(a)(3).

## B.     Factual background

Plaintiffs are five current and former employees of Allied Universal, a worldwide provider of security services with over 800,000 employees and $20 billion in annual revenue. AC ¶¶ 13–19. Plaintiffs purchased accident, critical illness, and/or hospital indemnity insurance through an Allied-sponsored welfare benefits plan governed by ERISA (the "Plan").[3] AC ¶¶ 2, 13–17. In

---

[2] A "participant" is "any employee or former employee of an employer … who is or may become eligible to receive a benefit of any type from an employee benefit plan," 29 U.S.C. § 1002(7), while a "beneficiary" is "a person designated by a participant" or the terms of the plan "who is or may become entitled to a benefit" under the plan, 29 U.S.C. § 1002(8).

[3] Although certain voluntary benefit programs can qualify for a "safe harbor" from ERISA coverage, AC ¶¶ 59–63, the Plan here is subject to ERISA, *id.*, ¶¶ 64–67.

addition to sponsoring the Plan, Allied is the Plan's "named fiduciary" as defined by ERISA. AC ¶¶ 20–22; *see* 29 U.S.C. §§ 1002(16)(B), 1102(a)(2). Allied administers the Plan through the Allied Universal Employee Benefits Committee, also a fiduciary. AC ¶ 25; *see* 29 U.S.C. § 1002(16)(A)(i). Because Defendants' arguments do not distinguish between Allied and its committee, Plaintiffs refer to them collectively as "Allied."

Insurance industry jargon classifies the types of accident, critical illness, and hospital indemnity programs at issue as "voluntary" benefits, as distinguished from "traditional" employee benefits like medical, dental, life, and disability insurance. AC ¶ 46. While traditional medical plans are typically subsidized by the employer, employees pay the full cost of premiums for voluntary benefits. *Id.* The employer holds employees' contributions in trust after withholding wages through payroll deductions. *Id.*

The voluntary insurance at issue here provides coverage for specific health-related events in the form of lump-sum benefits. *Id.* ¶ 47. These products are often marketed to rank-and-file employees as a way to cover the out-of-pocket medical costs not covered by traditional health insurance coverage. *Id.* ¶¶ 48–49.

Allied delegated certain administrative tasks to insurance brokerage firms, Defendants Mercer and Lockton. AC ¶¶ 27–38, 83–97. The bulk of these Defendants' compensation comes from commissions, which are "calculated as a percentage of the premiums" paid by participants. *Id.* ¶¶ 88–89, 91. If commissions are 40% of premiums, the premium rate must include the 40% to cover the cost of commissions. *Id.* ¶ 90. Because of the correlation between premiums and commissions, Mercer and Lockton had a financial incentive to drive up the premiums paid by participants. *Id.* ¶¶ 85–87.

Plaintiffs allege that Allied failed to monitor and control the commissions paid to Mercer and Lockton in connection with the Plan, AC ¶¶ 137–169, which amounted to $23 million during the class period, roughly 40% of all premiums paid by participants for the insurance at issue, *id.* ¶¶ 166, 209–10. These high commissions were partly attributable to the use of a "heaped" commission structure (*i.e.*, higher commissions for new enrollees) in a company with a history of high employee turnover. *Id.* ¶ 132. Similar plans sponsored by other employers paid commissions of approximately 10%, *id.* ¶ 168, as shown by numerous specific examples, including plans that used Lockton as a broker, *id.* ¶¶ 188–211. Thus, it is apparent that Defendants did not conduct appropriate due diligence to monitor broker compensation. *Id.* ¶¶ 120, 214. Because the commissions were a percentage of the premiums paid by employees, the excessive commissions inflated the premiums paid by Plaintiffs and all participants. *Id.* ¶¶ 170–71, 179–80.

Based on these facts, Plaintiffs assert claims that Allied and its Co-Defendants violated ERISA's fiduciary duties and prohibited transaction rules. AC ¶¶ 237–328. On behalf of a class of all participants who were subjected to these overcharges since December 23, 2019, Plaintiffs seek recovery of losses and equitable relief such as disgorgement of ill-gotten profits and reformation of the Plan to comply with ERISA. AC ¶ 216, pp. 62–63. Defendants' challenge to Plaintiffs' standing to bring their claims fails for the following reasons.

## ARGUMENT

### I.    Plaintiffs' alleged financial injuries establish Article III standing.

Article III requires an "injury in fact" that (i) is "concrete, particularized, and actual or imminent"; (ii) was "likely caused by the defendant"; and (iii) would "likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Defendants dispute only the injury-in-fact element. Allied Mem. 9, 12; Mercer Mem. 8; Lockton Mem. 7 (ECF 82) (sealed). But Plaintiffs easily satisfy that requirement. "The most obvious" Article III injuries "are

traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion*, 594 U.S. at 425. Plaintiffs plainly allege such monetary injuries: they "overpa[id]" for the insurance at issue due to Defendants' misconduct. AC ¶ 12; *id.* ¶ 13 ("Ms. Fellows overpaid"); *id.* ¶ 14 ("Mr. Lynn overpaid"); *id.* ¶ 15 ("Ms. Patton overpaid"); *id.* ¶ 16 ("Mr. Hall overpaid"); *id.* ¶ 17 ("Ms. Bustamante-Vicario overpaid"); *id.* ¶ 170 ("Plaintiffs and other Plan participants were injured because they overpaid"); *id.* ¶ 185 ("every Plan participant . . . suffered a direct, out of pocket loss" and the "overpayment was a direct result" of the previously described misconduct). Plaintiffs overpaid because 40% of their premiums constituted a broker commission, which would have been reduced to roughly 10% had Defendants acted lawfully. AC ¶¶ 166–68. These facts are more than sufficient to show that Plaintiffs have a concrete stake in the outcome of this Article III case or controversy. *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 533 (D. Minn. 2021) (allegation that the defendant caused the plaintiffs "to pay more than they should have" for prescription drugs establishes standing).

The Court need go no further to reject Defendants' standing challenge. Defendants' various counter-arguments mischaracterize and seek to complicate the inquiry, but none of them can refute the straightforward fact that Plaintiffs allege the "most obvious," "traditional" Article III injury, a pocketbook injury. *TransUnion*, 594 U.S. at 425.

## II.    Defendants' counterarguments do not defeat Plaintiffs' straightforward allegations of financial harm.

Defendants bring both "facial" and "factual" challenges to standing. *Carter v. HealthPort, Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (distinguishing a "facial" standing challenge, based "solely on" the complaint, from a "fact-based" standing challenge). Although Defendants

frame their arguments as "facial" challenges,[4] Allied admittedly tries to "disprove[]" Plaintiffs' allegations of injury through graphs and analyses derived from thousands of pages of extrinsic evidence, Allied Mem. 2, 15–17, and Mercer and Lockton both explicitly adopt this analysis in their standing arguments, Mercer Mem. 9; Lockton Mem. 9 (both joining Allied Br. §§ V.B.2– V.C).

Defendants' facial arguments cannot overcome the straightforward fact that Plaintiffs allege monetary injury. The factual challenge cannot properly be resolved at this stage, because it is intertwined with the ultimate merits question of whether Plaintiffs sustained losses due to excessive commissions. When a standing argument "overlaps" with the merits, courts should defer adjudicating jurisdiction until after discovery and the presentation of relevant facts. *All. for Environ. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006); *London v. Polishook*, 189 F.3d 196, 198 (2d Cir. 1999) ("Where jurisdiction is so intertwined with the merits that its resolution depends on the resolution of the merits, the trial court should employ the standard applicable to a motion for summary judgment."); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5B Fed. Prac. & Proc., § 1350 (June 2024) ("[I]f a factual attack implicates an element of the claim, the court should find that jurisdiction exists and treat the objection as a direct attack on the merits of the plaintiff's case."). Were the Court inclined to reach the issue now, Plaintiffs would be entitled to a fair opportunity to "come forward with evidence of their own," *Carter*, 822 F.3d at 57, which would necessarily require jurisdictional discovery and likely an evidentiary hearing, *All. for Environ. Renewal*, 436 F.3d at 87–88. But in any event, Defendants' fact-based challenges are ultimately irrelevant because they fail to account for the excessive commission

---

[4] Lockton Mem. 7 (disputing whether Plaintiffs "plausibly allege facts" supporting standing). Mercer Mem. 8–9 (disputing whether Plaintiffs adequately "allege" standing); Allied Mem. 9, 12 (arguing "Plaintiffs fail to plausibly allege an injury" and challenging "allegations").

component at issue. *See Carter*, 822 F.3d at 57 ("[T]he plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing.").

In assessing a facial standing challenge, a court accepts "as true all material [factual] allegations of the complaint" and draws "all reasonable inferences in favor of the plaintiff." *Carter*, 822 F.3d at 56–57. The plaintiff "has no evidentiary burden." *Id.* at 56. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Defendants challenge only the injury-in-fact requirement, which the Second Circuit has "repeatedly described" as "a low threshold." *John v. Whole Foods Market Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (quotation omitted). It is satisfied as long as the plaintiff has a "personal stake" in the dispute. *Carter*, 822 F.3d at 55 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "Any monetary loss suffered by the plaintiff satisfies this element; '[e]ven a small financial loss' suffices." *Id.* (quoting *Natural Resources Defense Council, Inc. v. United States Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013)). "[O]verpaying for a product results in a financial loss constituting a particularized and concrete injury in fact." *John*, 858 F.3d at 736.

"To successfully plead injury-in-fact, a plaintiff must only 'clearly . . . allege facts demonstrating'" that a defendant "inva[ded]" a plaintiff's "legally protected interest in a manner that is concrete and particularized." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (citation omitted). "It is well established in principle that the pleading standard for constitutional standing is lower than the standard for a substantive cause of action." *Id.* (citing *Ross*

9

*v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008)); *id.* ("'Clearly alleging' is a 'low[er] threshold' than that for 'sustaining a valid cause of action.'") (quoting *Ross*, 524 F.3d at 222). "To plead standing, the pleader need only show that allowing her to *raise* her claim in federal court would not move so beyond the court's ken as to usurp the power of the political branches." *Id.* Only when the alleged injury is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy," does a court lack the power to decide the merits. *Id.* The injury required for Article III purposes should not be confused with the showing required to sustain "a claim for damages[.]" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264–65 (2d Cir. 2006).

Here, Plaintiffs had a legally protected interest in the expenses they paid to participate in benefit plans being the product of fiduciary decisions made "solely in the[ir] interest" and with appropriate "care, skill, prudence, and diligence under the circumstances," 29 U.S.C. § 1104(a)(1)(B), which encompassed trust-law duties of investigating expenses and paying no more than reasonable compensation to service providers, *see Tibble*, 843 F.3d at 1197–98. But they received something far different and not worth the cost: an insurance product for which 40% of the premium payment was earmarked for a broker commission. AC ¶¶ 90, 166–67. A lawful fiduciary process would have reduced the commission component of the premium to an industry-standard 10%. *Id.* ¶ 168. Plaintiffs received nothing of value for paying the differential between the premium with a 40% commission and a lower premium including a standard 10% commission. *Id.* ¶¶ 209–11. This financial injury establishes injury-in-fact. *TransUnion*, 594 U.S. at 425; *Carter*, 822 F.3d at 55; *Rite Aid*, 519 F. Supp. 3d at 533.

Defendants nevertheless dispute standing based on an inapt analogy to a traditional pension plan and by asking the Court to disbelieve the commonsense economic reality—confirmed by

10

Defendants' own documents—that Plaintiffs allege a plausible correlation between broker commissions and insurance premiums. These arguments fail.

### A.    Comparisons to traditional retirement pensions are inapposite.

Defendants contend that because the Plan is purportedly a "defined benefit" plan, only a denial of benefits or the like can confer standing. Allied Mem. 10–11; Lockton Mem. 7 (both citing *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020)). To be clear, the Plan is a welfare plan, which is *not* a "defined benefit" plan under ERISA. *See* 29 U.S.C. § 1002(2), (35) ("defined benefit" plan is a "pension plan" that "provides retirement income"); *cf. id.* § 1002(1) ("welfare plan" definition). To the extent welfare plans may *resemble* defined benefit pension plans in certain respects, that has no bearing on the standard Article III analysis. Indeed, as *Thole* emphasized, "[t]here is no ERISA exception to Article III." *Thole*, 590 U.S. at 547. That means that a plaintiff's monetary injury is just as obvious of an Article III injury in a defined-benefit plan or welfare plan case as it is in any other type of case. The plaintiffs in *Thole* simply did not allege that they *personally*, as distinguished from the plan in which they participated, sustained any financial harm. *See infra*, p. 12. The same is true of Defendants' other post-*Thole* cases granting dismissal on standing grounds. *See infra*, pp. 12–15.

Although Defendants assert that *Thole* stands for a blanket rule that participants in a health insurance plan who received their benefits lack standing, several of the cases they cite reject that broad reading and recognize that allegations of personal financial harm can confer standing. *Knudsen v. MetLife Group, Inc.*, 117 F.4th 570, 580, 579 (3d Cir. 2024) (explaining that "financial harm, 'even if only a few pennies,… is a concrete, non-speculative injury,'" and declining to read *Thole* as requiring dismissal on standing grounds "whenever a participant in a self-funded healthcare plan brings an ERISA suit alleging that mismanagement of plan assets increased his/her out-of-pocket expenses."); *Lewandowski v. Johnson & Johnson*, No. 24-671, 2025 LX 110695, at

*14 (D.N.J. Jan. 24, 2025) (*Lewandowski I*) ("In plain terms, when Plaintiff spent more money on drugs at the pharmacy, which was allegedly the result of Defendants' breach of fiduciary duties, Plaintiff suffered a cognizable injury."), *appeal docketed*, No. 26-1107 (3d Cir. Jan. 21, 2026); *Navarro v. Wells Fargo & Co.*, No. 24-3043, 2025 LX 127846, at *23 (D. Minn. Mar. 24, 2025) ("[T]he Court does not read *Thole* to hold, as a matter of law, that a plaintiff suing a fiduciary of an ERISA-governed defined-benefit health plan cannot ever establish standing on a theory of harm premised on excessive out-of-pocket costs.").

The facts of *Thole* are nothing like this case. *Thole* held that participants in a defined-benefit retirement plan lacked standing to challenge conduct that led to the losses to the plan itself (the pool of assets from which benefits would be paid), but did not affect the plaintiffs' individual entitlement to benefits or their value. 590 U.S. at 542–47. Regardless of whether the plaintiffs won or lost, "they would still receive the exact same monthly benefits that they are already slated to receive" for the rest of their lives, not a penny more or less. *Id.* at 541. Therefore, unlike this case, there was no allegation that the plaintiffs had paid excessive premiums to participate in the plan or suffered any other sort of pocketbook injury.

Recent decisions denying motions to dismiss have rejected the identical argument that participants in a health insurance plan who "received all benefits promised under the Plan" lack standing under *Thole*. *See, e.g.*, *Stern v. JPMorgan Chase & Co.*, No. 1:25-cv-02097 (JLR), 2026 LX 132031, at *15, 21 (S.D.N.Y. Mar. 9, 2026); Order at 3–4, *Barbich v. Northwestern Univ.*, No. 25-6849, ECF 61 (N.D. Ill. Apr. 2, 2026), https://benefitslink.com/src/ctop/barbich-v-northwestern-ndill-04022026.pdf, archived at https://perma.cc/M5TP-3N9M. These courts found *Thole* distinguishable because the plaintiffs there had "not sustained any monetary injury." *Stern*, 2026 LX 132031, at *21 (quoting *Thole*, 590 U.S. at 540); *Barbich*, Order at 4 (*Thole* plaintiffs

"did not allege that they had sustained a financial injury.") (citing *Thole*, 590 U.S. at 540–41). In contrast, the *Stern* plaintiffs, participants in a welfare plan rather than a pension plan, had standing based on allegations that "they personally paid inflated out-of-pocket costs tied to the excessive prescription-drug prices set by the Plan's" pharmacy benefit manager. *Stern*, 2026 LX 132031, at *21. The *Barbich* plaintiffs likewise had standing because they alleged financial injury "in the form of excessive healthcare expenses, including through payroll deductions and lost wages." *Barbich*, Order at 4. Plaintiffs allege the same type of financial injury here, which establishes standing for the same reasons. Other courts have similarly concluded that *Thole* does not preclude standing in the welfare plan context. *Su v. BCBSM, Inc.*, 2024 WL 3904715, at *3 (D. Minn. Aug. 22, 2024) ("Unlike the plaintiffs in *Thole*, the [Plaintiffs] allege[] losses here" in the form of higher payments for the same coverage; rejecting argument that there was no injury because benefits were contractually defined by the plan documents). Thus, while Defendants "attempt[] to fit these facts to *Thole*[,]" this case is nothing like *Thole*. *Acosta v. Bd. of Trustees of Unite Here Health*, 2023 WL 2744556, at *3 (N.D. Ill. Mar. 31, 2023) (distinguishing *Thole* from healthcare cases and finding plaintiffs had standing for excessive fee claims).

In support of the defined-benefit analogy, Defendants cite inapposite cases in which the Plaintiffs alleged no financial harm or only speculative harms. Allied Mem. 11; Lockton Mem. 7. *Winsor* involved a traditional medical insurance plan in which the employer, who was not a defendant, subsidized the premiums and retained unfettered discretion in its settlor role to alter its contributions at any time for any reason. *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 521 (9th Cir. 2023). Given that discretion, and the lack of any allegation that their contribution rates were tied to overall premiums, plaintiffs had not shown that misconduct by a service provider "led to plaintiffs paying higher contributions." *Id.* at 524–25.

13

Along the same lines are *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570 (3d Cir. 2024), *Horvath v. Keystone*, 333 F.3d 450 (3d Cir. 2003), and *Navarro v. Wells Fargo & Co.*, No. 24-3043, 2025 LX 127846 (D. Minn. Mar. 24, 2025). Lockton Mem. 7–8; Allied Mem. 11. In *Knudsen* and *Navarro*, the employer's unfettered discretion to modify contribution amounts negated any connection between the alleged misconduct and the plaintiffs' costs. *Knudsen*, 117 F.4th at 582; *Navarro*, 2025 LX 127846, at *25; *see Stern*, 2026 LX 132031, at *19 (citing *Navarro* and *Knudsen* as holding that when premiums are "subject to discretionary allocation decisions, it is too speculative to conclude" that excess costs affected participant premiums). The plaintiff in *Horvath* did not allege she was "personally affected" economically by the alleged misconduct, and there was no evidence that alleged cost savings would have benefited employees "in the form of higher salary or additional benefits." *Id.* at 453, 457; *see Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 416–17 (3d Cir. 2013) (stating that the plaintiff in *Horvath* "never contended she suffered a financial loss, as her employer paid all the premiums").

Unlike the plaintiffs in those cases, Plaintiffs here pay the full cost of the premiums at issue, and Plaintiffs expressly allege that their overall premiums are tied to the rate of commissions. AC ¶¶ 46, 88, 179. Thus, Allied could not have offset any cost savings from reduced commissions by simply reducing its own contributory share of the premiums.

Defendants' other cases do not help their argument. *Gonzalez de Fuente* is a non-precedential summary order that does not stand for a rule that financial harm is not actionable. Allied Mem. 10, 12 (citing *Gonzalez de Fuente v. Preferred Home Care of New York LLC*, 858 F. App'x 432 (2d Cir. 2021), and district court decision, 2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020)). As explained by Judge Rochon in *Stern*, the *Gonzalez de Fuente* plaintiffs did not "point[] to specific overpayments" to support their ERISA claims. *Stern*, 2026 LX 132031, at *22–23. They instead

14

"relied solely on their New York Wage Parity Law claims to distinguish their case from *Thole*, '[a]pparently conceding that they ha[d] not claimed concrete harm under ERISA.'" *Id.* at \*22–23 (quoting and distinguishing *Gonzalez de Fuente v. Preferred Home Care of New York LLC*, 2020 WL 5994957, at \*3 (E.D.N.Y. Oct. 9, 2020)). Thus, *Gonzales de Fuente* simply does not address "whether allegations of specific overpayments" confer standing. *Id.* at \*23.

Lockton's remaining cases are also factually dissimilar. It cites a dispute as to whether plan language granted entitlement to a certain level of medical treatment, not a claimed out-of-pocket loss from excessive premiums, as here. *DaVita, Inc. v. Amy's Kitchen, Inc.*, 379 F. Supp. 3d 960, 971 (N.D. Cal. 2019). It also cites cases rejecting standing based on theories of future injuries that had not yet occurred. *Dempsey v. Verizon Commc'ns, Inc.*, 2026 U.S. Dist. LEXIS 3838, at \*24 (S.D.N.Y. Jan. 8, 2026) (plaintiff failed to allege imminent risk that an insurer would collapse and fail to pay); *Doe v. Blue Cross Blue Shield of Md., Inc.*, 173 F. Supp. 2d 398, 406 (D. Md. 2001) (plaintiffs asserted that Blue Cross "may at some indefinite future date deny benefits"). Here, the financial harm to Plaintiffs from overpayments has already occurred. *Doe*'s "standing" analysis is also dubious because the court imported non-jurisdictional *statutory* standing principles from an entirely different statute (RICO) to decide "Plaintiffs' standing under ERISA." *Id.* at 403–04.

In short, "[t]here is no ERISA exception to Article III," *Thole*, 590 U.S. at 547, for purported "defined benefit" plans or otherwise. Plaintiffs' alleged "monetary injury" establishes an "obvious" Article III injury here just as it would in any other case. *TransUnion*, 594 U.S. at 425.

> **B.     The inference that inflated commissions financially harmed Plaintiffs is far from speculative.**

Unable to show an Article III exception for defined-benefit plans, Defendants attempt to portray Plaintiffs' financial injuries as "speculative." These arguments boil down to a factual dispute as to whether broker commissions increase premiums. While Defendants urge the Court

15

to disbelieve the existence of a connection between commissions and premiums, Plaintiffs' factual allegation that commissions affect premiums—supported by numerous industry sources, Mercer's own website, Lockton's own contracts with the Plan—must be accepted as true. AC ¶¶ 87–91, 167, 179, 187, & nn. 20–22; *Carter*, 822 F.3d at 56–57; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"). Beyond those sources, it is a simple matter of common sense that commissions—which Defendants concede are "part of an insurer's expenses," Mercer Mem. 5—are necessarily reflected in the price paid for insurance. *See Twombly*, 550 U.S. at 565 (court properly views allegations "in light of common economic experience"); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("judicial experience and common sense" inform plausibility inquiry). Defendants' efforts to show otherwise fail.

To be sure, a line of cases have dismissed ERISA claims on standing grounds when the claimed harm is "speculative." Lockton Mem. 7–8; Allied Mem. 17–18 (collectively citing *Knudsen*, *Winsor*, *Horvath*, *Navarro*, and *Lewandowski v. Johnson & Johnson Grp. Health Plan*, No. 24-671, 2025 LX 517568 (D.N.J. Nov. 26, 2025) (*Lewandowski II*)). But as discussed, *supra* pp. 13–14, the "dispositive" fact in those cases, which involved traditional health insurance subsidized by the employer, was the employer's broad discretion over the portion of the premium paid by the employees, which rendered speculative any claim that reducing expenses would also reduce employees' out-of-pocket costs. *Stern*, 2026 LX 132031, at *19 (citing plan provision granting employer "sole discretion" to set participants' contribution rates and noting that a similar "discretionary structure was found dispositive" in *Knudsen*, *Navarro*, and *Lewandowski II*). Here, Allied does not subsidize premiums; participants pay "the entire cost" of the premium. AC ¶ 46. Therefore, the employer is not in a position to capture the benefit of reduced commissions for itself

16

while leaving the employees' costs unchanged. Any factor reducing premiums necessarily inures to the employees' benefit. *See supra*, p. 14.

While Mercer suggests in a footnote (Mercer Mem. 9 n.8), that Plaintiffs' harm is speculative because Aflac could have kept premiums unchanged despite a reduction in commissions, that "perfunctory and undeveloped" argument is both waived and meritless. *Moore v. U.S. Postal Serv.*, 159 F. App'x 265, 268 (2d Cir. 2005). Because Plaintiffs allege that overall premiums are tied to commissions, it is reasonable and not speculative to infer that reducing commissions would reduce premiums. Moreover, in the unlikely scenario that Aflac somehow refused to pass on any savings from reduced commissions to the participants, it would have been imprudent for Defendants to retain Aflac instead of replacing it with an alternate provider willing to do so. The employers in *Winsor* and similar cases, by contrast, could have exercised their contractual discretion to alter its contribution rate in a settlor capacity without breaching any legal duty.

Defendants' remaining arguments are merely an exercise in disputing the factual connection between commissions and premiums. Lockton contends that Plaintiffs have not plausibly alleged that its commissions were "unreasonably high" or "atypical." Lockton Mem. 8. This is a merits argument on damages; it has nothing to do with whether Plaintiffs have alleged the minimal financial injury required for Article III purposes. *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008) ("Injury in fact is a low threshold, which we have held 'need not be capable of sustaining a valid cause of action.'") (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264–65 (2d Cir. 2006)). Regardless, Lockton cherrypicks general allegations regarding a "range" of commissions, while completely ignoring Plaintiffs' allegation that Lockton's 40% commission was *four times higher* than the industry standard of roughly 10% for similar plans. AC ¶¶ 166–68, 187–203. A complaint must be read "as a whole." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022). Lockton

17

further ignores that the "range of commissions" it cites "is large because it includes outliers, like Mercer and Lockton, charging unreasonably high commissions[.]" AC ¶ 97.

Lockton further contends that "commission levels say nothing about whether premiums were too high," asserting that "commissions expressed as a percentage of premiums" is a "fundamentally flawed" metric. Lockton Mem. 8. Again, this is an argument regarding the proper *measure* of damages on the merits, not whether Plaintiffs have alleged the *existence* of even a small financial injury for Article III purposes. In any event, Lockton's opinion as to the proper loss measure presents a quintessential factual dispute that cannot be resolved on a *facial* challenge on a motion to dismiss, and can only be resolved by the factfinder based on expert testimony at trial.

Continuing to raise factual disputes, Lockton asserts that Plaintiffs improperly focus on "the first few years of its engagement" to show that its commissions are excessive. Lockton Mem. 8. But Plaintiffs have alleged the Plan's commissions for the entire six-year limitations period at issue, *see* 29 U.S.C. § 1113, which shows that the commissions were consistently excessive both before and after Lockton's engagement. AC ¶¶ 188, 216. Moreover, the heaped commission structure here is based on the year of enrollment, not the year of Lockton's engagement. AC ¶¶ 130–32.

Lockton contends that the "dollar-for-dollar" connection between broker commissions and premiums is "refuted" by the chart in the complaint. Lockton Mem. 9–10. Allied includes similar graphs for the Plan and the comparator plans cited in the complaint. Allied Mem. 17–18. But the fact that "commissions as a percentage of premiums declined" even as "total premiums rose" does not "refute" anything. Lockton Mem. 10. Plaintiff's chart shows that the *dollar amount* of "premiums paid" and "total broker commissions" increased in tandem each year, which *supports* rather than refutes the correlation. AC ¶ 188. That commission *as a percentage* declined slightly

18

simply means that the growth in premiums outpaced the growth in commissions due to other factors. Allied's graphs are uninformative for the same reason. Defendants' analysis thus comes nowhere close to refuting Plaintiffs' allegation that if Defendants had prudently reduced the Plan's commissions to the industry-standard 10% paid by comparable plans, participants necessarily— and more important for pleading purposes, plausibly—would have paid lower premiums.

Lockton also attempts to show that notwithstanding the excessive 40% commissions, Plaintiffs have not plausibly alleged that "premiums were too high" because data show that the Plan's total premiums were lower than some of the comparator plans referenced in the complaint. Lockton Mem. 9. Again, this is an argument about damages on the merits. Indeed, Lockton relies on Section V.C of Allied's brief, which raises a Rule 12(b)(6) argument. *See* Allied Mem. 20–21. Whether premiums were "too high" relative to other plans is a question of loss on the merits. For standing purposes, the only question is whether Defendants' failure to control premiums by reducing the Plan's 40% rate to an ERISA-compliant 10% increased the premiums that Plaintiffs paid by even a minuscule amount. *See Carter*, 822 F.3d at 55 ("Any monetary loss suffered by the plaintiff satisfies this element; '[e]ven a small financial loss' suffices.") (citation omitted).

For that reason, Defendants' efforts to "disprove[]" a strict "one for one," "dollar for dollar" correlation between commissions and premiums are beside the point. Allied Mem. 15–16; Lockton Mem. 9–10. For standing purposes, *any* correlation between commissions and premiums is enough to show that higher commissions caused Plaintiffs to pay more in premiums, thus sustaining at least a small financial loss, than they would have paid if Defendants had reduced premiums. Because commissions are undisputedly "part of an insurer's expenses" by Defendants' own admission, Mercer Mem. 5, it is not only plausible, but virtually *certain*, that higher commissions are necessarily passed on to policyholders in the form of higher premiums.

Accordingly, Defendants' assertion that Plaintiffs' claimed loss is too speculative because premiums are the product of "many variables" is a smokescreen. Lockton Mem. 9–10; Allied Mem. 15. Those variables certainly explain why Allied's Plan has lower *total* premiums than some comparators despite the excessive commission component: the demographics of Allied's workforce is comparatively young and less likely to require coverage than comparators' employees. *See* AC ¶¶ 204–06 (explaining that factors affecting premiums include risk of loss, amount of benefits paid, industry, and workforce demographics). But such factors do not render the connection between commissions and premiums "speculative" as Defendants assert.

To illustrate by example, it is well-known that auto premiums incorporate numerous factors that bear on risk, including gender, age, marital status, zip code, vehicle value, miles driven, occupation, credit score, driving record, and accident history.[5] Suppose that at the time a policy renews, a middle-aged married woman experiences a premium increase for at least two discernible reasons: (1) an accurate report to the insurance company of a significant increase in "miles driven," and (2) inaccurate information derived from public records that the driver's license was assessed points for a serious driving infraction. The woman's "overall premium" may still be far lower than many other drivers with clean driving records but a higher overall risk profile (*e.g.*, 18-year old males). And it is certainly possible that the woman's rate increase was also partly attributable to unknown changes in how the insurer evaluates other factors in the risk profile, as well as the accurate report of an increase in miles driven. None of that would make it "speculative" that the inaccurate report of a serious traffic offense played at least some role in the higher premium. The same is true here with respect to the broker's commissions.

---

[5] *See, e.g.*, Insurance Info. Institute, *What determines the price of an auto policy?*, https://www.iii.org/article/what-determines-the-price-an-auto-insurance-policy, archived at https://perma.cc/GJ8T-8Y8J.

Finally, Lockton's argument (Lockton Mem. 12) that Plaintiffs have no "personal, concrete stake" in recovering Lockton's commissions raises a merits issue, not a standing issue. Plaintiffs sustained a concrete, personal injury because they overpaid for insurance.[6] Whether the commissions were paid from "plan assets" as defined by ERISA goes to the merits question of whether they have a valid claim for relief under the statute and has nothing to do with Article III standing. *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) ("[C]aution[ing] against arguments that would essentially collapse the standing inquiry into the merits,' and attempts to conflate the threshold question of [the plaintiff's] standing under Article III . . . with the question of whether [he] has a valid claim on the merits"). The case that Lockton cites for the definition of ERISA "plan assets" does not address standing. *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 657–58 (9th Cir. 2019).

Lockton's non-ERISA district court case is also distinguishable. The plaintiffs there lacked standing because they did not allege "that the cost of their insurance policies were any higher than they would have been absent defendants' allegedly unlawful conduct." *Krukas v. AARP, Inc.*, *No*. 18-1124, 2021 LX 77048, at *35–36 (D.D.C. Nov. 2, 2021). Plaintiffs have done so.

---

[6] Lockton additionally challenges whether Plaintiffs have adequately alleged standing based on a diminished value theory; Plaintiffs, however, need not do so because they otherwise adequately allege a financial loss. But Plaintiffs do satisfy Article III standing on this alternate basis: Plaintiffs allege that because participants received insurance with low loss ratios, the value of their coverage is less than what it would have been if Defendants had monitored and controlled broker compensation, as ERISA requires. AC, at, *e.g.*, ¶¶ 163–65, 205–06. *See Franchise Tx. Bd. of Cal. v. Alcan Alum. Ltd.*, 493 U.S. 331, 336 (1990) (plaintiffs had standing to challenge unlawful act that "threaten[ed] to cause actual financial injury" by "reducing" the future "return on their investments" and "lowering the value of their stockholdings").

## CONCLUSION

The Court should deny Defendants' Rule 12(b)(1) motions.[7]


May 29, 2026                                     Respectfully submitted,

                                                /s/ Andrew D. Schlichter
                                                Andrew D. Schlichter, Bar No. 4403267
                                                Alexander L. Braitberg (*pro hac vice*)
                                                Patrick R. Kutz (*pro hac vice*)
                                                Kaitlin Minkler (*pro hac vice*)
                                                SCHLICHTER BOGARD LLC
                                                100 South Fourth Street, Suite 1200
                                                St. Louis, MO 63102
                                                (314) 621-6115
                                                (314) 621-5934 (fax)
                                                aschlichter@uselaws.com
                                                abraitberg@uselaws.com
                                                pkutz@uselaws.com
                                                kminkler@uselaws.com

                                                Ruben R. Chapa (*pro hac vice*)
                                                SCHLICHTER BOGARD LLC
                                                33 North Dearborn Street, Suite 1170
                                                Chicago, IL 60602
                                                (630) 919-9301
                                                (314) 621-5934 (fax)
                                                rchapa@uselaws.com

                                                *Attorneys for Plaintiffs*

---

[7] While Plaintiffs' existing allegations are sufficient, Defendants' request for a dismissal with prejudice is improper for the reasons discussed. *See supra*, p. 2.

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(c), I hereby certify that this brief complies with the word limit established by this Court. This brief contains exactly 6,973 words, as counted by Microsoft Word, the processing program used to prepare the document. In accordance with Rule 7.1(c), this word count excludes the caption, table of contents, table of authorities, signature blocks, and required certificate.

/s/ Andrew D. Schlichter
Andrew D. Schlichter

23